# EXHIBIT A

**SUM-100**

## SUMMONS
### (CITACION JUDICIAL)



FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)
CENTRAL DIVISION

18 SEP 21 PM 5:3

SUPERIOR COURT
SAN DIEGO COUNTY, CA

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

FAIR ISAAC CORPORATION, dba FICO, an unknown business entity;
and DOES 1-25, Inclusive.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
JOHN M. GARON, an individual
Martin

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.
  You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
  There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*
  *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*
  *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: | CASE NUMBER: *(Número del Caso):* |
|---|---|
| *(El nombre y dirección de la corte es):* Superior Court of California, County of SD<br>330 W. Broadway San Diego CA 92101 | 37-2018-00047800-CU-OE-CTL |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Josh D. Gruenberg 2155 First Avenue, San Diego, CA 92101 (619) 230-1234

| DATE: 9/20/2018 *(Fecha)* | SEP 2 1 2018 | Clerk, by *(Secretaria)* | C. Hines | , Deputy *(Adjunto)* |
|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* Fair Isaac Corporation dba FICO, an unknown business entity

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)          ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
   ☒ other *(specify):* an unknown business entity
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |
|---|---|---|

Ex A
Page 5

Joshua D. Gruenberg (163281)
Daphne Delvaux (292345)
Aisling S. Gilliland (163321)
GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-3542
TELEPHONE: (619) 230-1234
TELE COPIER: (619) 230-1074

Attorneys for Plaintiff
**JOHN MARTIN GARON**

18 SEP 21  PM 3: 53

SUPERIOR COURT
SAN DIEGO COUNTY, CA

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SAN DIEGO, CENTRAL DIVISION

JOHN MARTIN GARON, an individual,

Plaintiff,

v.

FAIR ISAAC CORPORATION, dba FICO, an unknown entity; and DOES 1 through 25, Inclusive,

Defendants.

Case No.: **37-2018-00047800-CU-OE-CTL**

PLAINTIFF'S COMPLAINT FOR:

1. RETALIATION [Cal. Gov't Code § 12940(h)];
2. RETALIATION BASED ON USE OF MEDICAL LEAVE [Cal. Gov't Code §12945.2(l)];
3. DISABILITY-BASED ASSOCIATIONAL DISCRIMINATION [Cal. Gov't Code §12926(o)];
4. FAILURE TO PREVENT DISCRIMINATION AND RETALIATION [Cal. Gov't Code § 12940(k)];
5. NEGLIGENT SUPERVISION;
6. WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY [Cal. Bus. & Prof. Code § 17200];
7. RETALIATION [Cal. Lab. Code §1102.5];
8. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**[JURY TRIAL DEMANDED]**

///
///

1
PLAINTIFF'S COMPLAINT

Ex A
Page 6

COMES NOW THE PLAINTIFF, alleging against Defendant as follows:

### GENERAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

1. Plaintiff JOHN MARTIN GARON (hereinafter "Plaintiff") is, and at all times herein mentioned was, a resident of the County of San Diego in the State of California.

2. Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, Defendant FAIR ISAACS CORPORATION, dba FICO, is at all times relevant was headquartered in San Jose, California, doing significant business in San Diego, California and is subject to suit under the California Fair Employment and Housing Act (FEHA), California Government Code § 12940 et seq.

3. Plaintiff is ignorant to the true names and capacities of the Defendants sued herein as DOES 1 through 25 and therefore sues these Defendants by such fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities when ascertained.

4. Plaintiff is informed and believes and thereon alleges that each fictitiously named Defendants are responsible in some manner for the occurrences herein alleged, and Plaintiff's injuries and damages as herein alleged are directly, proximately and/or legally caused by Defendants.

5. Plaintiff is informed and believes and thereon alleges that the aforementioned DOES are somehow responsible for the acts alleged herein as the agents, employers, representatives or employees of other named Defendants, and in doing the acts herein alleged were acting within the scope of their agency, employment or representative capacity of said named Defendants and are therefore responsible for the acts complained of herein.

6. Defendants had actual and constructive knowledge of the tortious acts and omissions alleged and thereafter ratified said conduct by failing to reprimand or terminate.

7. The actions of Defendants, and each of them, against Plaintiff constitute unlawful employment practices in violation of public policy, and have caused, and will continue to cause, Plaintiff loss of future earnings and employment.

///

8.  At all times mentioned herein, California Government Code section 12945.2, et seq., was in full force and effect and was binding on Defendants.

9.  Defendants' actions against Plaintiff constitute unlawful employment practices in violation of multiple sections of California Government Code section 12945.2 et seq., as herein alleged and have caused, and will continue to cause, Plaintiff loss of earnings.

10. At all times mentioned herein, California Government Code section 12940, et seq., was in full force and effect and was binding on Defendants.

11. Defendants' actions against Plaintiff constitute unlawful employment practices in violation of multiple sections of California Government Code section 12940 et seq., as herein alleged and have caused, and will continued to cause, Plaintiff loss of earnings.

12. At all times mentioned herein, California Business and Professions Code section 17200 et seq., was in full force and effect and was binding on Defendants.

13. Defendants' actions against Plaintiff constitute unlawful employment practices in violation of multiple sections of California Business and Professions Code section 17200 et seq., as herein alleged, and have caused, and will continue to cause, Plaintiff loss of earnings.

14. Defendants, and each of them, committed the acts alleged herein maliciously, fraudulently, and oppressively, and with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice or despicable conduct. Alternatively, Defendants' wrongful conduct was carried out with a conscious disregard for Plaintiff's rights.

15. Defendants' conduct warrants the assessment of punitive damages in an amount sufficient to punish Defendants and deter others from engaging in similar conduct.

16. Plaintiff seeks compensatory damages, punitive damages, costs of suit herein, and attorney fees as a result of the wrongdoing alleged herein.

17. Plaintiff filed a complaint with the California Department of Fair Employment and Housing on September 20, 2018, and thereafter received a "Right to Sue" letter from the DFEH, which is attached hereto as Exhibit "A."

1

## SPECIFIC FACTUAL ALLEGATIONS

2   18.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in the
3           preceding paragraphs as though fully set forth herein.
4   19.   In or about January of 1997, Plaintiff was hired by Hecht-Nielson Neural Computing
5           ("HNC") as an Application Engineer working to deploy software, develop and test code and
6           develop prototypes in cities across the United States and Canada.
7   20.   In or about April of 2002, Defendant FICO acquired HNC, and Plaintiff became an
8           employee of FICO.
9   21.   For the next sixteen (16) years, Plaintiff was an exemplary employee, winning awards and
10          earning promotions. Specifically, in January of 2004, Plaintiff was part of a small team that
11          won an award for completing the early delivery of a subsystem on a $10 million project.
12  22.   In the twenty (20) years that Plaintiff worked for Defendant FICO and its predecessor,
13          Plaintiff's technical skills and expertise were superior.
14  23.   In or about 2006 or 2007, Plaintiff became the Manager of Capstone Product Support where
15          he was constantly relied upon by FICO to put out fires for the Capstone product and resolve
16          major technological issues.
17  24.   In or about 2008, Plaintiff became Lead Engineer.
18  25.   In 2010, Plaintiff started working with Insurance Fraud Manager, ("IFM"). In 2012, FICO's
19          CEO announced to the San Diego office that IFM would become FICO's flagship product.
20  26.   In or about January of 2013, Plaintiff was transferred to Product Operations for IFM. At this
21          time, IFM was no longer targeted to become FICO's flagship product. The offshore
22          development of IFM had a number of logistical and technological hurdles to clear. One of
23          the challenges was that offshore engineers did not have access to live HIPAA data. All
24          HIPAA data had to be de-identified before being made available to offshore engineers.
25  27.   In March of 2014, Plaintiff led an extremely successful, long-awaited IFM upgrade.
26  28.   In 2015, Plaintiff was frequently "on call" as FICO moved it operations hub from Minnesota
27          to San Diego. This move resulted in a major workload increase for Plaintiff who was
28

1    required to be near his laptop addressing emergencies and system failures on a near constant

2    basis. At this time, FICO Product Operations lost many talented engineers as a result of the

3    demanding workload.

4    29.  Nonetheless, during this chaotic time for FICO, and while Plaintiff was working on call

5    around the clock, Plaintiff accomplished getting a significant IFM upgrade up and running,

6    which his supervisor, Robert Cunningham, called a "miracle."

7    30.  In or about mid-2016, Plaintiff received a $25,000 retention bonus from FICO. FICO paid

8    Plaintiff this bonus because they so needed Plaintiff's dedication, skills and expertise. FICO

9    wanted to make sure Plaintiff did not leave the company.

10   31.  Also in 2016, Plaintiff learned that there was an increasing likelihood that FICO would

11   offshore IFM product operations despite the fact that the de-identification of HIPAA

12   information had not yet been accomplished. When Plaintiff told Andrea Allmon, former

13   product manager for IFM, about this impending change, she responded, "That would

14   literally take an act of Congress" because HIPAA data cannot be handled by anyone outside

15   of the United States.

16   32.  In February of 2017, Plaintiff's father was diagnosed with pancreatic cancer. Plaintiff's

17   father's prognosis was grim. His physicians estimated he had three to six months to live. In

18   addition to needing care and transportation, Plaintiff's father, who had lived with Plaintiff

19   since 2008, presented a serious fall risk, and Plaintiff had to catch his father twice from

20   falling during a very short period.

21   33.  Because Plaintiff needed to care for his terminally ill father, in or about April 2017, Plaintiff

22   went on Family Medical Leave.

23   34.  In mid-July, Plaintiff's supervisor, Reef Baskerville, contacted Plaintiff to enquire when

24   Plaintiff would be returning to work. Plaintiff advised Baskerville he would be back at work

25   on July 20, 2017. Baskerville immediately sent out a meeting request for Plaintiff to meet

26   with him at 10:00 a.m. on July 20, 2017.

27   ///

28

35. The morning of July 20, 2017 did not go as planned for Plaintiff, and he was required to administer to his gravely ill father. Plaintiff advised Baskerville he would be fifteen minutes late for their meeting. Baskerville told Plaintiff not to bother, that he would be "too busy" to meet with Plaintiff. Immediately upon returning to work on July 20, 2017, Plaintiff felt that his work place atmosphere had changed. Baskerville was openly hostile, refusing to meet with Plaintiff despite Plaintiff's numerous efforts to re-accomplish the return meeting.

36. As part of his pervasive discriminatory and retaliatory demeanor toward Plaintiff, Baskerville did not agree to meet with Plaintiff again until July 24, 2017. Baskerville began the meeting with, "First of all, are you ready to come back to work because we've gone seventy-five miles down the road since you left," implying that Plaintiff had been left behind as a result of his taking FMLA. Baskerville also advised Plaintiff that punctuality would now be monitored along with productivity. This was not the case for Plaintiff prior to his taking Family Medical Leave. Baskerville further told Plaintiff he would need to become a subject matter expert ("SME") on all hosted products.

37. Also during the July 24, 2017 meeting, Baskerville advised Plaintiff of another change occurring at FICO. He informed Plaintiff that maintenance work for IFM was now being performed by offshore engineers in Bangalore and the United Kingdom. Plaintiff felt that preventing off-shore personnel from seeing United States health data was an obstacle that had not been addressed by FICO during Plaintiff's leave. Without this obstacle having been cleared, the use of offshore personnel amounted to a potential HIPAA violation and a breach of client contracts.

38. Plaintiff responded by expressing his concern that the offshore arrangement presented a potential HIPAA violation and further, violated client contracts, which specified that no offshore personnel could be used. For example, Kaiser Permanente required background checks for all persons touching Kaiser data.

39. Baskerville responded with hostility to Plaintiff's ongoing concerns telling him that the issue had "already been decided" and that the offshore arrangement was "none of [Plaintiff's]

business." Plaintiff had serious reservations about sending operation support offshore because it was inconsistent with the information he had previously received on the topic of offshoring HIPAA data.

40. Throughout the summer of 2017, the atmosphere at FICO became increasingly hostile toward Plaintiff. Baskerville was continually critical and antagonistic to Plaintiff. For example, if Plaintiff was required to attend an appointment with his father, Baskerville would tell Plaintiff, "don't bother coming in."

41. In July of 2017, although Plaintiff was entitled to a new upgraded phone, his request for a new phone was continually delayed. Baskerville essentially sabotaged Plaintiff's ability to perform his work tasks by denying him the equipment he needed. In or about November of 2017, Plaintiff's request for a phone was declined when Neil Hartley said, "We don't know if Johnny will be around to use the phone." Only after Plaintiff documented his need, request and subsequent delay did Plaintiff finally received his new phone five (5) months later.

42. Starting in September of 2017, Baskerville instructed Plaintiff to no longer meet with other team members and subject matter experts ("SME") to cross-train products. Some of these SME's were off-shore engineers. Given that these meetings resulted in more employees having familiarity and expertise with FICO's products, this measure was counter-productive and designed to punish and alienate Plaintiff from fellow experts. Baskerville came to Plaintiff's cubicle, directed Plaintiff to clear his calendar of SME meetings and stood over him while he did so.

43. In or about September 2017, Defendant further discriminated and retaliated against Plaintiff because of his medical leave and his association with his father, as well as his complaints about FICO's unlawful conduct. On or about September 21, 2017, Baskerville requested a meeting during which Lorraine Breithbart from HR was on the phone. During this meeting, Plaintiff was shocked to receive a Performance Improvement Plan ("PIP"). The PIP gave Plaintiff a performance rating of "poor." The PIP raised no concerns about Plaintiff's skills.

Rather, the PIP focused on a number of "tardies," or days Plaintiff was late for work, and Plaintiff working three (3) days from home.

44. Plaintiff objected to Baskerville and Breithbart regarding the tardies and absences and expressed his feeling the numbers were inflated. In response, Breithbart and Baskerville agreed the number of absences may have been incorrect, corroborating that the PIP was unjustified and therefore retaliatory.

45. In truth, there was no legitimate basis for the PIP. The PIP was, in effect, retaliation for Plaintiff taking Family Medical Leave to which he was legally entitled and an attempt to force Plaintiff to comply with the offshore process of IFM, which he believed to be both illegal and unethical. Plaintiff was stunned and disappointed to receive the PIP. About this time, Plaintiff expressed his concerns to Breithbart that the PIP was a response to Plaintiff taking his legally entitled Family Medical Leave.

46. On or about September 22, 2017, Plaintiff had a post-PIP follow-up meeting with Breithbart during which Plaintiff expressed to Breithbart that his relationship with Baskerville had deteriorated significantly since Plaintiff returned from FMLA. Plaintiff expressed to Breithbart his belief that Baskerville was unhappy with Plaintiff for taking FMLA and that Baskerville was retaliating against him.

47. Breithbart dismissed Plaintiff's concerns and advised Plaintiff that FMLA only guarantees an employee will have a job when he returns from leave.

48. During the September 22, 2017 meeting, Plaintiff additionally told Breithbart that he objected to the allegation contained in the PIP that he failed "to follow processes and procedures." Ironically, Baskerville's instruction that Plaintiff cease training off-shore personnel had become the subject of a Performance Improvement Plan targeted at Plaintiff. This was also a reference to Plaintiff's unwillingness to violate HIPAA requirements with the IFM product as well as client contracts by pushing for offshore maintenance. Accordingly, Defendant explicitly instructed Plaintiff to violate the law, which Plaintiff refused to do. Again, Baskerville brushed Plaintiff's concerns aside.

49.  From about September 21, 2017 through April 12, 2018, although the issues raised in the PIP were resolved within two-weeks, Plaintiff had weekly meetings with Baskerville during which Baskerville was openly hostile, belittling and chastising Plaintiff at every opportunity. Baskerville began falsely accusing Plaintiff of misrepresenting how Plaintiff spent his time at work, and the more Plaintiff tried to correct Baskerville or defend himself, the more Baskerville would accuse Plaintiff of lying.

50.  In October of 2017, Plaintiff requested he be permitted to complete training and become AWS certified. Baskerville told Plaintiff to worry about his PIP and denied Plaintiff the opportunity to receive additional training in retaliation for Plaintiff taking FMLA and objecting to the utilization of offshore maintenance.

51.  In about October of 2017, Plaintiff felt increasingly uncomfortable with the PIP requirements that he push IFM work offshore. Plaintiff felt compelled to call the FICO whistleblower hotline. Plaintiff was very worried about his job. He asked the hotline where his report would go once he completed it. The hotline advised Plaintiff that it would be sent to Human Resources.

52.  Realizing that a report to Human Resources would quickly escalate, Plaintiff decided to speak with Allyn Pon, the IFM Product Manager first. After asking Plaintiff to wait a couple of weeks before blowing the whistle, Pon eventually told Plaintiff he should go ahead and call back the FICO whistleblower hotline.

53.  Given the hostile environment Plaintiff had already been facing, he was seriously concerned about his job security. Plaintiff was afraid he would be further retaliated against if he blew the whistle on the offshore assignments.

54.  Instead of immediately calling the hotline, Plaintiff sought advice from his friend and former IFM Product Manager. She advised Plaintiff that the issue was really for Pon to address. Fearing he could lose his job, Plaintiff backed down and didn't call the hotline back.

55.  Also in October of 2017, Plaintiff expressed his concerns regarding his job security to Baskerville. Baskerville did not reassure Plaintiff that his job was secure.

56. In or about November of 2017, given Plaintiff's skill level and expertise, he inherited a number of new responsibilities, including operational support for two additional products, including Scorecard Pro and Decision Tree Pro, two of FICO's legacy tools designed to enable customers to evaluate, customize, deploy and scale state-of-the-art analytics and decision management solutions.

57. On December 6, 2017, Plaintiff's father passed away. Plaintiff took one week of approved bereavement leave.

58. In or about March of 2018, Plaintiff was considered for a new position with Robert Leider whom Plaintiff had known for about fifteen years. Plaintiff and Leider agreed Plaintiff was a great fit for the job which offered Plaintiff a much-needed change of pace and a hostility-free environment. Unfortunately, Plaintiff was ultimately denied the position because of the September 2017 PIP. Defendant's retaliatory actions had caused Plaintiff to lose out on opportunities for professional advancement and potential financial gain.

59. At this same time, Plaintiff learned that FICO's service provider at its data center in San Francisco was leaving. This departure had the potential to seriously disrupt FICO operations for Scorecard Pro and Decision Tree Pro.

60. Given Plaintiff's advanced skillset and work ethic, Baskerville turned to Plaintiff to "find a way" to ensure there were no operational interruptions through the departure. This is a very difficult task. Plaintiff took one day to find a workable solution and an additional day to write a full report. Plaintiff made the transition as seamless as Baskerville had hoped.

61. On or about April 8, 2018, Plaintiff expressed increased concern over the offshore maintenance for IFM. At one point, Plaintiff commented to an offshore engineer that the requested changes to a client's hosted IFM environment should not be performed by offshore engineers because they are not allowed access to client data.

62. Plaintiff is informed and believes that this remark was communicated back to Baskerville.

63. On or about April 12, 2018, Plaintiff's worst fear came true: Baskerville terminated Plaintiff, escorted him off the FICO property and forced him to leave behind his personal

effects, including his personal collection of technological books.

64.   In between FICO giving Plaintiff a $25,000 retention bonus not to leave the company in mid-2016 and Plaintiff's termination in April of 2018, two significant things happened: Plaintiff went on legally entitled Family Medical Leave, and Plaintiff objected to the illegal and unethical offshore maintenance utilized by FICO.   Defendant wrongfully terminated Plaintiff in direct retaliation for these two events.

65.   Plaintiff invested over twenty years of his life and most of his career in Defendant FICO. When FICO and Baskerville began demeaning, disparaging and belittling Plaintiff upon his return from Family Medical Leave, as described above, Plaintiff was confused and extremely distraught.  Plaintiff was haunted and tormented by the September 2017 unsubstantiated PIP throughout his remaining days at FICO.

## FIRST CAUSE OF ACTION

## RETALIATION

## [Cal. Gov't Code § 12940(h)]

66.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

67.   Plaintiff performed work for Defendant, as an employee, as stated herein.

68.   From July 2017 through April 2018, Defendant retaliated against Plaintiff, up to and including terminating his employment, as a direct and proximate result of his association with his terminally father and taking legally entitled Family Medical Leave

69.   Plaintiff believes and thereon alleges that his association with his terminally ill father, coupled with his availing himself of Family Medical Leave to which he was legally entitled, was a substantial motivating reason for Defendant's retaliation and his termination.

70.   As a direct, foreseeable, and proximate result of Defendant's conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and Plaintiff has suffered other economic losses in an amount to be determined at time of trial.  Plaintiff has sought to mitigate these damages.

71. As a direct, foreseeable, and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to his damage in a sum to be established according to proof.

72. As a result of Defendant's deliberate, outrageous, despicable conduct, Plaintiff is entitled to recover punitive and exemplary damages in an amount commensurate with Defendant's wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

73. In addition to such other damages as may properly be recovered herein, Plaintiff is entitled to recover prevailing party attorney's fees pursuant to Government Code section 12965(b).

## SECOND CAUSE OF ACTION

## RETALIATION BASED ON USE OF FAMILY MEDICAL LEAVE

### [Cal. Gov't Code § 12945.2]

74. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

75. At all times mentioned herein, California Government Code section 12945.2 et seq. was in full force and effect and was binding on Defendant. This section provides that it is unlawful for Defendant, as an employer, to deny an employee use of Family Care Medical Leave.

76. Plaintiff was eligible for and requested Family Medical Leave.

77. Defendant, by and through its employees and agents, engaged in conduct that, taken as a whole, materially and adversely affected the terms and conditions of Plaintiff's employment, as stated herein, including terminating Plaintiff's employment.

78. Plaintiff believes and thereon alleges that his use of medical leave for his father's serious health condition was a substantial motivating reason for Defendant engaging in conduct that, taken as a whole, materially and adversely affected the terms and conditions of Plaintiff's employment, up to and including terminating Plaintiff's employment.

79. As a direct, foreseeable, and proximate result of Defendant's conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment

///

1   opportunities, and Plaintiff has suffered other economic losses in an amount to be

2   determined at time of trial.  Plaintiff has sought to mitigate these damages.

3   80.   As a direct, foreseeable, and proximate result of Defendant's conduct, Plaintiff has suffered

4         and continues to suffer humiliation, emotional distress, loss of reputation, and mental and

5         physical pain and anguish, all to his damage in a sum to be established according to proof.

6   81.   As a result of Defendant's deliberate, outrageous, despicable conduct, Plaintiff is entitled to

7         recover punitive and exemplary damages in an amount commensurate with Defendant's

8         wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

9   82.   In addition to such other damages as may properly be recovered herein, Plaintiff is entitled

10        to recover prevailing party attorney fees pursuant to California Government Code section

11        12965.

12                              **THIRD CAUSE OF ACTION**

13              **DISABILITY-BASED ASSOCIATIONAL DISCRIMINATION**

14                          **[Cal. Gov't Code §12926(o)]**

15  83.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in the

16        preceding paragraphs as though fully set forth herein.

17  84.   At all times mentioned herein, California Government Code section 12926(o) was in full

18        force and effect and was binding on Defendant. This section provides that a physical

19        disability includes "a perception that . . . the person is associated with a person who has, or

20        is perceived to have, any of those characteristics."

21  85.   Plaintiff performed work for Defendant, as an employee, as stated herein.

22  86.   Plaintiff's father was diagnosed with pancreatic cancer, became a fall risk and required

23        attention, care and transportation.

24  87.   Defendant and its supervisory employees knew of Plaintiff's father's severe illness.

25  88.   Defendant and its supervisory employees subjected Plaintiff to adverse employment actions,

26        harassment and hostility and ultimately terminated his employment.

27  ///

28

89. Plaintiff's association with his father was the substantial motivating reason for Defendant's decision to take adverse employment actions against Plaintiff including terminating Plaintiff's employment.

90. As a direct, foreseeable, and proximate result of Defendant's conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and Plaintiff has suffered other economic losses in an amount to be determined at time of trial. Plaintiff has sought to mitigate these damages.

91. As a direct, foreseeable, and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to his damage in a sum to be established according to proof.

92. As a result of Defendant's deliberate, outrageous, despicable conduct, Plaintiff is entitled to recover punitive and exemplary damages in an amount commensurate with Defendant's wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

93. Plaintiff has incurred and continues to incur legal expenses and attorney fees.

94. In addition to such other damages as may properly be recovered herein, Plaintiff is entitled to recover prevailing party attorney fees and costs pursuant to California Government Code section 12965.

## FOURTH CAUSE OF ACTION
## FAILURE TO PREVENT DISCRIMINATION AND RETALIATION
### [Cal. Gov't Code § 12940(k)]

95. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

96. At all times relevant herein, Plaintiff was employed by Defendants.

97. Plaintiff was subjected to discrimination and retaliation in the course of his employment for availing himself of his family medical leave to which he was legally entitled.

98. Defendant's failure to take reasonable steps to prevent the discrimination and retaliation was a substantial factor in causing Plaintiff's harm.

99. As a direct, foreseeable, and proximate result of Defendant's conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and Plaintiff has suffered other economic losses in an amount to be determined at time of trial.  Plaintiff has sought to mitigate these damages.

100. As a direct, foreseeable, and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to his damage in a sum to be established according to proof.

101. As a result of Defendant's deliberate, outrageous, despicable conduct, Plaintiff is entitled to recover punitive and exemplary damages in an amount commensurate with Defendant's wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

## FIFTH CAUSE OF ACTION

## NEGLIGENT SUPERVISION

102. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

103. Plaintiff performed worked for Defendants, as an employee, as stated herein.

104. Defendant's management-level employees discriminated against Plaintiff on the basis of Plaintiff's father's medical conditions.

105. Defendant's management-level employees were incompetent and retaliated against Plaintiff for his use of Family Medical Leave.

106. Defendant knew or should have known of the employees' discrimination and retaliation.

107. Defendant failed to correct the unlawful and unethical conduct of its employees.

108. As a direct, foreseeable, and proximate result of Defendant's conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and Plaintiff has suffered other economic losses in an amount to be determined at time of trial.  Plaintiff has sought to mitigate these damages.

///

///

109.  As a direct, foreseeable, and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to his damage in a sum to be established according to proof.

110.  In addition to such other damages as may properly be recovered herein, Plaintiff is entitled to recover prevailing party attorney fees.

## SIXTH CAUSE OF ACTION

## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

### [Cal. Bus. & Prof. Code §17200]

111.  Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

112.  Plaintiff performed work for Defendants as an employee, as stated herein.

113.  Defendant FICO wrongfully terminated Plaintiff's employment.

114.  Plaintiff believes and thereon alleges that his voiced opposition to Defendant's unfair and illegal business practices, including Defendant's use of off-shore engineers, which constituted a HIPAA violation, was a substantial motivating reason for his termination.

115.  Plaintiff had a good faith belief that Defendant's conduct, including but not limited to, Defendants' use of off-shore engineers, was in violation of HIPAA and was inconsistent with the terms of Defendant's contracts with its clients.

116.  Defendant's conduct in terminating Plaintiff's employment on the basis of his opposition to Defendant's unfair and unethical business practices violated the public policy of HIPAA which is designed to protect the privacy of medical patients, as well as the public policy of the State of California embodied in the California Business and Professions Code section 17220, et seq., in violation of California law pursuant to *City of Moorpark v. Sup.Ct.* (1998) 18 Cal.4th 1143.

117.  As a direct, foreseeable, and proximate result of Defendant's conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment

///

opportunities, and Plaintiff has suffered other economic losses in an amount to be
determined at time of trial. Plaintiff has sought to mitigate these damages.

118. As a direct, foreseeable, and proximate result of Defendant's conduct, Plaintiff has suffered
and continues to suffer humiliation, emotional distress, loss of reputation, and mental and
physical pain and anguish, all to his damage in a sum to be established according to proof.

119. As a result of Defendant's deliberate, outrageous, despicable conduct, Plaintiff is entitled to
recover punitive and exemplary damages in an amount commensurate with Defendant's
wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

120. In addition to such other damages as may properly be recovered herein, Plaintiff is entitled
to recover prevailing party's attorneys' fees

## SEVENTH CAUSE OF ACTION

### RETALIATION

### [Cal. Lab. Code § 1102.5]

121. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the
preceding paragraphs as though fully set forth herein.

122. Plaintiff performed work for Defendant, as an employee, as stated herein.

123. Defendant discharged Plaintiff in retaliation for his complaints of Defendant's unlawful
activities concerning the transfer of maintenance to off-shore engineers and the exposure of
client's private information to employees whose backgrounds had not been checked or
verified.

124. Plaintiff's complaints were a substantial motivating factor in Defendant's decision to
discharge Plaintiff.

125. As a direct, foreseeable and proximate result of Defendant's conduct, Plaintiff sustained and
continues to sustain substantial losses in earnings, employment benefits, employment
opportunities, and Plaintiff has suffered other economic losses in an amount to be
determined at time of trial. Plaintiff has sought to mitigate these damages.

///

126.  As a direct, foreseeable and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to his damage in a sum to be established according to proof.

127.  As a result of Defendant's deliberate, outrageous, despicable conduct, Plaintiff is entitled to recover punitive and exemplary damages in an amount commensurate with Defendant's wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

128.  In addition to such other damages as may properly be recovered herein, Plaintiff is entitled to recover prevailing party's attorneys' fees.

## EIGHTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

129.  Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

130.  Defendants intended to cause Plaintiff to suffer extreme emotional distress. Plaintiff did suffer extreme emotional distress as a result of Defendants' actions.

131.  As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings and other employment benefits and opportunities. Plaintiff has sought to mitigate these damages.

132.  As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to his damage in a sum to be established according to proof.

WHEREFORE, Plaintiff prays for the following relief:

1.  For general and compensatory damages in an amount according to proof;

2.  For punitive damages in an amount necessary to make an example of and to punish Defendants, and to deter future similar misconduct;

3.  For cumulative damages pursuant to California Business and Professions Code section 17205;

3.  For mental and emotional distress damages;

4.  For back pay, front pay and other monetary relief;

5.  For an award of interest at the prevailing legal rate, as permitted by law;

6.  For costs of suit, including attorney's fees as permitted by law, including those available pursuant to California Government Code section12965(b), and California Code of Civil Procedure section 1021.5;

7.  For an award of interest, including prejudgment interest, at the legal rate as permitted by law;

8.  For such other and further relief as the Court deems proper and just under all the Circumstances.

**PLAINTIFF JOHN MARTIN GARON** demands a jury trial on all issues in this case.

DATED: September 20, 2018          GRUENBERG LAW

JOSHUA D. GRUENBERG
DAPHNE DELVAUX
AISLING S. GILLILAND
Attorneys for Plaintiff
**JOHN MARTIN GARON**

1

## EXHIBIT "A"

2

3

(1)   PLAINTIFF JOHN MARTIN GARON'S DFEH COMPLAINT

4

(2)   PLAINTIFF JOHN MARTIN GARON'S RIGHT TO SUE LETTER

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   **COMPLAINT OF EMPLOYMENT DISCRIMINATION**
    **BEFORE THE STATE OF CALIFORNIA**
2   **DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING**
    **Under the California Fair Employment and Housing Act**
3   **(Gov. Code, § 12900 et seq.)**

4
    **In the Matter of the Complaint of**
5   John Garon                                    DFEH No. 201809-03619620

6                        Complainant,

7   vs.

8   Fair Isaac Corporation
    3661 Valley Centre Drive Suite 500
9   San Diego, California 92130

10                    Respondents

11  _____

12  1. Respondent **Fair Isaac Corporation** is an **employer** subject to suit under the
    California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).
13

14  2. Complainant **John Garon**, resides in the City of **San Diego** State of **California.**

15  3. Complainant alleges that on or about **April 12, 2018**, respondent took the
    following adverse actions:
16

17  **Complainant was discriminated against** because of complainant's family care or
    medical leave (cfra) (employers of 50 or more people), association with someone of
18  a protected class and as a result of the discrimination was terminated, reprimanded,
    denied a work environment free of discrimination and/or retaliation, denied work
19  opportunities or assignments.

20  **Complainant experienced retaliation** because complainant reported or resisted
    any form of discrimination or harassment, requested or used california family rights
21  act or fmla and as a result was terminated, reprimanded, denied or forced transfer,
    denied a work environment free of discrimination and/or retaliation, denied any
22  employment benefit or privilege, failed to give equal considerations in making
23  employment decisions.

24
    **Additional Complaint Details:** In or about April of 2002, Complainant became an
25  employee of FICO.

26
                                    -1-
27  _____
                    *Complaint – DFEH No. 201809-03619620*

28  Date Filed: September 20, 2018

For the next sixteen (16) years, Complainant was an exemplary employee, winning awards and earning promotions. In 2016, Complainant learned that there was an increasing likelihood that FICO would offshore IFM product operations despite the fact that the de-identification of HIPAA information had not been accomplished. Legally and contractually, HIPAA data cannot be handled by anyone outside of the United States.

In February of 2017, Complainant's father was diagnosed with pancreatic cancer. Complainant's father's prognosis was grim. His physicians estimated he had three to six months to live. In addition to needing care and transportation, Complainant's father, who had lived with Complainant since 2008, presented a serious fall risk, and Complainant had to catch his father twice from falling during a very short period. Because Complainant needed to care for his terminally ill father, in or about April 2017, Complainant went on Family Medical Leave.

Immediately upon returning to work on July 20, 2017, Complainant felt that his work place atmosphere had changed. Baskerville was openly hostile, refusing to meet with Complainant despite Complainant's numerous efforts to re-accomplish the return meeting.

As part of his pervasive discriminatory and retaliatory demeanor toward Complainant, Baskerville did not agree to meet with Complainant again until July 24, 2017. Baskerville began the meeting with, "First of all, are you ready to come back to work because we've gone seventy-five miles down the road since you left," implying that Complainant had been left behind as a result of his taking FMLA. Baskerville also advised Complainant that punctuality would now be monitored along with productivity. This was not the case for Complainant prior to his taking Family Medical Leave.

Also during the July 24, 2017 meeting, Baskerville advised Complainant of another change occurring at FICO. He informed Complainant that maintenance work for IFM was now being performed by offshore engineers in Bangalore and the United Kingdom. Complainant felt that preventing off-shore personnel from seeing United States health data was an obstacle that had not been addressed by FICO during Complainant's leave. Without this obstacle having been cleared, the use of offshore personnel amounted to a potential HIPAA violation and a breach of client contracts.

Complainant responded by expressing his concern that the offshore arrangement presented a potential HIPAA violation and further, violated client contracts, which specified that no offshore personnel could be used. For example, Kaiser Permanente required background checks for all persons touching Kaiser data. Baskerville responded with hostility to Complainant's ongoing concerns telling him that the issue had "already been decided" and that the offshore arrangement was "none of [Complainant's] business." Complainant had serious reservations about sending operation support offshore because it was inconsistent with the information he had previously received on the topic of offshoring HIPAA data.

Date Filed: September 20, 2018

1  Throughout the summer of 2017, the atmosphere at FICO became
increasingly hostile toward Complainant. Baskerville was continually critical and
2  antagonistic to Complainant. For example, if Complainant was required to attend an
appointment with his father, Baskerville would tell Complainant, "don't bother coming
3  in."

4  Starting in September of 2017, Baskerville instructed Complainant to no
longer meet with other team members and subject matter experts ("SME") to cross-
5  train products. Some of these SME's were off-shore engineers. Given that these
meetings resulted in more employees having familiarity and expertise with FICO's
6  products, this measure was counter-productive and designed to punish and alienate
Complainant from fellow experts. Baskerville came to Complainant's cubicle,
7  directed Complainant to clear his calendar of SME meetings and stood over him
8  while he did so.

9  In or about September 2017, Respondent further discriminated and retaliated
against Complainant because of his medical leave and his association with his
10  father, as well as his complaints about FICO's unlawful conduct. On or about
September 21, 2017, Baskerville requested a meeting during which Lorraine
11  Breithbart from HR was on the phone. During this meeting, Complainant was
shocked to receive a Performance Improvement Plan ("PIP"). The PIP gave
12  Complainant a performance rating of "poor." The PIP raised no concerns about
Complainant's skills. Rather, the PIP focused on a number of "tardies," or days
13  Complainant was late for work, and Complainant working three (3) days from home.

14  Complainant objected to Baskerville and Breithbart regarding the tardies and
absences and expressed his feeling the numbers were inflated. In response,
15  Breithbart and Baskerville agreed the number of absences may have been incorrect,
corroborating that the PIP was unjustified and therefore retaliatory.

16  In truth, there was no legitimate basis for the PIP. The PIP was, in effect,
retaliation for Complainant taking Family Medical Leave to which he was legally
17  entitled and an attempt to force Complainant to comply with the offshore process of
IFM, which he believed to be both illegal and unethical. Complainant was stunned
18  and disappointed to receive the PIP. About this time, Complainant expressed his
19  concerns to Breithbart that the PIP was a response to Complainant taking his legally
entitled Family Medical Leave.

20  On or about September 22, 2017, Complainant had a post-PIP follow-up
meeting with Breithbart during which Complainant expressed to Breithbart that his
21  relationship with Baskerville had deteriorated significantly since Complainant
returned from FMLA. Complainant expressed to Breithbart his belief that Baskerville
22  was unhappy with Complainant for taking FMLA and that Baskerville was retaliating
against him. Breithbart dismissed Complainant's concerns and advised Complainant
23  that FMLA only guarantees an employee will have a job when he returns from leave.

24  During the September 22, 2017 meeting, Complainant additionally told
Breithbart that he objected to the allegation contained in the PIP that he failed "to
25  follow processes and procedures." Ironically, Baskerville's instruction that

26

27  -3-
*Complaint – DFEH No. 201809-03619620*

28  Date Filed: September 20, 2018

Ex A
Page 28

1  Complainant cease training off-shore personnel had become the subject of a
   Performance Improvement Plan targeted at Complainant. This was also a reference
2  to Complainant's unwillingness to violate HIPAA requirements with the IFM product
   as well as client contracts by pushing for offshore maintenance. Accordingly,
3  Respondent explicitly instructed Complainant to violate the law, which Complainant
4  refused to do. Again, Baskerville brushed Complainant's concerns aside.
         From about September 21, 2017 through April 12, 2018, although the issues
5  raised in the PIP were resolved within two-weeks, Complainant had weekly meetings
   with Baskerville during which Baskerville was openly hostile, belittling and chastising
6  Complainant at every opportunity. Baskerville began falsely accusing Complainant
7  of misrepresenting how Complainant spent his time at work, and the more
   Complainant tried to correct Baskerville or defend himself, the more Baskerville
8  would accuse Complainant of lying.
         In October of 2017, Complainant requested he be permitted to complete
9  training and become AWS certified. Baskerville told Complainant to worry about his
   PIP and denied Complainant the opportunity to receive additional training in
10 retaliation for Complainant taking FMLA and objecting to the utilization of offshore
11 maintenance.
         In about October of 2017, Complainant felt increasingly uncomfortable with
12 the PIP requirements that he push IFM work offshore. Complainant felt compelled to
   call the FICO whistleblower hotline. Complainant was very worried about his job.
13 He asked the hotline where his report would go once he completed it. The hotline
14 advised Complainant that it would be sent to Human Resources. Given the hostile
   environment Complainant had already been facing, he was seriously concerned
15 about his job security. Complainant was afraid he would be further retaliated against
   if he blew the whistle on the offshore assignments. Fearing he could lose his job,
16 Complainant backed down and didn't call the hotline back.
         In or about March of 2018, Complainant was considered for a new position
17 with Robert Leider whom Complainant had known for about fifteen years.
   Complainant and Leider agreed Complainant was a great fit for the job which offered
18 Complainant a much-needed change of pace and a hostility-free environment.
19 Unfortunately, Complainant was ultimately denied the position because of the
   September 2017 PIP. Respondent's retaliatory actions had caused Complainant to
20 lose out on opportunities for professional advancement and potential financial gain.
         On or about April 8, 2018, Complainant expressed increased concern over
21 the offshore maintenance for IFM. At one point, Complainant commented to an
22 offshore engineer that the requested changes to a client's hosted IFM environment
   should not be performed by offshore engineers because they are not allowed access
23 to client data.
   Complainant is informed and believes that this remark was communicated back to
24 Baskerville.

25

26
                                      -4-
27                    *Complaint -- DFEH No. 201809-03619620*

28 Date Filed: September 20, 2018
                                                              Ex A
                                                              Page 29

1      On or about April 12, 2018, Complainant's worst fear came true: Baskerville
2  terminated Complainant, escorted him off the FICO property and forced him to leave
   behind his personal effects, including his personal collection of technological books.
3      In between FICO giving Complainant a $25,000 retention bonus not to leave
   the company in mid-2016 and Complainant's termination in April of 2018, two
4  significant things happened:  Complainant went on legally entitled Family Medical
   Leave, and Complainant objected to the illegal and unethical offshore maintenance
5  utilized by FICO.   Respondent wrongfully terminated Complainant in direct
   retaliation for these two events.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
                                        -5-
27                        *Complaint – DFEH No. 201809-03619620*

28  Date Filed: September 20, 2018                                    Ex A
                                                                     Page 30

1 | VERIFICATION

2 | I, **Aisling Gilliland**, am the **Attorney** in the above-entitled complaint.  I have read the
3 | foregoing complaint and know the contents thereof.  The matters alleged are based
on information and belief, which I believe to be true.

4 | On September 20, 2018, I declare under penalty of perjury under the laws of the State
5 | of California that the foregoing is true and correct.

6 | **San Diego, CA**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

-6-
*Complaint – DFEH No. 201809-03619620*

27

28 | Date Filed: September 20, 2018

Ex A
Page 31



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**

2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
(800) 884-1684 (Voice) I (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov I email: contact.center@dfeh.ca.gov

GOVERNOR EDMUND G. BROWN JR.

DIRECTOR KEVIN KISH

September 20, 2018

RE:   **Notice of Filing of Discrimination Complaint**
DFEH Matter Number: 201809-03619620
Right to Sue: Garon / Fair Isaac Corporation

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the
Department of Fair Employment and Housing (DFEH) in accordance with Government
Code section 12960. This constitutes service of the complaint pursuant to Government
Code section 12962. The complainant has requested an authorization to file a lawsuit.
This case is not being investigated by DFEH and is being closed immediately. A copy of
the Notice of Case Closure and Right to Sue is enclosed for your records.

Please refer to the attached complaint for a list of all respondent(s) and their contact
information.

No response to DFEH is requested or required.

Sincerely,

Department of Fair Employment and Housing



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GOVERNOR EDMUND G. BROWN JR.
DIRECTOR KEVIN KISH

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**
2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
(800) 884-1684 (Voice) | (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov | email: contact.center@dfeh.ca.gov

September 20, 2018

John Garon
2155 First Ave
San Diego, California 92101

RE:     **Notice of Case Closure and Right to Sue**
        DFEH Matter Number: 201809-03619620
        Right to Sue: Garon / Fair Isaac Corporation

Dear John Garon,

This letter informs you that the above-referenced complaint was filed with the
Department of Fair Employment and Housing (DFEH) has been closed effective
September 20, 2018 because an immediate Right to Sue notice was requested. DFEH
will take no further action on the complaint.

This letter is also your Right to Sue notice. According to Government Code section
12965, subdivision (b), a civil action may be brought under the provisions of the Fair
Employment and Housing Act against the person, employer, labor organization or
employment agency named in the above-referenced complaint. The civil action must be
filed within one year from the date of this letter.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment
Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this
DFEH Notice of Case Closure or within 300 days of the alleged discriminatory act,
whichever is earlier.

Sincerely,

Department of Fair Employment and Housing

Ex A
Page 33

# EXHIBIT B

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego

**11/20/2018** at 02:36:00 PM

Clerk of the Superior Court
By Linda Sheffa,Deputy Clerk

Phillip L. Kossy (Bar No. 071543)
Email: phillip.kossy@procopio.com
Annie Ellis (Bar No. 273107)
Email: annie.ellis@procopio.com
PROCOPIO, CORY, HARGREAVES &
   SAVITCH LLP
525 B Street, Suite 2200
San Diego, CA  92101
Telephone: 619.238.1900
Facsimile: 619.235.0398

Attorneys for Defendant
Fair Isaac Corporation

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN DIEGO – CENTRAL DIVISION

| | |
|---|---|
| JOHN MARTIN GARON, an individual,<br><br>         Plaintiff,<br><br>v.<br><br>FAIR ISAAC CORPORATION, dba FICO, an unknown entity; and DOES 1 through 25, Inclusive,<br><br>         Defendants. | Case No. 37-2018-00047800-CU-OE-CTL<br><br>**DEFENDANT'S ANSWER TO PLAINTIFF'S COMPLAINT**<br><br>Dept:     C-66<br>Judge:   Hon. Kenneth J. Medel<br><br>Action Filed:    September 21, 2018<br>Trial Date:      Not Yet Set |

Defendant Fair Isaac Corporation hereby submits the following answer and affirmative defenses to the Complaint filed by Plaintiff John Martin Garon:

## I. GENERAL DENIAL

Pursuant to California Code of Civil Procedure section 431.30, Defendant denies generally and specifically each, every, and all of the allegations of the Complaint, and the whole thereof. Defendant further denies that Plaintiff has sustained, or will sustain, any injury, damage, or loss by reason of any act, omission, breach, negligence, or any other conduct or the absence thereof, on the part of Defendant, or any agent, attorney, servant, or employee of Defendant.

## II. AFFIRMATIVE DEFENSES

As separate and distinct affirmative defenses to the Complaint, and to each purported cause of action therein, Defendant alleges:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST AFFIRMATIVE DEFENSE**

**(Failure to State a Cause of Action)**

The Complaint fails to state facts sufficient to constitute any cause of action against Defendant.

**SECOND AFFIRMATIVE DEFENSE**

**(Statutes of Limitations)**

Some or all of the claims in the Complaint are barred by each and every applicable statute of limitations, including, but not limited to, California Code of Civil Procedure sections 335, 335.1 and 340 and California Government Code sections 12960 and 12965.

**THIRD AFFIRMATIVE DEFENSE**

**(Failure to Exhaust Administrative Remedies)**

Some or all of the claims in the Complaint are barred in that Plaintiff failed to timely, properly, or completely exhaust his available administrative remedies, including, but not limited to, remedies under the California Fair Employment and Housing Act and under California Labor Code section 1101 *et seq.*

**FOURTH AFFIRMATIVE DEFENSE**

**(Workers' Compensation Preemption)**

The causes of action in the Complaint seeking damages for work-related injuries are preempted and barred by the exclusive remedy provisions of California's workers' compensation statutes, California Labor Code section 3600 *et seq.*, in that: (1) the injuries complained of occurred when both Plaintiff and Defendant were subject to California Labor Code sections 3600 *et seq.*; (2) at the time of the alleged injuries, Plaintiff was performing services incidental to his employment and was acting within the course and scope of his employment; and (3) Plaintiff alleges that the injuries were caused by his employment; accordingly, this Court lacks subject matter jurisdiction over said claims.

/ / /

/ / /

/ / /

DEFENDANT'S ANSWER TO PLAINTIFF'S COMPLAINT

**FIFTH AFFIRMATIVE DEFENSE**

**(Estoppel and Waiver)**

Plaintiff's alleged causes of action, and each of them, are barred, in whole or in part, by the doctrines of estoppel and waiver because of Plaintiff's conduct and/or omissions.

**SIXTH AFFIRMATIVE DEFENSE**

**(Consent)**

Plaintiff consented to and approved all or some of the acts and omissions about which Plaintiff now complains.  Accordingly, Plaintiff is now barred from pursuing this action.

**SEVENTH AFFIRMATIVE DEFENSE**

**(At-Will Employment)**

Some or all of the claims in the Complaint are barred in that Plaintiff's employment relationship with Defendant was for an unspecified period of time and was at-will pursuant to California Labor Code section 2922 and by agreement.

**EIGHTH AFFIRMATIVE DEFENSE**

**(After-Acquired Evidence)**

Some or all of the claims for damages in the Complaint are barred or any recovery is reduced by the doctrine of after-acquired evidence.

**NINTH AFFIRMATIVE DEFENSE**

**(No Authority)**

Any improper, illegal, discriminatory, harassing, and/or defamatory action or statement of any agent, servant, or employee of Defendant was contrary to and in violation of Defendant's policies and was never actually or apparently authorized by Defendant and, if undertaken, was undertaken without its knowledge and never ratified, consented to, or approved.

**TENTH AFFIRMATIVE DEFENSE**

**(Mixed Motive)**

To the extent that any adverse employment action taken against Plaintiff was motivated by both discriminatory and non-discriminatory reasons sufficient to constitute a "mixed motive," Defendant is not liable because its legitimate reason(s), standing alone, would have induced

DEFENDANT'S ANSWER TO PLAINTIFF'S COMPLAINT
CASE NO. 37-2018-00047800-CU-OE-CTL

1   Defendant to make the same decision at that time.

2   **ELEVENTH AFFIRMATIVE DEFENSE**

3   **(Avoidable Consequences)**

4   The relief prayed for in the Complaint is barred by the avoidable consequences doctrine.

5   Defendant had policies and procedures in place to prevent and promptly correct any alleged

6   incidents of wrongful conduct.  Plaintiff unreasonably failed to take advantage of such policies and

7   procedures.  As such, Plaintiff's alleged damages would have been avoided and/or reduced by

8   reasonable use of such procedures.

9   **TWELFTH AFFIRMATIVE DEFENSE**

10   **(Good Faith/Legitimate Business Reasons)**

11   Plaintiff's claims are barred for the reason that the alleged conduct of Defendant was at all

12   times undertaken in the good faith exercise of a legitimate business reason.

13   **THIRTEENTH AFFIRMATIVE DEFENSE**

14   **(Apportionment)**

15   Defendant is not legally responsible for any damages claimed by Plaintiff.  If, however,

16   Defendant is found to be legally responsible, Defendant's legal responsibility is not the sole and

17   proximate cause of any injury, and damages awarded to Plaintiff, if any, should be apportioned

18   according to the respective fault and legal responsibility of all parties, persons, entities, agents,

19   servants, and/or employees who contributed to and/or caused said incidents according to proof

20   presented at the time of trial.

21   **FOURTEENTH AFFIRMATIVE DEFENSE**

22   **(Punitive Damages Unconstitutional)**

23   Under the applicable law and the facts of this case, Plaintiff is not entitled to

24   punitive/exemplary damages.  Moreover, punitive/exemplary damages such as those claimed by

25   Plaintiff are unconstitutional under the United States and/or California Constitutions.

26   / / /

27   / / /

28   / / /

Ex B
Page 38

4

DEFENDANT'S ANSWER TO PLAINTIFF'S COMPLAINT

DOCS 3451291.1

CASE NO. 37-2018-00047800-CU-OE-CTL

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

Plaintiff has suffered no damages as a result of any alleged act or omission of Defendant, and Plaintiff has failed to mitigate his damages, if any.

## III. PRAYER FOR RELIEF

WHEREFORE, Defendant requests relief as follows:

1.      That Plaintiff take nothing by virtue of this action;

1.      That the action be dismissed with prejudice and judgment be entered for Defendant;

2.      That any liability attributed to Defendant be limited in direct proportion to that percentage of fault actually attributable to Defendant;

3.      For reasonable attorneys' fees and for costs of suit incurred herein, including expert fees; and

5.      For such other and further relief as this Court may deem just and proper.

Respectfully submitted,

DATED: November 20, 2018                    PROCOPIO, CORY, HARGREAVES &
                                                                SAVITCH LLP


By: _____
        Phillip L. Kossy
        Annie Ellis
        Attorneys for Defendant Fair Isaac
        Corporation

DEFENDANT'S ANSWER TO PLAINTIFF'S COMPLAINT
CASE NO. 37-2018-00047800-CU-OE-CTL

DOCS 3451291.1

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego

**11/20/2018** at 02:36:00 PM

Clerk of the Superior Court
By Linda Sheffa,Deputy Clerk

1  Phillip L. Kossy (Bar No. 071543)
Email: phillip.kossy@procopio.com
2  Annie Ellis (Bar No. 273107)
Email: annie.ellis@procopio.com
3  PROCOPIO, CORY, HARGREAVES &
       SAVITCH LLP
4  525 B Street, Suite 2200
San Diego, CA  92101
5  Telephone: 619.238.1900
Facsimile: 619.235.0398
6
7  Attorneys for Defendant
Fair Isaac Corporation

8           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9           **COUNTY OF SAN DIEGO – CENTRAL DIVISION**

10

| | |
|---|---|
| 11   JOHN MARTIN GARON, an individual, | Case No. 37-2018-00047800-CU-OE-CTL |
| 12                   Plaintiff, | **PROOF OF SERVICE** |
| 13   v. | Dept:        C-66 |
| 14   FAIR ISAAC CORPORATION, dba FICO, an | Judge:       Hon. Kenneth J. Medel |
| 15   unknown entity; and DOES 1 through 25, Inclusive, | Action Filed:      September 21, 2018 |
| 16                   Defendants. | Trial Date:        Not Yet Set |

17

18        I am a resident of the State of California, over the age of eighteen years, and not a party to

19  the within action.  My business address is PROCOPIO, CORY, HARGREAVES & SAVITCH

20  LLP, 525 "B" Street, Suite 2200, San Diego, California 92101.  On November 28, 2018, I served

21  the within documents:

22        1.        **DEFENDANT'S ANSWER TO PLAINTIFF'S COMPLAINT**

23  ☒        **BY U.S. MAIL** by placing the document(s) listed above in a sealed envelope with
                  postage thereon fully prepaid, in the United States mail at San Diego, California
24                addressed as set forth below.  I am readily familiar with the firm's practice of
                  collection and processing correspondence for mailing.  Under that practice it would
25                be deposited with the U.S. Postal Service on the same day with postage thereon fully
                  prepaid in the ordinary course of business.  I am aware that on motion of the party
26                served, service is presumed invalid if postal cancellation date or postage meter date
                  is more than one day after date of deposit for mailing an affidavit.
27

28                                                                        Ex B
                                                                          Page 40

**BY OVERNIGHT DELIVERY** by placing the document(s) listed above in a sealed overnight envelope and depositing it for overnight delivery at San Diego, California, addressed as set forth below.  I am readily familiar with the practice of this firm for collection and processing of correspondence for processing by overnight mail.  Pursuant to this practice, correspondence would be deposited in the overnight box located 525 "B" Street, Suite 2200, San Diego, California 92101 the ordinary course of business on the date of this declaration.

**BY PERSONAL SERVICE** by personally delivering the document(s) listed above to the person(s) at the address(es) listed below: (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package, which was clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office, between the hours of nine in the morning and five in the evening; or (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and six in the evening.

**BY MESSENGER SERVICE** by providing the above listed document(s) addressed to the person(s) at the address(es) listed below to a professional messenger service for personal service. *[A declaration by the messenger service to be provided upon request and/or separately filed.]*

**BY ELECTRONIC SERVICE** based upon an agreement of the parties to accept service by electronic transmission, by electronically mailing the document(s) listed above from my email address bobbie.howard@procopio.com, to the e-mail address(es), set forth below, or as stated on the attached service list and/or by electronically notifying the parties set forth below that the document(s) listed above can be located and downloaded from the hyperlink provided. No error was received, within a reasonable time after the transmission, nor any electronic message or other indication that the transmission was unsuccessful.

Joshua D. Gruenberg                           Attorneys for Plaintiff
Daphne Delvaux
Aisling S. Gilliland
Gruenberg Law
2155 First Avenue
San Diego, CA 92101-3542
Telephone:  (619) 230-1234
Facsimile:   (619) 230-1074

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on November 28, 2018 at San Diego, California.

*BHoward*
Bobbie Howard

Ex B
Page 41

2

# EXHIBIT C

1  Phillip L. Kossy (Bar No. 071543)
   E-mail:phillip.kossy@procopio.com
2  Annie Ellis (Bar No. 273107)
   E-mail:annie.ellis@procopio.com
3  PROCOPIO, CORY, HARGREAVES &
      SAVITCH LLP
4  525 B Street, Suite 2200
   San Diego, CA  92101
5  Telephone: 619.238.1900
   Facsimile: 619.235.0398
6
   Attorneys for Defendant
7  Fair Isaac Corporation

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9              **COUNTY OF SAN DIEGO, CENTRAL DIVISION**

10 | JOHN MARTIN GARON, an individual, | Case No. 37-2018-00047800-CU-OE-CTL |

11 |          Plaintiff, | **DEFENDANT'S SPECIAL**
                          **INTERROGATORIES TO PLAINTIFF**
12 | v. | **(SET ONE)** |

13 | FAIR ISAAC CORPORATION, dba FICO, an
     unknown entity; and DOES 1 through 25, | Dept:       C-66
14   Inclusive, | Judge:      Hon. Kenneth J. Medel |

15 |          Defendants. | Complaint Filed:   September 21, 2018
                            Trial Date:         Not Yet Set |

16

17 **PROPOUNDING PARTY: DEFENDANT FAIR ISAAC CORPORATION**

18 **RESPONDING PARTY:    PLAINTIFF JOHN MARTIN GARON**

19 **SET NO.:                ONE (1)**

20        Defendant Fair Isaac Corporation requires, pursuant to California Code of Civil Procedure

21 section 2030.010 *et seq.*, that Plaintiff John Martin Garon provide written responses to the

22 following interrogatories within thirty (30) days after service.  Each of these interrogatories shall

23 be answered fully, separately, in writing, and under oath.

24                     **SPECIAL INTERROGATORIES**

25 **SPECIAL INTERROGATORY NO. 1:**

26        STATE ALL FACTS RELATING TO any contention that DEFENDANT had knowledge

27 of YOUR father's cancer diagnosis.

28

1    (The term "STATE ALL FACTS" regarding an allegation, contention, or other matter shall

2  mean to describe in detail each event, occurrence, or fact that supports, relates to, or contravenes

3  the basis of such contention, including by providing all relevant dates and identities of all persons

4  involved and describing in detail the full contents of each conversation or discussion that occurred

5  therein.)

6    (The terms "YOU," "YOUR," and "YOURSELF" shall mean Plaintiff John Martin Garon

7  and any and all agents, employees, attorneys, representatives, accountants, consultants,

8  investigators, records custodians, and any and all other person(s) acting or purporting to act on his

9  behalf.)

10    (The term "RELATE TO" shall mean related to, referred to, relating to, referring to, stating,

11  describing, recording, constituting, contradicting, supporting, embodying, memorializing,

12  mentioning, studying, analyzing, discussing, commenting on, specifying, listing, summarizing,

13  reviewing, or identifying.)

14    (The term "DEFENDANT" shall mean Defendant Fair Isaac Corporation and all other past

15  or present persons, entities, employees, agents, officers, directors, and attorneys acting or

16  purporting to act on behalf of DEFENDANT, including, but not limited to, any predecessors-in-

17  interest, any parent corporations, any affiliated and subsidiary companies, and any other persons or

18  entities related in any way to DEFENDANT.)

19  **SPECIAL INTERROGATORY NO. 2:**

20    STATE ALL FACTS RELATING TO any contention that Andrea Allmon made the

21  statement, "That would literally take an act of Congress," as alleged in paragraph 31 of YOUR

22  COMPLAINT.

23    (The term "COMPLAINT" refers to the Complaint filed on behalf of Plaintiff John Martin

24  Garon against Defendant Fair Isaac Corporation in the Superior Court of the State of California for

25  the County of San Diego, Case No. 37-2018-00047800-CU-OE-CTL.)

26  / / /

27  / / /

28

2

DEFENDANT'S SPECIAL INTERROGATORIES TO PLAINTIFF (SET ONE)
CASE NO. 37-2018-00047800-CU-OE-CTL

DOCS 3491853.2

**SPECIAL INTERROGATORY NO. 3:**

STATE ALL FACTS RELATING TO the first alleged cause of action in YOUR COMPLAINT, for retaliation.

**SPECIAL INTERROGATORY NO. 4:**

Do YOU contend in the first alleged cause of action in YOUR COMPLAINT, for retaliation, that DEFENDANT violated the Family and Medical Leave Act ("FMLA")?

**SPECIAL INTERROGATORY NO. 5:**

STATE ALL FACTS RELATING TO the second alleged cause of action in YOUR COMPLAINT, for retaliation.

**SPECIAL INTERROGATORY NO. 6:**

Do YOU contend in the second alleged cause of action in YOUR COMPLAINT, for retaliation, that DEFENDANT violated the FMLA?

**SPECIAL INTERROGATORY NO. 7:**

Do YOU contend in the third alleged cause of action in YOUR COMPLAINT, for associational discrimination, that DEFENDANT violated the Americans with Disabilities Act?

**SPECIAL INTERROGATORY NO. 8:**

STATE ALL FACTS RELATING TO the fourth alleged cause of action in YOUR COMPLAINT, for failure to prevent discrimination and/or retaliation.

**SPECIAL INTERROGATORY NO. 9:**

STATE ALL FACTS RELATING TO the fifth alleged cause of action in YOUR COMPLAINT, for negligent supervision.

**SPECIAL INTERROGATORY NO. 10:**

STATE ALL FACTS RELATING TO the sixth alleged cause of action in YOUR COMPLAINT, for wrongful termination.

**SPECIAL INTERROGATORY NO. 11:**

STATE ALL FACTS RELATING TO the seventh alleged cause of action in YOUR COMPLAINT, for retaliation.

**SPECIAL INTERROGATORY NO. 12:**

STATE ALL FACTS RELATING TO the eighth alleged cause of action in YOUR COMPLAINT, for intentional infliction of emotional distress.

**SPECIAL INTERROGATORY NO. 13:**

STATE ALL FACTS RELATING TO any contention that YOUR "work place atmosphere had changed," as alleged in paragraph 25 of YOUR COMPLAINT.

**SPECIAL INTERROGATORY NO. 14:**

STATE ALL FACTS RELATING TO any contention that "the use of offshore personnel amounted to a potential HIPAA violation and a breach of client contracts," as alleged in paragraphs 37-39 of YOUR COMPLAINT.

**SPECIAL INTERROGATORY NO. 15:**

STATE ALL FACTS RELATING TO any contention that the "atmosphere at FICO became increasingly hostile toward" YOU, as alleged in paragraph 40 of YOUR COMPLAINT.

**SPECIAL INTERROGATORY NO. 16:**

STATE ALL FACTS RELATING TO any contention that the "PIP was unjustified and therefore retaliatory," as alleged in paragraphs 44-45 of YOUR COMPLAINT.

**SPECIAL INTERROGATORY NO. 17:**

STATE ALL FACTS RELATING TO any contention that YOU complained about retaliation during YOUR employment with DEFENDANT, as alleged in paragraphs 46-48 of YOUR COMPLAINT.

**SPECIAL INTERROGATORY NO. 18:**

STATE ALL FACTS RELATING TO YOUR contention that is alleged in paragraph 49 of YOUR COMPLAINT that Baskerville "was openly hostile, belittling and chastising Plaintiff at every opportunity.  Baskerville began falsely accusing Plaintiff of misrepresenting how Plaintiff spent his time at work, and the more Plaintiff tried to correct Baskerville or defend himself, the more Baskerville would accuse Plaintiff of lying."

/ / /

4

DEFENDANT'S SPECIAL INTERROGATORIES TO PLAINTIFF (SET ONE)
CASE NO. 37-2018-00047800-CU-OE-CTL

DOCS 3491853.2

**SPECIAL INTERROGATORY NO. 19:**

STATE ALL FACTS RELATING TO any contention that YOU complained about discrimination during YOUR employment with DEFENDANT.

**SPECIAL INTERROGATORY NO. 20:**

STATE ALL FACTS RELATING TO any contention that YOU complained about any unlawful conduct during YOUR employment with DEFENDANT.

**SPECIAL INTERROGATORY NO. 21:**

STATE ALL FACTS RELATING TO any contention that any supervisor's conduct toward YOU during YOUR employment with DEFENDANT was intentionally unlawful.

**SPECIAL INTERROGATORY NO. 22:**

STATE ALL FACTS RELATING TO any contention that any supervisor's conduct toward YOU during YOUR employment with DEFENDANT was discriminatory.

**SPECIAL INTERROGATORY NO. 23:**

STATE ALL FACTS RELATING TO any contention that any supervisor's conduct toward YOU during YOUR employment with DEFENDANT was retaliatory.

**SPECIAL INTERROGATORY NO. 24:**

STATE ALL FACTS RELATING TO YOUR claim for punitive damages.

**SPECIAL INTERROGATORY NO. 25:**

STATE ALL FACTS RELATING TO YOUR claim for emotional distress damages.

**SPECIAL INTERROGATORY NO. 26:**

Describe with particularity every effort that YOU have made since January 1, 2016, to find employment or other work, including but not limited to sending resumes, examining advertisements, filling out applications, and interviewing.

**SPECIAL INTERROGATORY NO. 27:**

IDENTIFY the name, address, and telephone number of every person (including headhunters or recruiters) whom YOU have contacted in any manner (in person, via telephone, via e-mail, etc.) to seek employment or other work since January 1, 2016.

DEFENDANT'S SPECIAL INTERROGATORIES TO PLAINTIFF (SET ONE)
CASE NO. 37-2018-00047800-CU-OE-CTL

DOCS 3491853.2

1    (The term "IDENTIFY" regarding an allegation, contention, or other matter shall mean to

2    describe in detail each event, occurrence, or fact that supports, relates to, or contravenes the basis

3    of such contention, including by providing all relevant dates and identities of all persons involved

4    and describing in detail the full contents of each conversation or discussion that occurred therein.)

5    **SPECIAL INTERROGATORY NO. 28:**

6        IDENTIFY any and all DOCUMENTS regarding any and all correspondence, job

7    applications, or other DOCUMENTS that YOU prepared or received in any of YOUR efforts to

8    find employment since January 1, 2016.

9        (The terms "DOCUMENT" or "DOCUMENTS" shall mean any written, recorded, or

10   graphic matter, however produced or reproduced, or writing of any kind, as defined in Evidence

11   Code section 250, including, but not limited to, any kind of papers, writings, notes,

12   correspondence, letters, e-mails, memoranda, facsimiles, wires, charts, reports, drawings,

13   illustrations, notices, legal descriptions, court documents, depositions, discovery, diaries, calendars,

14   log books, time books, day books, date books, invoices, purchase orders, shipping documents,

15   statements, books of accounts, ledgers, books, records, audited and unaudited financial statements,

16   notices, tax returns, circulars, bulletins, manuals, results of investigations, progress reports, studies

17   made by or for your business or personal use, working papers, contracts, agreements, affidavits,

18   declarations, statements, vouchers, maps, evaluations, bank checks, charge slips, receipts, expense

19   accounts, statistical records, cost sheets, bids, abstracts of bid, time sheets or logs, job or

20   transaction files, permit or licenses, or applications therefore, abstracts and summaries of other

21   documents, computer data, computer databases, computer printouts, files (including contents and

22   folders), recordings, tapes, transcriptions, photographs, transparencies, audiotapes, videotapes, and

23   all other tangible things upon which any handwriting, typing, printing, drawing, plans,

24   representation, magnetic or electrical impulse, or other form of communication of any nature

25   relating to or pertaining in any way to the subject matters involved in these requests, including but

26   not limited to all originals, drafts, copies, or other reproductions, whether prepared by handwriting,

27   typewriting, printing, or any other means of recording upon any tangible thing in any form of

28

DOCS 3491853.2

communication or representation, including letters, words, pictures, sounds, or symbols, or any combination thereof.  Without limiting any of the foregoing, the term "WRITING" and/or "DOCUMENT" also includes, but is not limited to, floppy disks, hard drives, magnetic tape, and computer memory.)

**SPECIAL INTERROGATORY NO. 29:**

IDENTIFY every job offer that YOU have received since January 1, 2016, including the date of the offer, the offering employer, the hiring principal, the job title, and the pay rate.

**SPECIAL INTERROGATORY NO. 30:**

IDENTIFY the name, address, and telephone number of YOUR current employer or principal for which you perform work, if any.

**SPECIAL INTERROGATORY NO. 31:**

State YOUR compensation rate at YOUR current employer or principal for which you perform work, if any, i.e., YOUR monthly or annual salary or YOUR hourly pay rate.

**SPECIAL INTERROGATORY NO. 32:**

IDENTIFY the name, address, and telephone number of every employer or principal for which YOU have performed work since January 1, 2016.

**SPECIAL INTERROGATORY NO. 33:**

IDENTIFY the nature, source and amount of every form of earned income that YOU have received since January 1, 2016.

DATED: December 13, 2018                    PROCOPIO, CORY, HARGREAVES &
                                                            SAVITCH LLP


                                            By: _____
                                                    Phillip L. Kossy
                                                    Annie Ellis
                                                    Attorneys for Defendant
                                                    Fair Isaac Corporation

1  Phillip L. Kossy (Bar No. 071543)
   Email: phillip.kossy@procopio.com
2  Annie Ellis (Bar No. 273107)
   Email: annie.ellis@procopio.com
3  PROCOPIO, CORY, HARGREAVES &
       SAVITCH LLP
4  525 B Street, Suite 2200
   San Diego, CA  92101
5  Telephone: 619.238.1900
   Facsimile: 619.235.0398
6
7  Attorneys for Defendant
   Fair Isaac Corporation

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9              **COUNTY OF SAN DIEGO – CENTRAL DIVISION**

10

| | |
|---|---|
| 11  JOHN MARTIN GARON, an individual, | Case No. 37-2018-00047800-CU-OE-CTL |
| 12       Plaintiff, | **PROOF OF SERVICE** |
| 13  v. | Dept:      C-66 |
| | Judge:     Hon. Kenneth J. Medel |
| 14  FAIR ISAAC CORPORATION, dba FICO, an | |
|     unknown entity; and DOES 1 through 25, | Action Filed:    September 21, 2018 |
| 15  Inclusive, | Trial Date:      Not Yet Set |
| 16       Defendants. | |

17

18         I am a resident of the State of California, over the age of eighteen years, and not a party to

19  the within action.  My business address is PROCOPIO, CORY, HARGREAVES & SAVITCH

20  LLP, 525 "B" Street, Suite 2200, San Diego, California 92101.  On December 13, 2018, I served

21  the within documents:

22         **1.     DEFENDANT'S DEMAND FOR PRODUCTION OF DOCUMENTS TO**

23  **PLAINTIFF (SET ONE); and**

24         **2.     DEFENDANT'S SPECIAL INTERROGATORIES TO PLAINTIFF (SET**

25  **ONE)**

26  / / /

27  / / /

28  / / /

Ex C
Page 50

DOCS 3487584.1                                          CASE NO. 37-2018-00047800-CU-OE-CTL

1    ☒    **BY U.S. MAIL** by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Diego, California addressed as set forth below.  I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on the same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing an affidavit.

6    ☐    **BY OVERNIGHT DELIVERY** by placing the document(s) listed above in a sealed overnight envelope and depositing it for overnight delivery at San Diego, California, addressed as set forth below.  I am readily familiar with the practice of this firm for collection and processing of correspondence for processing by overnight mail.  Pursuant to this practice, correspondence would be deposited in the overnight box located 525 "B" Street, Suite 2200, San Diego, California 92101 the ordinary course of business on the date of this declaration.

10   ☐    **BY PERSONAL SERVICE** by personally delivering the document(s) listed above to the person(s) at the address(es) listed below: (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package, which was clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office, between the hours of nine in the morning and five in the evening; or (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and six in the evening.

15   ☐    **BY MESSENGER SERVICE** by providing the above listed document(s) addressed to the person(s) at the address(es) listed below to a professional messenger service for personal service. *[A declaration by the messenger service to be provided upon request and/or separately filed.]*

17   ☒    **BY ELECTRONIC SERVICE** based upon an agreement of the parties to accept service by electronic transmission, by electronically mailing the document(s) listed above from my email address bobbie.howard@procopio.com, to the e-mail address(es), set forth below, or as stated on the attached service list and/or by electronically notifying the parties set forth below that the document(s) listed above can be located and downloaded from the hyperlink provided. No error was received, within a reasonable time after the transmission, nor any electronic message or other indication that the transmission was unsuccessful.

Ex C
Page 51

2

PROOF OF SERVICE

DOCS 3487584.1                                    CASE NO. 37-2018-00047800-CU-OE-CTL

Joshua D. Gruenberg                                    Attorneys for Plaintiff
Daphne Delvaux
Aisling S. Gilliland
Gruenberg Law
2155 First Avenue
San Diego, CA 92101-3542
Telephone:  (619) 230-1234
Facsimile:  (619) 230-1074
Email:      josh@gruenberglaw.com
            daphne@gruenberglaw.com
            bianca@gruenberglaw.com
            aisling@gruenberglaw.com


        I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

        Executed on December 13, 2018 at San Diego, California.

                                _____
                                Bobbie Howard

Ex C
Page 52

PROOF OF SERVICE

DOCS 3487584.1                                          CASE NO. 37-2018-00047800-CU-OE-CTL

# EXHIBIT D

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Josh D. Gruenberg, Esq. (163281)
Daphne Delvaux, Esq. (292345)
Aisling S. Gilliland, Esq. (163321)
**GRUENBERG LAW**
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013
TELEPHONE: (619) 230-1234
TELECOPIER: (619) 230-1074

Attorneys for Plaintiff
**JOHN MARTIN GARON**

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN DIEGO, CENTRAL DIVISION

| | |
|---|---|
| JOHN MARTIN GARON, an individual, | Case No. 37-2018-00047800-CU-DE-CTL |
| Plaintiff, | **PLAINTIFF'S RESPONSES TO DEFENDANT'S SPECIAL INTERROGATORIES** |
| v. | **[SET ONE (1)]** |
| FAIR ISAAC CORPORATION, dba FICO, an unknown entity; and DOES 1 through 25, inclusive, | Dept: C-66<br>Judge: Hon. Kenneth J. Medel |
| Defendants. | Complaint filed: September 21, 2018<br>Trial Date:      Not Set |

PROPOUNDING PARTY:    DEFENDANT FAIR ISAAC CORPORATION

RESPONDING PARTY:    PLAINTIFF JOHN MARTIN GARON

SET NUMBER:    ONE (1)

### PRELIMINARY STATEMENT

These responses are made solely for the purpose of, and in relation to, this action.  Each answer is given subject to all appropriate objections (including but not limited to objections concerning competency, relevancy, materiality, propriety and admissibility) which would require the exclusion of any statement contained herein if the Interrogatory were asked of, or any statement contained herein were made by, a witness present and testifying in Court.  All such objections and grounds therefore are reserved and may be interposed at the time of trial.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    The party on whose behalf the answers are given has not yet completed investigation of

2    the facts relating to this action, has not yet completed discovery in this action, and has not yet

3    completed preparation for trial.  Consequently, the following answers are given without

4    prejudice to the answering party's right to produce, at the time of trial, subsequently discovered

5    evidence relating to the proof of facts subsequently discovered to be material.

6    Except for facts explicitly admitted herein, no admission of any nature whatsoever is to

7    be implied or inferred.  The fact that any Interrogatory herein has been answered should not be

8    taken as an admission, or a concession of the existence, of any facts set forth or assumed by such

9    Interrogatory, or that such answer constitutes evidence of any fact thus set forth or assumed.  All

10   answers must be construed as given on the basis of present recollection.  Any Interrogatory

11   deemed as continuing is objected to as oppressive, over burdensome, improper and not in

12   compliance with Code of Civil Procedure Section 2030.010, et seq., and will not be regarded as

13   continuing in nature.

14                           **GENERAL OBJECTIONS**

15   Plaintiff incorporates the following general objections (the "General Objections") into

16   each and every one of his specific responses and objections set forth below. Plaintiff objects to

17   each and every Interrogatory insofar as: (1) it seeks information that is protected by the attorney-

18   client and/or attorney-work product privileges and/or is otherwise privileged; (2) it seeks

19   information that is publicly available and/or uniquely or equally available to Defendant from

20   itself, its employees, or third parties; (3) it seeks information which predates or postdates or does

21   not specifically refer to, the events which are the subject of this litigation; (4) it purports to

22   impose an obligation on Plaintiff to provide a response for or on behalf of any other person or

23   entity and/or seeks information not in Plaintiff's possession, custody, or control; (5) it seeks the

24   identification of documents or information exclusively in the possession, custody, or control of

25   Plaintiff's lawyers; (6) it violates Plaintiff's right to privacy; (7) it is duplicative; (8) it is vague,

26   ambiguous, and/or overbroad; and (9) it calls for legal conclusions and/or requires a lay person to

27   decipher, respond to, and be bound by highly-technical legal terms.

28   ///

Ex D
Page 55

1  Plaintiff also objects that the requests taken individually and as a whole seek irrelevant

2  information and/or information that is not likely to lead to the discovery of admissible evidence

3  and accordingly are not specified with sufficient particularity, overbroad, unduly burdensome,

4  and propounded to vex, harass and/or intimidate Plaintiff. Plaintiff further objects insofar as the

5  interrogatories seek information already in the hands of Defendant and/or produced by

6  Defendant to Plaintiff in this action.

7  Finally, Plaintiff objects to these interrogatories to the extent that each allegation

8  contained in Plaintiff's complaint was alleged to be likely to have evidentiary support after a

9  reasonable opportunity for further investigation or discovery, and that these interrogatories

10  prematurely seek discovery about these allegations before Plaintiff has had a reasonable

11  opportunity for further investigation and discovery.

12  Subject to the foregoing Preliminary Statement and the General Objections and to the

13  specific responses and objections set forth below, Plaintiff responds to the Interrogatories.

14  Notwithstanding the foregoing, as noted, Plaintiff has not completed his investigation of the facts

15  and documents related to this action, has not fully completed discovery in this action, and has not

16  completed his preparation for trial. Consequently, the following responses are provided without

17  prejudice to Plaintiff's right to supplement or further amend the responses and to produce

18  evidence, documentary or otherwise, of any subsequently discovered facts and/or documents.

19  **RESPONSES TO SPECIAL INTERRGATORIES**

20  **Response to Special Interrogatory No. 1:**

21  Objection. This Interrogatory calls for speculation and for information which is more

22  readily available to propounding party. This Interrogatory further seeks the legal reasoning and

23  theories of Plaintiff's contentions. Plaintiff is not required to prepare the respondent's case.

24  (Sav-On Drugs, Inc. v. Superior Court of Los Angeles County (1975) 15 Cal.3d 1.) Further, this

25  Interrogatory is unduly burdensome and oppressive insofar as it seems to require that the entire

26  case be litigated in writing, which is not the purpose of discovery; rather, discovery is intended to

27  eliminate surprise and promote resolution short of trial. *See generally* Greyhound Corp. v. Super.

28  Ct., 56 Cal. 2d 355 (1961). This Interrogatory is additionally overbroad as to time. Subject to

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

Ex D
Page 56

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1  and without waiving these or any other applicable objections, Plaintiff responds as follows:  At

2  the time Plaintiff requested leave, Plaintiff told Reef Baskerville that his father was suffering

3  from pancreatic cancer which was likely terminal.  Plaintiff additionally submitted FICO's

4  "Request for Leave Form for Care Other," which informed FICO of Plaintiff's father's

5  diagnosis.

6  **Response to Special Interrogatory No. 2:**

7      Objection.  This Interrogatory calls for speculation and for information which is more

8  readily available to propounding party. This Interrogatory further seeks the legal reasoning and

9  theories of Plaintiff's contentions. Plaintiff is not required to prepare the respondent's case.

10  (Sav-On Drugs, Inc. v. Superior Court of Los Angeles County (1975) 15 Cal.3d 1.) Further, this

11  Interrogatory is unduly burdensome and oppressive insofar as it seems to require that the entire

12  case be litigated in writing, which is not the purpose of discovery; rather, discovery is intended to

13  eliminate surprise and promote resolution short of trial. *See generally* Greyhound Corp. v. Super.

14  Ct., 56 Cal. 2d 355 (1961).  This Interrogatory is additionally overbroad as to time. Subject to

15  and without waiving these or any other applicable objections, Plaintiff responds as follows:  In or

16  about 2016, Plaintiff asked Allmon if IFM could be offshored.  Allmon responded, "That would

17  literally take an act of Congress."  Plaintiff is informed and believes that Allmon raised the

18  offshoring issue to Claus Moldt.

19  **Response to Special Interrogatory No. 3:**

20      Objection.  This Interrogatory calls for speculation and for information which is more

21  readily available to propounding party. This Interrogatory further seeks the legal reasoning and

22  theories of Plaintiff's contentions. Plaintiff is not required to prepare the respondent's case.

23  (Sav-On Drugs, Inc. v. Superior Court of Los Angeles County (1975) 15 Cal.3d 1.) Further, this

24  Interrogatory is unduly burdensome and oppressive insofar as it seems to require that the entire

25  case be litigated in writing, which is not the purpose of discovery; rather, discovery is intended to

26  eliminate surprise and promote resolution short of trial. *See generally* Greyhound Corp. v. Super.

27  Ct., 56 Cal. 2d 355 (1961).  This Interrogatory is additionally overbroad as to time. Subject to

28  and without waiving these or any other applicable objections, Plaintiff responds as follows:

Ex D
Page 57

1    In or about January of 1997, Plaintiff was hired by Hecht-Nielson Neural Computing

2 ("HNC") as an Application Engineer working to deploy software, develop and test code and

3 develop prototypes in cities across the United States and Canada. In or about April of 2002,

4 Defendant FICO acquired HNC, and Plaintiff became an employee of FICO.

5    In 2010, Plaintiff started working with Insurance Fraud Manager, ("IFM").  In or about

6 January of 2013, Plaintiff was transferred to Product Operations for IFM.  The offshore

7 development of IFM had a number of logistical and technological hurdles to clear.  One of the

8 challenges was that offshore engineers did not have access to live HIPAA data.  All HIPAA data

9 had to be de-identified before being made available to offshore engineers.

10    In March of 2014, Plaintiff led a long-awaited IFM upgrade.

11    In 2015, Plaintiff was frequently "on call" as FICO moved its operations hub from

12 Minnesota to San Diego.  This move resulted in a major workload increase for Plaintiff who was

13 required to be near his laptop addressing emergencies and system failures on a near constant

14 basis. There were multiple "On call" weeks where Plaintiff slept for less than 18 hours over the

15 seven days. Consequently, there was a high level of attrition from the Product Operations group.

16 At one point, the "On call" rotation was just Plaintiff, Hannah Chan, and Greg Arseneau. In

17 December of 2015, Plaintiff took "On call" responsibilities for three out of the four weeks.

18    Also in 2016, Plaintiff learned that there was an increasing likelihood that FICO would

19 offshore IFM product operations despite the fact that the de-identification of HIPAA information

20 had not yet been accomplished.  When Plaintiff told Andrea Allmon, former product manager for

21 IFM, about this impending change, she responded, "That would literally take an act of Congress"

22 because HIPAA data cannot be handled by anyone outside of the United States.

23    In February of 2017, Plaintiff's father was diagnosed with pancreatic cancer.  Plaintiff's

24 father's prognosis was grim.  His physicians estimated he had three to six months to live.  In

25 addition to needing care and transportation, Plaintiff's father, who had lived with Plaintiff since

26 2008, presented a serious fall risk, and Plaintiff had to catch his father twice from falling during

27 a very short period. Because Plaintiff needed to care for his terminally ill father, in or about April

28 2017, Plaintiff went on Family Medical Leave.

Ex D
Page 58

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

PLAINTIFF'S RESPONSES TO DEFENDANT'S SPECIAL INTERROGATORIES, SET ONE (1)

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    In mid-July, Plaintiff's supervisor, Reef Baskerville, contacted Plaintiff to enquire when

2  Plaintiff would be returning to work. Plaintiff advised Baskerville he would be back at work on

3  July 20, 2017. Baskerville immediately sent out a meeting request for Plaintiff to meet with him

4  at 10:00 a.m. on July 20, 2017.

5    The morning of July 20, 2017 did not go as planned for Plaintiff, and he was required to

6  administer to his gravely ill father. Plaintiff advised Baskerville he would be fifteen minutes late

7  for their meeting. Baskerville told Plaintiff not to bother, that he would be "too busy" to meet

8  with Plaintiff. Immediately upon returning to work on July 20, 2017, Plaintiff felt that his work

9  place atmosphere had changed. Baskerville was openly hostile, refusing to meet with Plaintiff

10  despite Plaintiff's numerous efforts to re-accomplish the return meeting.

11    As part of his pervasive discriminatory and retaliatory demeanor toward Plaintiff,

12  Baskerville did not agree to meet with Plaintiff again until July 24, 2017. Baskerville began the

13  meeting with, "First of all, are you ready to come back to work because we've gone seventy-five

14  miles down the road since you left," implying that Plaintiff had been left behind as a result of his

15  taking FMLA. Baskerville also advised Plaintiff that punctuality would now be monitored along

16  with productivity. This was not the case for Plaintiff prior to his taking Family Medical Leave.

17  Baskerville further told Plaintiff he would need to become a subject matter expert ("SME") on

18  all hosted products.

19    Also during the July 24, 2017 meeting, Baskerville advised Plaintiff of another change

20  occurring at FICO. He informed Plaintiff that maintenance work for IFM was now being

21  performed by offshore engineers in Bangalore and the United Kingdom. Plaintiff felt that

22  preventing off-shore personnel from seeing United States health data was an obstacle that had

23  not been addressed by FICO during Plaintiff's leave. Without this obstacle having been cleared,

24  the use of offshore personnel amounted to a potential HIPAA violation and a breach of client

25  contracts. Plaintiff responded by expressing his concern that the offshore arrangement presented

26  a potential HIPAA violation and further, violated client contracts, which specified that no

27  offshore personnel could be used. For example, Kaiser Permanente required background checks

28  for all persons touching Kaiser data.

Ex D
Page 59

PLAINTIFF'S RESPONSES TO DEFENDANT'S SPECIAL INTERROGATORIES, SET ONE (1)

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    Baskerville responded with hostility to Plaintiff's ongoing concerns telling him that the

2    issue had "already been decided" and that the offshore arrangement was "none of [Plaintiff's]

3    business." Plaintiff had serious reservations about sending operation support offshore because it

4    was inconsistent with the information he had previously received on the topic of offshoring

5    HIPAA data.

6    Throughout the summer of 2017, the atmosphere at FICO became increasingly hostile

7    toward Plaintiff. Baskerville was continually critical and antagonistic to Plaintiff. For example,

8    if Plaintiff was required to attend an appointment with his father, Baskerville would tell Plaintiff,

9    "don't bother coming in."

10    In July of 2017, although Plaintiff was entitled to a new upgraded phone, his request for a

11    new phone was continually delayed. Baskerville essentially sabotaged Plaintiff's ability to

12    perform his work tasks by denying him the equipment he needed. In or about November of

13    2017, Plaintiff's request for a phone was declined when Neil Hartley said, "We don't know if

14    Johnny will be around to use the phone." Only after Plaintiff documented his need, request and

15    subsequent delay did Plaintiff finally receive his new phone five (5) months later.

16    Starting in September of 2017, Baskerville instructed Plaintiff to no longer meet with

17    other team members and subject matter experts ("SME") to cross-train products. Some of these

18    SME's were off-shore engineers. Given that these meetings resulted in more employees having

19    familiarity and expertise with FICO's products, this measure was counter-productive and

20    designed to punish and alienate Plaintiff from fellow experts. Baskerville came to Plaintiff's

21    cubicle, directed Plaintiff to clear his calendar of SME meetings and stood over him while he did

22    so.

23    In or about September 2017, Defendant further discriminated and retaliated against

24    Plaintiff because of his medical leave and his association with his father, as well as his

25    complaints about FICO's unlawful conduct. On or about September 21, 2017, Baskerville

26    requested a meeting during which Lorraine Breithbart from HR was on the phone. During this

27    meeting, Plaintiff was shocked to receive a Performance Improvement Plan ("PIP"). The PIP

28    gave Plaintiff a performance rating of "poor." The PIP raised no concerns about Plaintiff's

Ex D
Page 60

1    skills. Rather, the PIP focused on a number of "tardies," or days Plaintiff was late for work, and

2    Plaintiff working three (3) days from home.

3       Plaintiff objected to Baskerville and Breithbart regarding the tardies and absences and

4    expressed his feeling the numbers were inflated.  In response, Breithbart and Baskerville agreed

5    the number of absences may have been incorrect, corroborating that the PIP was unjustified and

6    therefore retaliatory.

7       In truth, there was no legitimate basis for the PIP.  The PIP was, in effect, retaliation for

8    Plaintiff taking Family Medical Leave to which he was legally entitled and an attempt to force

9    Plaintiff to comply with the offshore process of IFM, which he believed to be both illegal and

10   unethical.  Plaintiff was stunned and disappointed to receive the PIP.  About this time, Plaintiff

11   expressed his concerns to Breithbart that the PIP was a response to Plaintiff taking his legally

12   entitled Family Medical Leave.

13      On or about September 22, 2017, Plaintiff had a post-PIP follow-up meeting with

14   Breithbart during which Plaintiff expressed to Breithbart that his relationship with Baskerville

15   had deteriorated significantly since Plaintiff returned from FMLA.  Plaintiff expressed to

16   Breithbart his belief that Baskerville was unhappy with Plaintiff for taking FMLA and that

17   Baskerville was retaliating against him.  Breithbart dismissed Plaintiff's concerns and advised

18   Plaintiff that FMLA only guarantees an employee will have a job when he returns from leave.

19      During the September 22, 2017 meeting, Plaintiff additionally told Breithbart that he

20   objected to the allegation contained in the PIP that he failed "to follow processes and

21   procedures."  Ironically, Baskerville's instruction that Plaintiff cease training off-shore personnel

22   had become the subject of a Performance Improvement Plan targeted at Plaintiff.  This was also

23   a reference to Plaintiff's unwillingness to violate HIPAA requirements with the IFM product as

24   well as client contracts by pushing for offshore maintenance.  Accordingly, Defendant explicitly

25   instructed Plaintiff to violate the law, which Plaintiff refused to do. Again, Breithbart brushed

26   Plaintiff's concerns aside.

27      From about September 21, 2017 through April 12, 2018, although the issues raised in the

28   PIP were resolved within two-weeks, Plaintiff had weekly meetings with Baskerville during

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

Ex D
Page 61

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1   which Baskerville was openly hostile, belittling and chastising Plaintiff at every opportunity.

2   Baskerville began falsely accusing Plaintiff of misrepresenting how Plaintiff spent his time at

3   work, and the more Plaintiff tried to correct Baskerville or defend himself, the more Baskerville

4   would accuse Plaintiff of lying.

5       In October of 2017, Plaintiff requested he be permitted to take Python training.

6   Baskerville told Plaintiff to worry about his PIP and denied Plaintiff the opportunity to receive

7   additional training in retaliation for Plaintiff taking FMLA and objecting to the utilization of

8   offshore maintenance. Later, Plaintiff is informed and believes that Baskerville communicated

9   with Suresh Reddy after Suresh had indicated that a number of the engineers who had been

10  signed up for AWS training were not using their access. Plaintiff asked Suresh if Plaintiff was

11  one of the engineers Suresh was trying to contact. Suresh said no, Plaintiff had not been signed

12  up for AWS training even though FICO was trying to get as many engineers "AWS Certified" as

13  possible.

14      In about October of 2017, Plaintiff felt increasingly uncomfortable with the PIP

15  requirements that he push IFM work offshore.  Plaintiff felt compelled to call the FICO

16  whistleblower hotline.  Plaintiff was very worried about his job.  He asked the hotline where his

17  report would go once he completed it.  The hotline advised Plaintiff that it would be sent to

18  Human Resources.

19      Realizing that a report to Human Resources would quickly escalate, Plaintiff decided to

20  speak with Allyn Pon, the IFM Product Manager first.  After asking Plaintiff to wait a couple of

21  weeks before blowing the whistle, Pon eventually told Plaintiff he should go ahead and call back

22  the FICO whistleblower hotline.

23      Given the hostile environment Plaintiff had already been facing, he was seriously

24  concerned about his job security.  Plaintiff was afraid he would be further retaliated against if he

25  blew the whistle on the offshore assignments.  Instead of immediately calling the hotline,

26  Plaintiff sought advice from his friend and former IFM Product Manager.  She advised Plaintiff

27  that the issue was really for Pon to address.  Fearing he could lose his job, Plaintiff backed down

Ex D
Page 62

28  ///

1   and didn't call the hotline back.  Instead, Plaintiff resolved that he personally would not violate

2   HIPAA policy.

3         Also in October of 2017, Plaintiff expressed his concerns regarding his job security to

4   Baskerville.  Baskerville did not reassure Plaintiff that his job was secure.

5         In or about November of 2017, given Plaintiff's skill level and expertise, he inherited a

6   number of new responsibilities, including operational support for two additional products,

7   including Scorecard Pro and Decision Tree Pro, two of FICO's legacy tools designed to enable

8   customers to evaluate, customize, deploy and scale state-of-the-art analytics and decision

9   management solutions.

10        On December 6, 2017, Plaintiff's father passed away.  Plaintiff took one week of

11  approved bereavement leave.

12        In or about March of 2018, Plaintiff was considered for a new position with Robert

13  Leider whom Plaintiff had known for about fifteen years.  Plaintiff and Leider agreed Plaintiff

14  was a great fit for the job which offered Plaintiff a much-needed change of pace and a hostility-

15  free environment.  Unfortunately, Plaintiff was ultimately denied the position because of the

16  September 2017 PIP.  Defendant's retaliatory actions had caused Plaintiff to lose out on

17  opportunities for professional advancement and potential financial gain.

18        At this same time, Plaintiff learned that FICO's service provider at its data center in San

19  Francisco was leaving.  This departure had the potential to seriously disrupt FICO operations for

20  Scorecard Pro and Decision Tree Pro.  Given Plaintiff's advanced skillset and work ethic,

21  Baskerville turned to Plaintiff to "find a way" to ensure there were no operational interruptions

22  through the departure.  This is a very difficult task.  Plaintiff took one day to find a workable

23  solution and an additional day to write a full report.  Plaintiff made the transition as seamless as

24  Baskerville had hoped.

25        On or about April 8, 2018, Plaintiff expressed increased concern over the offshore

26  maintenance for IFM.  At one point, Plaintiff commented to an offshore engineer that the

27  requested changes to a client's hosted IFM environment should not be performed by offshore

28  ///

Ex D
Page 63

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1  engineers because they are not allowed access to client data.  Plaintiff is informed and believes

2  that this remark was communicated back to Baskerville.

3       On or about April 12, 2018, Plaintiff's worst fear came true: Baskerville terminated

4  Plaintiff, escorted him off the FICO property and forced him to leave behind his personal effects,

5  including his personal collection of technological books.

6       In between FICO giving Plaintiff a $25,000 retention bonus not to leave the company in

7  mid-2016 and Plaintiff's termination in April of 2018, two significant things happened:  Plaintiff

8  went on legally entitled Family Medical Leave, and Plaintiff objected to the illegal and unethical

9  offshore maintenance utilized by FICO.   Defendant wrongfully terminated Plaintiff in direct

10 retaliation for these two events.

11      Plaintiff invested over twenty years of his life and most of his career in Defendant FICO.

12 When FICO and Baskerville began demeaning, disparaging and belittling Plaintiff upon his

13 return from Family Medical Leave, as described above, Plaintiff was confused and extremely

14 distraught.  Plaintiff was haunted and tormented by the September 2017 unsubstantiated PIP

15 throughout his remaining days at FICO.

16 **Response to Special Interrogatory No. 4:**

17      Objection.  This Interrogatory calls for speculation, legal conclusion and analysis.  This

18 Interrogatory is additionally vague and ambiguous. Subject to and without waiving these or any

19 other applicable objections, Plaintiff responds as follows:  Yes.

20 **Response to Special Interrogatory No. 5:**

21 Objection.  This Interrogatory calls for speculation and for information which is more readily

22 available to propounding party. This Interrogatory further seeks the legal reasoning and theories

23 of Plaintiff's contentions. Plaintiff is not required to prepare the respondent's case.  (Sav-On

24 Drugs, Inc. v. Superior Court of Los Angeles County (1975) 15 Cal.3d 1.) Further, this

25 Interrogatory is unduly burdensome and oppressive insofar as it seems to require that the entire

26 case be litigated in writing, which is not the purpose of discovery; rather, discovery is intended to

27 eliminate surprise and promote resolution short of trial. *See generally* Greyhound Corp. v. Super.

Ex D
Page 64

28 ///

1   Ct., 56 Cal. 2d 355 (1961).  This Interrogatory is additionally overbroad as to time. Subject to

2   and without waiving these or any other applicable objections, Plaintiff responds as follows:

3           In or about January of 1997, Plaintiff was hired by Hecht-Nielson Neural Computing

4   ("HNC") as an Application Engineer working to deploy software, develop and test code and

5   develop prototypes in cities across the United States and Canada. In or about April of 2002,

6   Defendant FICO acquired HNC, and Plaintiff became an employee of FICO.

7           In 2010, Plaintiff started working with Insurance Fraud Manager, ("IFM").  In or about

8   January of 2013, Plaintiff was transferred to Product Operations for IFM.  The offshore

9   development of IFM had a number of logistical and technological hurdles to clear.  One of the

10  challenges was that offshore engineers did not have access to live HIPAA data.  All HIPAA data

11  had to be de-identified before being made available to offshore engineers.

12          In March of 2014, Plaintiff led a long-awaited IFM upgrade.

13          In 2015, Plaintiff was frequently "on call" as FICO moved its operations hub from

14  Minnesota to San Diego.  This move resulted in a major workload increase for Plaintiff who was

15  required to be near his laptop addressing emergencies and system failures on a near constant

16  basis. There were multiple "On call" weeks where Plaintiff slept for less than 18 hours over the

17  seven days. Consequently, there was a high level of attrition from the Product Operations group.

18  At one point, the "On call" rotation was just Plaintiff, Hannah Chan, and Greg Arseneau. In

19  December of 2015, Plaintiff took "On call" responsibilities for three out of the four weeks.

20          Also in 2016, Plaintiff learned that there was an increasing likelihood that FICO would

21  offshore IFM product operations despite the fact that the de-identification of HIPAA information

22  had not yet been accomplished.  When Plaintiff told Andrea Allmon, former product manager for

23  IFM, about this impending change, she responded, "That would literally take an act of Congress"

24  because HIPAA data cannot be handled by anyone outside of the United States.

25          In February of 2017, Plaintiff's father was diagnosed with pancreatic cancer.  Plaintiff's

26  father's prognosis was grim.  His physicians estimated he had three to six months to live.  In

27  addition to needing care and transportation, Plaintiff's father, who had lived with Plaintiff since

28  2008, presented a serious fall risk, and Plaintiff had to catch his father twice from falling during

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

Ex D
Page 65

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    a very short period. Because Plaintiff needed to care for his terminally ill father, in or about April

2    2017, Plaintiff went on Family Medical Leave.

3        In mid-July, Plaintiff's supervisor, Reef Baskerville, contacted Plaintiff to enquire when

4    Plaintiff would be returning to work. Plaintiff advised Baskerville he would be back at work on

5    July 20, 2017.  Baskerville immediately sent out a meeting request for Plaintiff to meet with him

6    at 10:00 a.m. on July 20, 2017.

7        The morning of July 20, 2017 did not go as planned for Plaintiff, and he was required to

8    administer to his gravely ill father.  Plaintiff advised Baskerville he would be fifteen minutes late

9    for their meeting.  Baskerville told Plaintiff not to bother, that he would be "too busy" to meet

10   with Plaintiff.  Immediately upon returning to work on July 20, 2017, Plaintiff felt that his work

11   place atmosphere had changed.  Baskerville was openly hostile, refusing to meet with Plaintiff

12   despite Plaintiff's numerous efforts to re-accomplish the return meeting.

13       As part of his pervasive discriminatory and retaliatory demeanor toward Plaintiff,

14   Baskerville did not agree to meet with Plaintiff again until July 24, 2017.  Baskerville began the

15   meeting with, "First of all, are you ready to come back to work because we've gone seventy-five

16   miles down the road since you left," implying that Plaintiff had been left behind as a result of his

17   taking FMLA.  Baskerville also advised Plaintiff that punctuality would now be monitored along

18   with productivity.  This was not the case for Plaintiff prior to his taking Family Medical Leave.

19   Baskerville further told Plaintiff he would need to become a subject matter expert ("SME") on

20   all hosted products.

21       Also during the July 24, 2017 meeting, Baskerville advised Plaintiff of another change

22   occurring at FICO.  He informed Plaintiff that maintenance work for IFM was now being

23   performed by offshore engineers in Bangalore and the United Kingdom.  Plaintiff felt that

24   preventing off-shore personnel from seeing United States health data was an obstacle that had

25   not been addressed by FICO during Plaintiff's leave.  Without this obstacle having been cleared,

26   the use of offshore personnel amounted to a potential HIPAA violation and a breach of client

27   contracts. Plaintiff responded by expressing his concern that the offshore arrangement presented

28   a potential HIPAA violation and further, violated client contracts, which specifically also

Ex D
Page 66

PLAINTIFF'S RESPONSES TO DEFENDANT'S SPECIAL INTERROGATORIES, SET ONE (1)

1    offshore personnel could be used. For example, Kaiser Permanente required background checks

2    for all persons touching Kaiser data.

3        Baskerville responded with hostility to Plaintiff's ongoing concerns telling him that the

4    issue had "already been decided" and that the offshore arrangement was "none of [Plaintiff's]

5    business." Plaintiff had serious reservations about sending operation support offshore because it

6    was inconsistent with the information he had previously received on the topic of offshoring

7    HIPAA data.

8        Throughout the summer of 2017, the atmosphere at FICO became increasingly hostile

9    toward Plaintiff. Baskerville was continually critical and antagonistic to Plaintiff. For example,

10   if Plaintiff was required to attend an appointment with his father, Baskerville would tell Plaintiff,

11   "don't bother coming in."

12       In July of 2017, although Plaintiff was entitled to a new upgraded phone, his request for a

13   new phone was continually delayed. Baskerville essentially sabotaged Plaintiff's ability to

14   perform his work tasks by denying him the equipment he needed. In or about November of

15   2017, Plaintiff's request for a phone was declined when Neil Hartley said, "We don't know if

16   Johnny will be around to use the phone." Only after Plaintiff documented his need, request and

17   subsequent delay did Plaintiff finally receive his new phone five (5) months later.

18       Starting in September of 2017, Baskerville instructed Plaintiff to no longer meet with

19   other team members and subject matter experts ("SME") to cross-train products. Some of these

20   SME's were off-shore engineers. Given that these meetings resulted in more employees having

21   familiarity and expertise with FICO's products, this measure was counter-productive and

22   designed to punish and alienate Plaintiff from fellow experts. Baskerville came to Plaintiff's

23   cubicle, directed Plaintiff to clear his calendar of SME meetings and stood over him while he did

24   so.

25       In or about September 2017, Defendant further discriminated and retaliated against

26   Plaintiff because of his medical leave and his association with his father, as well as his

27   complaints about FICO's unlawful conduct. On or about September 21, 2017, Baskerville

28   requested a meeting during which Lorraine Breithbart from HR was on the phone during this

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

Ex D

Page 67

1   meeting, Plaintiff was shocked to receive a Performance Improvement Plan ("PIP"). The PIP

2   gave Plaintiff a performance rating of "poor." The PIP raised no concerns about Plaintiff's

3   skills. Rather, the PIP focused on a number of "tardies," or days Plaintiff was late for work, and

4   Plaintiff working three (3) days from home.

5        Plaintiff objected to Baskerville and Breithbart regarding the tardies and absences and

6   expressed his feeling the numbers were inflated. In response, Breithbart and Baskerville agreed

7   the number of absences may have been incorrect, corroborating that the PIP was unjustified and

8   therefore retaliatory.

9        In truth, there was no legitimate basis for the PIP. The PIP was, in effect, retaliation for

10  Plaintiff taking Family Medical Leave to which he was legally entitled and an attempt to force

11  Plaintiff to comply with the offshore process of IFM, which he believed to be both illegal and

12  unethical. Plaintiff was stunned and disappointed to receive the PIP. About this time, Plaintiff

13  expressed his concerns to Breithbart that the PIP was a response to Plaintiff taking his legally

14  entitled Family Medical Leave.

15       On or about September 22, 2017, Plaintiff had a post-PIP follow-up meeting with

16  Breithbart during which Plaintiff expressed to Breithbart that his relationship with Baskerville

17  had deteriorated significantly since Plaintiff returned from FMLA. Plaintiff expressed to

18  Breithbart his belief that Baskerville was unhappy with Plaintiff for taking FMLA and that

19  Baskerville was retaliating against him. Breithbart dismissed Plaintiff's concerns and advised

20  Plaintiff that FMLA only guarantees an employee will have a job when he returns from leave.

21       During the September 22, 2017 meeting, Plaintiff additionally told Breithbart that he

22  objected to the allegation contained in the PIP that he failed "to follow processes and

23  procedures." Ironically, Baskerville's instruction that Plaintiff cease training off-shore personnel

24  had become the subject of a Performance Improvement Plan targeted at Plaintiff. This was also

25  a reference to Plaintiff's unwillingness to violate HIPAA requirements with the IFM product as

26  well as client contracts by pushing for offshore maintenance. Accordingly, Defendant explicitly

27  instructed Plaintiff to violate the law, which Plaintiff refused to do. Again, Breithbart brushed

28  Plaintiff's concerns aside.

Ex D
Page 68

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

PLAINTIFF'S RESPONSES TO DEFENDANT'S SPECIAL INTERROGATORIES, SET ONE (1)

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

From about September 21, 2017 through April 12, 2018, although the issues raised in the PIP were resolved within two-weeks, Plaintiff had weekly meetings with Baskerville during which Baskerville was openly hostile, belittling and chastising Plaintiff at every opportunity. Baskerville began falsely accusing Plaintiff of misrepresenting how Plaintiff spent his time at work, and the more Plaintiff tried to correct Baskerville or defend himself, the more Baskerville would accuse Plaintiff of lying.

In October of 2017, Plaintiff requested he be permitted to take Python training. Baskerville told Plaintiff to worry about his PIP and denied Plaintiff the opportunity to receive additional training in retaliation for Plaintiff taking FMLA and objecting to the utilization of offshore maintenance. Later, Plaintiff is informed and believes that Baskerville communicated with Suresh Reddy after Suresh had indicated that a number of the engineers who had been signed up for AWS training were not using their access. Plaintiff asked Suresh if Plaintiff was one of the engineers Suresh was trying to contact. Suresh said no, Plaintiff had not been signed up for AWS training even though FICO was trying to get as many engineers "AWS Certified" as possible.

In about October of 2017, Plaintiff felt increasingly uncomfortable with the PIP requirements that he push IFM work offshore. Plaintiff felt compelled to call the FICO whistleblower hotline. Plaintiff was very worried about his job. He asked the hotline where his report would go once he completed it. The hotline advised Plaintiff that it would be sent to Human Resources.

Realizing that a report to Human Resources would quickly escalate, Plaintiff decided to speak with Allyn Pon, the IFM Product Manager first. After asking Plaintiff to wait a couple of weeks before blowing the whistle, Pon eventually told Plaintiff he should go ahead and call back the FICO whistleblower hotline.

Given the hostile environment Plaintiff had already been facing, he was seriously concerned about his job security. Plaintiff was afraid he would be further retaliated against if he blew the whistle on the offshore assignments. Instead of immediately calling the hotline, Plaintiff sought advice from his friend and former IFM Product Manager. She told Plaintiff

Ex D
Page 69

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1  that the issue was really for Pon to address.  Fearing he could lose his job, Plaintiff backed down

2  and didn't call the hotline back. Instead, Plaintiff resolved that he personally would not violate

3  HIPAA policy.

4      Also in October of 2017, Plaintiff expressed his concerns regarding his job security to

5  Baskerville.  Baskerville did not reassure Plaintiff that his job was secure.

6      In or about November of 2017, given Plaintiff's skill level and expertise, he inherited a

7  number of new responsibilities, including operational support for two additional products,

8  including Scorecard Pro and Decision Tree Pro, two of FICO's legacy tools designed to enable

9  customers to evaluate, customize, deploy and scale state-of-the-art analytics and decision

10  management solutions.

11      On December 6, 2017, Plaintiff's father passed away.  Plaintiff took one week of

12  approved bereavement leave.

13      In or about March of 2018, Plaintiff was considered for a new position with Robert

14  Leider whom Plaintiff had known for about fifteen years.  Plaintiff and Leider agreed Plaintiff

15  was a great fit for the job which offered Plaintiff a much-needed change of pace and a hostility-

16  free environment.  Unfortunately, Plaintiff was ultimately denied the position because of the

17  September 2017 PIP.  Defendant's retaliatory actions had caused Plaintiff to lose out on

18  opportunities for professional advancement and potential financial gain.

19      At this same time, Plaintiff learned that FICO's service provider at its data center in San

20  Francisco was leaving.  This departure had the potential to seriously disrupt FICO operations for

21  Scorecard Pro and Decision Tree Pro.  Given Plaintiff's advanced skillset and work ethic,

22  Baskerville turned to Plaintiff to "find a way" to ensure there were no operational interruptions

23  through the departure.  This is a very difficult task.  Plaintiff took one day to find a workable

24  solution and an additional day to write a full report.  Plaintiff made the transition as seamless as

25  Baskerville had hoped.

26      On or about April 8, 2018, Plaintiff expressed increased concern over the offshore

27  maintenance for IFM.  At one point, Plaintiff commented to an offshore engineer that the

28  requested changes to a client's hosted IFM environment should not be performed by offshore

1  engineers because they are not allowed access to client data.  Plaintiff is informed and believes

2  that this remark was communicated back to Baskerville.

3       On or about April 12, 2018, Plaintiff's worst fear came true: Baskerville terminated

4  Plaintiff, escorted him off the FICO property and forced him to leave behind his personal effects,

5  including his personal collection of technological books.

6       In between FICO giving Plaintiff a $25,000 retention bonus not to leave the company in

7  mid-2016 and Plaintiff's termination in April of 2018, two significant things happened:  Plaintiff

8  went on legally entitled Family Medical Leave, and Plaintiff objected to the illegal and unethical

9  offshore maintenance utilized by FICO.   Defendant wrongfully terminated Plaintiff in direct

10  retaliation for these two events.

11       Plaintiff invested over twenty years of his life and most of his career in Defendant FICO.

12  When FICO and Baskerville began demeaning, disparaging and belittling Plaintiff upon his

13  return from Family Medical Leave, as described above, Plaintiff was confused and extremely

14  distraught.  Plaintiff was haunted and tormented by the September 2017 unsubstantiated PIP

15  throughout his remaining days at FICO.

**Response to Special Interrogatory No. 6:**

16

17       Objection.  This Interrogatory calls for speculation, legal conclusion and analysis.  This

18  Interrogatory is additionally vague and ambiguous. Subject to and without waiving these or any

19  other applicable objections, Plaintiff responds as follows:  Yes.

20  **Response to Special Interrogatory No. 7:**

21       Objection.  This Interrogatory calls for speculation, legal conclusion and analysis.  This

22  Interrogatory is additionally vague and ambiguous. Subject to and without waiving these or any

23  other applicable objections, Plaintiff responds as follows:  Yes.

24  **Response to Special Interrogatory No. 8:**

25       Objection.  This Interrogatory calls for speculation and for information which is more

26  readily available to propounding party. This Interrogatory further seeks the legal reasoning and

27  theories of Plaintiff's contentions. Plaintiff is not required to prepare the respondent's case.

28  (Sav-On Drugs, Inc. v. Superior Court of Los Angeles County (1975) 15 Cal.3d 1. Further, this

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA  92101-2013

1   Interrogatory is unduly burdensome and oppressive insofar as it seems to require that the entire

2   case be litigated in writing, which is not the purpose of discovery; rather, discovery is intended to

3   eliminate surprise and promote resolution short of trial. *See generally* Greyhound Corp. v. Super.

4   Ct., 56 Cal. 2d 355 (1961). This Interrogatory is additionally overbroad as to time. Subject to

5   and without waiving these or any other applicable objections, Plaintiff responds as follows:

6        In or about January of 1997, Plaintiff was hired by Hecht-Nielson Neural Computing

7   ("HNC") as an Application Engineer working to deploy software, develop and test code and

8   develop prototypes in cities across the United States and Canada. In or about April of 2002,

9   Defendant FICO acquired HNC, and Plaintiff became an employee of FICO.

10        In 2010, Plaintiff started working with Insurance Fraud Manager, ("IFM"). In or about

11   January of 2013, Plaintiff was transferred to Product Operations for IFM. The offshore

12   development of IFM had a number of logistical and technological hurdles to clear. One of the

13   challenges was that offshore engineers did not have access to live HIPAA data. All HIPAA data

14   had to be de-identified before being made available to offshore engineers.

15        In March of 2014, Plaintiff led a long-awaited IFM upgrade.

16        In 2015, Plaintiff was frequently "on call" as FICO moved its operations hub from

17   Minnesota to San Diego. This move resulted in a major workload increase for Plaintiff who was

18   required to be near his laptop addressing emergencies and system failures on a near constant

19   basis. There were multiple "On call" weeks where Plaintiff slept for less than 18 hours over the

20   seven days. Consequently, there was a high level of attrition from the Product Operations group.

21   At one point, the "On call" rotation was just Plaintiff, Hannah Chan, and Greg Arseneau. In

22   December of 2015, Plaintiff took "On call" responsibilities for three out of the four weeks.

23        Also in 2016, Plaintiff learned that there was an increasing likelihood that FICO would

24   offshore IFM product operations despite the fact that the de-identification of HIPAA information

25   had not yet been accomplished. When Plaintiff told Andrea Allmon, former product manager for

26   IFM, about this impending change, she responded, "That would literally take an act of Congress"

27   because HIPAA data cannot be handled by anyone outside of the United States.

28   ///

Ex D
Page 72

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

In February of 2017, Plaintiff's father was diagnosed with pancreatic cancer. Plaintiff's father's prognosis was grim. His physicians estimated he had three to six months to live. In addition to needing care and transportation, Plaintiff's father, who had lived with Plaintiff since 2008, presented a serious fall risk, and Plaintiff had to catch his father twice from falling during a very short period. Because Plaintiff needed to care for his terminally ill father, in or about April 2017, Plaintiff went on Family Medical Leave.

In mid-July, Plaintiff's supervisor, Reef Baskerville, contacted Plaintiff to enquire when Plaintiff would be returning to work. Plaintiff advised Baskerville he would be back at work on July 20, 2017. Baskerville immediately sent out a meeting request for Plaintiff to meet with him at 10:00 a.m. on July 20, 2017.

The morning of July 20, 2017 did not go as planned for Plaintiff, and he was required to administer to his gravely ill father. Plaintiff advised Baskerville he would be fifteen minutes late for their meeting. Baskerville told Plaintiff not to bother, that he would be "too busy" to meet with Plaintiff. Immediately upon returning to work on July 20, 2017, Plaintiff felt that his work place atmosphere had changed. Baskerville was openly hostile, refusing to meet with Plaintiff despite Plaintiff's numerous efforts to re-accomplish the return meeting.

As part of his pervasive discriminatory and retaliatory demeanor toward Plaintiff, Baskerville did not agree to meet with Plaintiff again until July 24, 2017. Baskerville began the meeting with, "First of all, are you ready to come back to work because we've gone seventy-five miles down the road since you left," implying that Plaintiff had been left behind as a result of his taking FMLA. Baskerville also advised Plaintiff that punctuality would now be monitored along with productivity. This was not the case for Plaintiff prior to his taking Family Medical Leave. Baskerville further told Plaintiff he would need to become a subject matter expert ("SME") on all hosted products.

Also during the July 24, 2017 meeting, Baskerville advised Plaintiff of another change occurring at FICO. He informed Plaintiff that maintenance work for IFM was now being performed by offshore engineers in Bangalore and the United Kingdom. Plaintiff felt that preventing off-shore personnel from seeing United States health data was an obstacle that had

Ex D
Page 78

1   not been addressed by FICO during Plaintiff's leave.  Without this obstacle having been cleared,

2   the use of offshore personnel amounted to a potential HIPAA violation and a breach of client

3   contracts. Plaintiff responded by expressing his concern that the offshore arrangement presented

4   a potential HIPAA violation and further, violated client contracts, which specified that no

5   offshore personnel could be used. For example, Kaiser Permanente required background checks

6   for all persons touching Kaiser data.

7        Baskerville responded with hostility to Plaintiff's ongoing concerns telling him that the

8   issue had "already been decided" and that the offshore arrangement was "none of [Plaintiff's]

9   business." Plaintiff had serious reservations about sending operation support offshore because it

10  was inconsistent with the information he had previously received on the topic of offshoring

11  HIPAA data.

12       Throughout the summer of 2017, the atmosphere at FICO became increasingly hostile

13  toward Plaintiff.  Baskerville was continually critical and antagonistic to Plaintiff.  For example,

14  if Plaintiff was required to attend an appointment with his father, Baskerville would tell Plaintiff,

15  "don't bother coming in."

16       In July of 2017, although Plaintiff was entitled to a new upgraded phone, his request for a

17  new phone was continually delayed.  Baskerville essentially sabotaged Plaintiff's ability to

18  perform his work tasks by denying him the equipment he needed.  In or about November of

19  2017, Plaintiff's request for a phone was declined when Neil Hartley said, "We don't know if

20  Johnny will be around to use the phone." Only after Plaintiff documented his need, request and

21  subsequent delay did Plaintiff finally receive his new phone five (5) months later.

22       Starting in September of 2017, Baskerville instructed Plaintiff to no longer meet with

23  other team members and subject matter experts ("SME") to cross-train products.  Some of these

24  SME's were off-shore engineers.  Given that these meetings resulted in more employees having

25  familiarity and expertise with FICO's products, this measure was counter-productive and

26  designed to punish and alienate Plaintiff from fellow experts.  Baskerville came to Plaintiff's

27  cubicle, directed Plaintiff to clear his calendar of SME meetings and stood over him while he did

28  so.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

Ex D
Page 74

1    In or about September 2017, Defendant further discriminated and retaliated against

2  Plaintiff because of his medical leave and his association with his father, as well as his

3  complaints about FICO's unlawful conduct.  On or about September 21, 2017, Baskerville

4  requested a meeting during which Lorraine Breithbart from HR was on the phone.  During this

5  meeting, Plaintiff was shocked to receive a Performance Improvement Plan ("PIP").  The PIP

6  gave Plaintiff a performance rating of "poor."  The PIP raised no concerns about Plaintiff's

7  skills. Rather, the PIP focused on a number of "tardies," or days Plaintiff was late for work, and

8  Plaintiff working three (3) days from home.

9    Plaintiff objected to Baskerville and Breithbart regarding the tardies and absences and

10  expressed his feeling the numbers were inflated.  In response, Breithbart and Baskerville agreed

11  the number of absences may have been incorrect, corroborating that the PIP was unjustified and

12  therefore retaliatory.

13    In truth, there was no legitimate basis for the PIP.  The PIP was, in effect, retaliation for

14  Plaintiff taking Family Medical Leave to which he was legally entitled and an attempt to force

15  Plaintiff to comply with the offshore process of IFM, which he believed to be both illegal and

16  unethical.  Plaintiff was stunned and disappointed to receive the PIP.  About this time, Plaintiff

17  expressed his concerns to Breithbart that the PIP was a response to Plaintiff taking his legally

18  entitled Family Medical Leave.

19    On or about September 22, 2017, Plaintiff had a post-PIP follow-up meeting with

20  Breithbart during which Plaintiff expressed to Breithbart that his relationship with Baskerville

21  had deteriorated significantly since Plaintiff returned from FMLA.  Plaintiff expressed to

22  Breithbart his belief that Baskerville was unhappy with Plaintiff for taking FMLA and that

23  Baskerville was retaliating against him.  Breithbart dismissed Plaintiff's concerns and advised

24  Plaintiff that FMLA only guarantees an employee will have a job when he returns from leave.

25    During the September 22, 2017 meeting, Plaintiff additionally told Breithbart that he

26  objected to the allegation contained in the PIP that he failed "to follow processes and

27  procedures."  Ironically, Baskerville's instruction that Plaintiff cease training off-shore personnel

28  had become the subject of a Performance Improvement Plan targeted at Plaintiff. This was also

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

Ex. D
Page 75

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1  a reference to Plaintiff's unwillingness to violate HIPAA requirements with the IFM product as

2  well as client contracts by pushing for offshore maintenance.  Accordingly, Defendant explicitly

3  instructed Plaintiff to violate the law, which Plaintiff refused to do. Again, Breithbart brushed

4  Plaintiff's concerns aside.

5       From about September 21, 2017 through April 12, 2018, although the issues raised in the

6  PIP were resolved within two-weeks, Plaintiff had weekly meetings with Baskerville during

7  which Baskerville was openly hostile, belittling and chastising Plaintiff at every opportunity.

8  Baskerville began falsely accusing Plaintiff of misrepresenting how Plaintiff spent his time at

9  work, and the more Plaintiff tried to correct Baskerville or defend himself, the more Baskerville

10  would accuse Plaintiff of lying.

11       In October of 2017, Plaintiff requested he be permitted to take Python training.

12  Baskerville told Plaintiff to worry about his PIP and denied Plaintiff the opportunity to receive

13  additional training in retaliation for Plaintiff taking FMLA and objecting to the utilization of

14  offshore maintenance. Later, Plaintiff is informed and believes that Baskerville communicated

15  with Suresh Reddy after Suresh had indicated that a number of the engineers who had been

16  signed up for AWS training were not using their access. Plaintiff asked Suresh if Plaintiff was

17  one of the engineers Suresh was trying to contact. Suresh said no, Plaintiff had not been signed

18  up for AWS training even though FICO was trying to get as many engineers "AWS Certified" as

19  possible.

20       In about October of 2017, Plaintiff felt increasingly uncomfortable with the PIP

21  requirements that he push IFM work offshore.  Plaintiff felt compelled to call the FICO

22  whistleblower hotline.  Plaintiff was very worried about his job.  He asked the hotline where his

23  report would go once he completed it.  The hotline advised Plaintiff that it would be sent to

24  Human Resources.

25       Realizing that a report to Human Resources would quickly escalate, Plaintiff decided to

26  speak with Allyn Pon, the IFM Product Manager first.  After asking Plaintiff to wait a couple of

27  weeks before blowing the whistle, Pon eventually told Plaintiff he should go ahead and call back

28  the FICO whistleblower hotline.

Ex D
Page 76

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1   Given the hostile environment Plaintiff had already been facing, he was seriously

2   concerned about his job security.  Plaintiff was afraid he would be further retaliated against if he

3   blew the whistle on the offshore assignments.  Instead of immediately calling the hotline,

4   Plaintiff sought advice from his friend and former IFM Product Manager.  She advised Plaintiff

5   that the issue was really for Pon to address.  Fearing he could lose his job, Plaintiff backed down

6   and didn't call the hotline back. Instead, Plaintiff resolved that he personally would not violate

7   HIPAA policy.

8   Also in October of 2017, Plaintiff expressed his concerns regarding his job security to

9   Baskerville.  Baskerville did not reassure Plaintiff that his job was secure.

10   In or about November of 2017, given Plaintiff's skill level and expertise, he inherited a

11   number of new responsibilities, including operational support for two additional products,

12   including Scorecard Pro and Decision Tree Pro, two of FICO's legacy tools designed to enable

13   customers to evaluate, customize, deploy and scale state-of-the-art analytics and decision

14   management solutions.

15   On December 6, 2017, Plaintiff's father passed away.  Plaintiff took one week of

16   approved bereavement leave.

17   In or about March of 2018, Plaintiff was considered for a new position with Robert

18   Leider whom Plaintiff had known for about fifteen years.  Plaintiff and Leider agreed Plaintiff

19   was a great fit for the job which offered Plaintiff a much-needed change of pace and a hostility-

20   free environment.  Unfortunately, Plaintiff was ultimately denied the position because of the

21   September 2017 PIP.  Defendant's retaliatory actions had caused Plaintiff to lose out on

22   opportunities for professional advancement and potential financial gain.

23   At this same time, Plaintiff learned that FICO's service provider at its data center in San

24   Francisco was leaving.  This departure had the potential to seriously disrupt FICO operations for

25   Scorecard Pro and Decision Tree Pro.  Given Plaintiff's advanced skillset and work ethic,

26   Baskerville turned to Plaintiff to "find a way" to ensure there were no operational interruptions

27   through the departure.  This is a very difficult task.  Plaintiff took one day to find a workable

28   ///

EX D
Page 77

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1  solution and an additional day to write a full report.  Plaintiff made the transition as seamless as

2  Baskerville had hoped.

3       On or about April 8, 2018, Plaintiff expressed increased concern over the offshore

4  maintenance for IFM.  At one point, Plaintiff commented to an offshore engineer that the

5  requested changes to a client's hosted IFM environment should not be performed by offshore

6  engineers because they are not allowed access to client data.  Plaintiff is informed and believes

7  that this remark was communicated back to Baskerville.

8       On or about April 12, 2018, Plaintiff's worst fear came true: Baskerville terminated

9  Plaintiff, escorted him off the FICO property and forced him to leave behind his personal effects,

10  including his personal collection of technological books.

11       In between FICO giving Plaintiff a $25,000 retention bonus not to leave the company in

12  mid-2016 and Plaintiff's termination in April of 2018, two significant things happened:  Plaintiff

13  went on legally entitled Family Medical Leave, and Plaintiff objected to the illegal and unethical

14  offshore maintenance utilized by FICO.   Defendant wrongfully terminated Plaintiff in direct

15  retaliation for these two events.

16       Plaintiff invested over twenty years of his life and most of his career in Defendant FICO.

17  When FICO and Baskerville began demeaning, disparaging and belittling Plaintiff upon his

18  return from Family Medical Leave, as described above, Plaintiff was confused and extremely

19  distraught.  Plaintiff was haunted and tormented by the September 2017 unsubstantiated PIP

20  throughout his remaining days at FICO.

21  **Response to Special Interrogatory No. 9:**

22       Objection.  This Interrogatory calls for speculation and for information which is more

23  readily available to propounding party. This Interrogatory further seeks the legal reasoning and

24  theories of Plaintiff's contentions. Plaintiff is not required to prepare the respondent's case.

25  (Sav-On Drugs, Inc. v. Superior Court of Los Angeles County (1975) 15 Cal.3d 1.) Further, this

26  Interrogatory is unduly burdensome and oppressive insofar as it seems to require that the entire

27  case be litigated in writing, which is not the purpose of discovery; rather, discovery is intended to

28  eliminate surprise and promote resolution short of trial. *See generally* Greyhound Corp. v. Super.

Ex D
Page 78

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    Ct., 56 Cal. 2d 355 (1961).  This Interrogatory is additionally overbroad as to time. Subject to

2    and without waiving these or any other applicable objections, Plaintiff responds as follows:

3    In or about January of 1997, Plaintiff was hired by Hecht-Nielson Neural Computing

4    ("HNC") as an Application Engineer working to deploy software, develop and test code and

5    develop prototypes in cities across the United States and Canada. In or about April of 2002,

6    Defendant FICO acquired HNC, and Plaintiff became an employee of FICO.

7    In 2010, Plaintiff started working with Insurance Fraud Manager, ("IFM").  In or about

8    January of 2013, Plaintiff was transferred to Product Operations for IFM.  The offshore

9    development of IFM had a number of logistical and technological hurdles to clear.  One of the

10   challenges was that offshore engineers did not have access to live HIPAA data.  All HIPAA data

11   had to be de-identified before being made available to offshore engineers.

12   In March of 2014, Plaintiff led a long-awaited IFM upgrade.

13   In 2015, Plaintiff was frequently "on call" as FICO moved its operations hub from

14   Minnesota to San Diego.  This move resulted in a major workload increase for Plaintiff who was

15   required to be near his laptop addressing emergencies and system failures on a near constant

16   basis. There were multiple "On call" weeks where Plaintiff slept for less than 18 hours over the

17   seven days. Consequently, there was a high level of attrition from the Product Operations group.

18   At one point, the "On call" rotation was just Plaintiff, Hannah Chan, and Greg Arseneau. In

19   December of 2015, Plaintiff took "On call" responsibilities for three out of the four weeks.

20   Also in 2016, Plaintiff learned that there was an increasing likelihood that FICO would

21   offshore IFM product operations despite the fact that the de-identification of HIPAA information

22   had not yet been accomplished.  When Plaintiff told Andrea Allmon, former product manager for

23   IFM, about this impending change, she responded, "That would literally take an act of Congress"

24   because HIPAA data cannot be handled by anyone outside of the United States.

25   In February of 2017, Plaintiff's father was diagnosed with pancreatic cancer.  Plaintiff's

26   father's prognosis was grim.  His physicians estimated he had three to six months to live.  In

27   addition to needing care and transportation, Plaintiff's father, who had lived with Plaintiff since

28   2008, presented a serious fall risk, and Plaintiff had to catch his father twice from falling during

Ex D
Page 79

a very short period. Because Plaintiff needed to care for his terminally ill father, in or about April 2017, Plaintiff went on Family Medical Leave.

In mid-July, Plaintiff's supervisor, Reef Baskerville, contacted Plaintiff to enquire when Plaintiff would be returning to work. Plaintiff advised Baskerville he would be back at work on July 20, 2017. Baskerville immediately sent out a meeting request for Plaintiff to meet with him at 10:00 a.m. on July 20, 2017.

The morning of July 20, 2017 did not go as planned for Plaintiff, and he was required to administer to his gravely ill father. Plaintiff advised Baskerville he would be fifteen minutes late for their meeting. Baskerville told Plaintiff not to bother, that he would be "too busy" to meet with Plaintiff. Immediately upon returning to work on July 20, 2017, Plaintiff felt that his work place atmosphere had changed. Baskerville was openly hostile, refusing to meet with Plaintiff despite Plaintiff's numerous efforts to re-accomplish the return meeting.

As part of his pervasive discriminatory and retaliatory demeanor toward Plaintiff, Baskerville did not agree to meet with Plaintiff again until July 24, 2017. Baskerville began the meeting with, "First of all, are you ready to come back to work because we've gone seventy-five miles down the road since you left," implying that Plaintiff had been left behind as a result of his taking FMLA. Baskerville also advised Plaintiff that punctuality would now be monitored along with productivity. This was not the case for Plaintiff prior to his taking Family Medical Leave. Baskerville further told Plaintiff he would need to become a subject matter expert ("SME") on all hosted products.

Also during the July 24, 2017 meeting, Baskerville advised Plaintiff of another change occurring at FICO. He informed Plaintiff that maintenance work for IFM was now being performed by offshore engineers in Bangalore and the United Kingdom. Plaintiff felt that preventing off-shore personnel from seeing United States health data was an obstacle that had not been addressed by FICO during Plaintiff's leave. Without this obstacle having been cleared, the use of offshore personnel amounted to a potential HIPAA violation and a breach of client contracts. Plaintiff responded by expressing his concern that the offshore arrangement presented a potential HIPAA violation and further, violated client contracts, which specifically had no

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

Ex D
Page 80

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1  offshore personnel could be used. For example, Kaiser Permanente required background checks

2  for all persons touching Kaiser data.

3      Baskerville responded with hostility to Plaintiff's ongoing concerns telling him that the

4  issue had "already been decided" and that the offshore arrangement was "none of [Plaintiff's]

5  business." Plaintiff had serious reservations about sending operation support offshore because it

6  was inconsistent with the information he had previously received on the topic of offshoring

7  HIPAA data.

8      Throughout the summer of 2017, the atmosphere at FICO became increasingly hostile

9  toward Plaintiff. Baskerville was continually critical and antagonistic to Plaintiff. For example,

10  if Plaintiff was required to attend an appointment with his father, Baskerville would tell Plaintiff,

11  "don't bother coming in."

12      In July of 2017, although Plaintiff was entitled to a new upgraded phone, his request for a

13  new phone was continually delayed. Baskerville essentially sabotaged Plaintiff's ability to

14  perform his work tasks by denying him the equipment he needed. In or about November of

15  2017, Plaintiff's request for a phone was declined when Neil Hartley said, "We don't know if

16  Johnny will be around to use the phone." Only after Plaintiff documented his need, request and

17  subsequent delay did Plaintiff finally receive his new phone five (5) months later.

18      Starting in September of 2017, Baskerville instructed Plaintiff to no longer meet with

19  other team members and subject matter experts ("SME") to cross-train products. Some of these

20  SME's were off-shore engineers. Given that these meetings resulted in more employees having

21  familiarity and expertise with FICO's products, this measure was counter-productive and

22  designed to punish and alienate Plaintiff from fellow experts. Baskerville came to Plaintiff's

23  cubicle, directed Plaintiff to clear his calendar of SME meetings and stood over him while he did

24  so.

25      In or about September 2017, Defendant further discriminated and retaliated against

26  Plaintiff because of his medical leave and his association with his father, as well as his

27  complaints about FICO's unlawful conduct. On or about September 21, 2017, Baskerville

28  requested a meeting during which Lorraine Breithart from HR was on the phone. During this

Ex. D
Page 81

1  meeting, Plaintiff was shocked to receive a Performance Improvement Plan ("PIP"). The PIP

2  gave Plaintiff a performance rating of "poor." The PIP raised no concerns about Plaintiff's

3  skills. Rather, the PIP focused on a number of "tardies," or days Plaintiff was late for work, and

4  Plaintiff working three (3) days from home.

5          Plaintiff objected to Baskerville and Breithbart regarding the tardies and absences and

6  expressed his feeling the numbers were inflated. In response, Breithbart and Baskerville agreed

7  the number of absences may have been incorrect, corroborating that the PIP was unjustified and

8  therefore retaliatory.

9          In truth, there was no legitimate basis for the PIP. The PIP was, in effect, retaliation for

10 Plaintiff taking Family Medical Leave to which he was legally entitled and an attempt to force

11 Plaintiff to comply with the offshore process of IFM, which he believed to be both illegal and

12 unethical. Plaintiff was stunned and disappointed to receive the PIP. About this time, Plaintiff

13 expressed his concerns to Breithbart that the PIP was a response to Plaintiff taking his legally

14 entitled Family Medical Leave.

15         On or about September 22, 2017, Plaintiff had a post-PIP follow-up meeting with

16 Breithbart during which Plaintiff expressed to Breithbart that his relationship with Baskerville

17 had deteriorated significantly since Plaintiff returned from FMLA. Plaintiff expressed to

18 Breithbart his belief that Baskerville was unhappy with Plaintiff for taking FMLA and that

19 Baskerville was retaliating against him. Breithbart dismissed Plaintiff's concerns and advised

20 Plaintiff that FMLA only guarantees an employee will have a job when he returns from leave.

21         During the September 22, 2017 meeting, Plaintiff additionally told Breithbart that he

22 objected to the allegation contained in the PIP that he failed "to follow processes and

23 procedures." Ironically, Baskerville's instruction that Plaintiff cease training off-shore personnel

24 had become the subject of a Performance Improvement Plan targeted at Plaintiff. This was also

25 a reference to Plaintiff's unwillingness to violate HIPAA requirements with the IFM product as

26 well as client contracts by pushing for offshore maintenance. Accordingly, Defendant explicitly

27 instructed Plaintiff to violate the law, which Plaintiff refused to do. Again, Breithbart brushed

28 Plaintiff's concerns aside.

Ex D
Page 82

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

From about September 21, 2017 through April 12, 2018, although the issues raised in the PIP were resolved within two-weeks, Plaintiff had weekly meetings with Baskerville during which Baskerville was openly hostile, belittling and chastising Plaintiff at every opportunity. Baskerville began falsely accusing Plaintiff of misrepresenting how Plaintiff spent his time at work, and the more Plaintiff tried to correct Baskerville or defend himself, the more Baskerville would accuse Plaintiff of lying.

In October of 2017, Plaintiff requested he be permitted to take Python training. Baskerville told Plaintiff to worry about his PIP and denied Plaintiff the opportunity to receive additional training in retaliation for Plaintiff taking FMLA and objecting to the utilization of offshore maintenance. Later, Plaintiff is informed and believes that Baskerville communicated with Suresh Reddy after Suresh had indicated that a number of the engineers who had been signed up for AWS training were not using their access. Plaintiff asked Suresh if Plaintiff was one of the engineers Suresh was trying to contact. Suresh said no, Plaintiff had not been signed up for AWS training even though FICO was trying to get as many engineers "AWS Certified" as possible.

In about October of 2017, Plaintiff felt increasingly uncomfortable with the PIP requirements that he push IFM work offshore. Plaintiff felt compelled to call the FICO whistleblower hotline. Plaintiff was very worried about his job. He asked the hotline where his report would go once he completed it. The hotline advised Plaintiff that it would be sent to Human Resources.

Realizing that a report to Human Resources would quickly escalate, Plaintiff decided to speak with Allyn Pon, the IFM Product Manager first. After asking Plaintiff to wait a couple of weeks before blowing the whistle, Pon eventually told Plaintiff he should go ahead and call back the FICO whistleblower hotline.

Given the hostile environment Plaintiff had already been facing, he was seriously concerned about his job security. Plaintiff was afraid he would be further retaliated against if he blew the whistle on the offshore assignments. Instead of immediately calling the hotline, Plaintiff sought advice from his friend and former IFM Product Manager. She advised Plaintiff

Ex D
Page 83

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1   that the issue was really for Pon to address.  Fearing he could lose his job, Plaintiff backed down

2   and didn't call the hotline back. Instead, Plaintiff resolved that he personally would not violate

3   HIPAA policy.

4       Also in October of 2017, Plaintiff expressed his concerns regarding his job security to

5   Baskerville.  Baskerville did not reassure Plaintiff that his job was secure.

6       In or about November of 2017, given Plaintiff's skill level and expertise, he inherited a

7   number of new responsibilities, including operational support for two additional products,

8   including Scorecard Pro and Decision Tree Pro, two of FICO's legacy tools designed to enable

9   customers to evaluate, customize, deploy and scale state-of-the-art analytics and decision

10  management solutions.

11      On December 6, 2017, Plaintiff's father passed away.  Plaintiff took one week of

12  approved bereavement leave.

13      In or about March of 2018, Plaintiff was considered for a new position with Robert

14  Leider whom Plaintiff had known for about fifteen years.  Plaintiff and Leider agreed Plaintiff

15  was a great fit for the job which offered Plaintiff a much-needed change of pace and a hostility-

16  free environment.  Unfortunately, Plaintiff was ultimately denied the position because of the

17  September 2017 PIP.  Defendant's retaliatory actions had caused Plaintiff to lose out on

18  opportunities for professional advancement and potential financial gain.

19      At this same time, Plaintiff learned that FICO's service provider at its data center in San

20  Francisco was leaving.  This departure had the potential to seriously disrupt FICO operations for

21  Scorecard Pro and Decision Tree Pro.  Given Plaintiff's advanced skillset and work ethic,

22  Baskerville turned to Plaintiff to "find a way" to ensure there were no operational interruptions

23  through the departure.  This is a very difficult task.  Plaintiff took one day to find a workable

24  solution and an additional day to write a full report.  Plaintiff made the transition as seamless as

25  Baskerville had hoped.

26      On or about April 8, 2018, Plaintiff expressed increased concern over the offshore

27  maintenance for IFM.  At one point, Plaintiff commented to an offshore engineer that the

28  requested changes to a client's hosted IFM environment should not be performed offshore

Ex D
Page 84

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1   engineers because they are not allowed access to client data.  Plaintiff is informed and believes

2   that this remark was communicated back to Baskerville.

3          On or about April 12, 2018, Plaintiff's worst fear came true: Baskerville terminated

4   Plaintiff, escorted him off the FICO property and forced him to leave behind his personal effects,

5   including his personal collection of technological books.

6          In between FICO giving Plaintiff a $25,000 retention bonus not to leave the company in

7   mid-2016 and Plaintiff's termination in April of 2018, two significant things happened:  Plaintiff

8   went on legally entitled Family Medical Leave, and Plaintiff objected to the illegal and unethical

9   offshore maintenance utilized by FICO.   Defendant wrongfully terminated Plaintiff in direct

10  retaliation for these two events.

11         Plaintiff invested over twenty years of his life and most of his career in Defendant FICO.

12  When FICO and Baskerville began demeaning, disparaging and belittling Plaintiff upon his

13  return from Family Medical Leave, as described above, Plaintiff was confused and extremely

14  distraught.  Plaintiff was haunted and tormented by the September 2017 unsubstantiated PIP

15  throughout his remaining days at FICO.

16  **Response to Special Interrogatory No. 10:**

17         Objection.  This Interrogatory calls for speculation and for information which is more

18  readily available to propounding party. This Interrogatory further seeks the legal reasoning and

19  theories of Plaintiff's contentions. Plaintiff is not required to prepare the respondent's case.

20  (Sav-On Drugs, Inc. v. Superior Court of Los Angeles County (1975) 15 Cal.3d 1.) Further, this

21  Interrogatory is unduly burdensome and oppressive insofar as it seems to require that the entire

22  case be litigated in writing, which is not the purpose of discovery; rather, discovery is intended to

23  eliminate surprise and promote resolution short of trial. *See generally* Greyhound Corp. v. Super.

24  Ct., 56 Cal. 2d 355 (1961).  This Interrogatory is additionally overbroad as to time. Subject to

25  and without waiving these or any other applicable objections, Plaintiff responds as follows:

26         In or about January of 1997, Plaintiff was hired by Hecht-Nielson Neural Computing

27  ("HNC") as an Application Engineer working to deploy software, develop and test code and

28  ///

Ex D
Page 85

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1  prototypes in cities across the United States and Canada. In or about April of 2002, Defendant

2  FICO acquired HNC, and Plaintiff became an employee of FICO.

3      In 2010, Plaintiff started working with Insurance Fraud Manager, ("IFM").  In or about

4  January of 2013, Plaintiff was transferred to Product Operations for IFM.  The offshore

5  development of IFM had a number of logistical and technological hurdles to clear.  One of the

6  challenges was that offshore engineers did not have access to live HIPAA data.  All HIPAA data

7  had to be de-identified before being made available to offshore engineers.

8      In March of 2014, Plaintiff led a long-awaited IFM upgrade.

9      In 2015, Plaintiff was frequently "on call" as FICO moved its operations hub from

10  Minnesota to San Diego.  This move resulted in a major workload increase for Plaintiff who was

11  required to be near his laptop addressing emergencies and system failures on a near constant

12  basis. There were multiple "On call" weeks where Plaintiff slept for less than 18 hours over the

13  seven days. Consequently, there was a high level of attrition from the Product Operations group.

14  At one point, the "On call" rotation was just Plaintiff, Hannah Chan, and Greg Arseneau. In

15  December of 2015, Plaintiff took "On call" responsibilities for three out of the four weeks.

16      Also in 2016, Plaintiff learned that there was an increasing likelihood that FICO would

17  offshore IFM product operations despite the fact that the de-identification of HIPAA information

18  had not yet been accomplished.  When Plaintiff told Andrea Allmon, former product manager for

19  IFM, about this impending change, she responded, "That would literally take an act of Congress"

20  because HIPAA data cannot be handled by anyone outside of the United States.

21      In February of 2017, Plaintiff's father was diagnosed with pancreatic cancer.  Plaintiff's

22  father's prognosis was grim.  His physicians estimated he had three to six months to live.  In

23  addition to needing care and transportation, Plaintiff's father, who had lived with Plaintiff since

24  2008, presented a serious fall risk, and Plaintiff had to catch his father twice from falling during

25  a very short period. Because Plaintiff needed to care for his terminally ill father, in or about April

26  2017, Plaintiff went on Family Medical Leave.

27      In mid-July, Plaintiff's supervisor, Reef Baskerville, contacted Plaintiff to enquire when

28  Plaintiff would be returning to work. Plaintiff advised Baskerville he would be back at work on

Ex D
Page 86

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1   July 20, 2017.  Baskerville immediately sent out a meeting request for Plaintiff to meet with him

2   at 10:00 a.m. on July 20, 2017.

3           The morning of July 20, 2017 did not go as planned for Plaintiff, and he was required to

4   administer to his gravely ill father.  Plaintiff advised Baskerville he would be fifteen minutes late

5   for their meeting.  Baskerville told Plaintiff not to bother, that he would be "too busy" to meet

6   with Plaintiff.  Immediately upon returning to work on July 20, 2017, Plaintiff felt that his work

7   place atmosphere had changed.  Baskerville was openly hostile, refusing to meet with Plaintiff

8   despite Plaintiff's numerous efforts to re-accomplish the return meeting.

9           As part of his pervasive discriminatory and retaliatory demeanor toward Plaintiff,

10  Baskerville did not agree to meet with Plaintiff again until July 24, 2017.  Baskerville began the

11  meeting with, "First of all, are you ready to come back to work because we've gone seventy-five

12  miles down the road since you left," implying that Plaintiff had been left behind as a result of his

13  taking FMLA.  Baskerville also advised Plaintiff that punctuality would now be monitored along

14  with productivity.  This was not the case for Plaintiff prior to his taking Family Medical Leave.

15  Baskerville further told Plaintiff he would need to become a subject matter expert ("SME") on

16  all hosted products.

17          Also during the July 24, 2017 meeting, Baskerville advised Plaintiff of another change

18  occurring at FICO.  He informed Plaintiff that maintenance work for IFM was now being

19  performed by offshore engineers in Bangalore and the United Kingdom.  Plaintiff felt that

20  preventing off-shore personnel from seeing United States health data was an obstacle that had

21  not been addressed by FICO during Plaintiff's leave.  Without this obstacle having been cleared,

22  the use of offshore personnel amounted to a potential HIPAA violation and a breach of client

23  contracts. Plaintiff responded by expressing his concern that the offshore arrangement presented

24  a potential HIPAA violation and further, violated client contracts, which specified that no

25  offshore personnel could be used. For example, Kaiser Permanente required background checks

26  for all persons touching Kaiser data.

27          Baskerville responded with hostility to Plaintiff's ongoing concerns telling him that the

28  issue had "already been decided" and that the offshore arrangement was "none of [Plaintiff's]

Ex D
Page 87

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1   business." Plaintiff had serious reservations about sending operation support offshore because it

2   was inconsistent with the information he had previously received on the topic of offshoring

3   HIPAA data.

4   Throughout the summer of 2017, the atmosphere at FICO became increasingly hostile

5   toward Plaintiff. Baskerville was continually critical and antagonistic to Plaintiff. For example,

6   if Plaintiff was required to attend an appointment with his father, Baskerville would tell Plaintiff,

7   "don't bother coming in."

8   In July of 2017, although Plaintiff was entitled to a new upgraded phone, his request for a

9   new phone was continually delayed. Baskerville essentially sabotaged Plaintiff's ability to

10  perform his work tasks by denying him the equipment he needed. In or about November of

11  2017, Plaintiff's request for a phone was declined when Neil Hartley said, "We don't know if

12  Johnny will be around to use the phone." Only after Plaintiff documented his need, request and

13  subsequent delay did Plaintiff finally receive his new phone five (5) months later.

14  Starting in September of 2017, Baskerville instructed Plaintiff to no longer meet with

15  other team members and subject matter experts ("SME") to cross-train products. Some of these

16  SME's were off-shore engineers. Given that these meetings resulted in more employees having

17  familiarity and expertise with FICO's products, this measure was counter-productive and

18  designed to punish and alienate Plaintiff from fellow experts. Baskerville came to Plaintiff's

19  cubicle, directed Plaintiff to clear his calendar of SME meetings and stood over him while he did

20  so.

21  In or about September 2017, Defendant further discriminated and retaliated against

22  Plaintiff because of his medical leave and his association with his father, as well as his

23  complaints about FICO's unlawful conduct. On or about September 21, 2017, Baskerville

24  requested a meeting during which Lorraine Breithbart from HR was on the phone. During this

25  meeting, Plaintiff was shocked to receive a Performance Improvement Plan ("PIP"). The PIP

26  gave Plaintiff a performance rating of "poor." The PIP raised no concerns about Plaintiff's

27  skills. Rather, the PIP focused on a number of "tardies," or days Plaintiff was late for work, and

28  Plaintiff working three (3) days from home.

Ex D
Page 88

1    Plaintiff objected to Baskerville and Breithbart regarding the tardies and absences and

2 expressed his feeling the numbers were inflated.  In response, Breithbart and Baskerville agreed

3 the number of absences may have been incorrect, corroborating that the PIP was unjustified and

4 therefore retaliatory.

5    In truth, there was no legitimate basis for the PIP.  The PIP was, in effect, retaliation for

6 Plaintiff taking Family Medical Leave to which he was legally entitled and an attempt to force

7 Plaintiff to comply with the offshore process of IFM, which he believed to be both illegal and

8 unethical.  Plaintiff was stunned and disappointed to receive the PIP.  About this time, Plaintiff

9 expressed his concerns to Breithbart that the PIP was a response to Plaintiff taking his legally

10 entitled Family Medical Leave.

11    On or about September 22, 2017, Plaintiff had a post-PIP follow-up meeting with

12 Breithbart during which Plaintiff expressed to Breithbart that his relationship with Baskerville

13 had deteriorated significantly since Plaintiff returned from FMLA.  Plaintiff expressed to

14 Breithbart his belief that Baskerville was unhappy with Plaintiff for taking FMLA and that

15 Baskerville was retaliating against him.  Breithbart dismissed Plaintiff's concerns and advised

16 Plaintiff that FMLA only guarantees an employee will have a job when he returns from leave.

17    During the September 22, 2017 meeting, Plaintiff additionally told Breithbart that he

18 objected to the allegation contained in the PIP that he failed "to follow processes and

19 procedures."  Ironically, Baskerville's instruction that Plaintiff cease training off-shore personnel

20 had become the subject of a Performance Improvement Plan targeted at Plaintiff.  This was also

21 a reference to Plaintiff's unwillingness to violate HIPAA requirements with the IFM product as

22 well as client contracts by pushing for offshore maintenance.  Accordingly, Defendant explicitly

23 instructed Plaintiff to violate the law, which Plaintiff refused to do. Again, Breithbart brushed

24 Plaintiff's concerns aside.

25    From about September 21, 2017 through April 12, 2018, although the issues raised in the

26 PIP were resolved within two-weeks, Plaintiff had weekly meetings with Baskerville during

27 which Baskerville was openly hostile, belittling and chastising Plaintiff at every opportunity.

28 Baskerville began falsely accusing Plaintiff of misrepresenting how Plaintiff spent time at

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    work, and the more Plaintiff tried to correct Baskerville or defend himself, the more Baskerville

2    would accuse Plaintiff of lying.

3         In October of 2017, Plaintiff requested he be permitted to take Python training.

4    Baskerville told Plaintiff to worry about his PIP and denied Plaintiff the opportunity to receive

5    additional training in retaliation for Plaintiff taking FMLA and objecting to the utilization of

6    offshore maintenance. Later, Plaintiff is informed and believes that Baskerville communicated

7    with Suresh Reddy after Suresh had indicated that a number of the engineers who had been

8    signed up for AWS training were not using their access. Plaintiff asked Suresh if Plaintiff was

9    one of the engineers Suresh was trying to contact. Suresh said no, Plaintiff had not been signed

10   up for AWS training even though FICO was trying to get as many engineers "AWS Certified" as

11   possible.

12        In about October of 2017, Plaintiff felt increasingly uncomfortable with the PIP

13   requirements that he push IFM work offshore.  Plaintiff felt compelled to call the FICO

14   whistleblower hotline.  Plaintiff was very worried about his job.  He asked the hotline where his

15   report would go once he completed it.  The hotline advised Plaintiff that it would be sent to

16   Human Resources.

17        Realizing that a report to Human Resources would quickly escalate, Plaintiff decided to

18   speak with Allyn Pon, the IFM Product Manager first.  After asking Plaintiff to wait a couple of

19   weeks before blowing the whistle, Pon eventually told Plaintiff he should go ahead and call back

20   the FICO whistleblower hotline.

21        Given the hostile environment Plaintiff had already been facing, he was seriously

22   concerned about his job security.  Plaintiff was afraid he would be further retaliated against if he

23   blew the whistle on the offshore assignments.  Instead of immediately calling the hotline,

24   Plaintiff sought advice from his friend and former IFM Product Manager.  She advised Plaintiff

25   that the issue was really for Pon to address.  Fearing he could lose his job, Plaintiff backed down

26   and didn't call the hotline back. Instead, Plaintiff resolved that he personally would not violate

27   HIPAA policy.

Ex D
Page 90

28   ///

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    Also in October of 2017, Plaintiff expressed his concerns regarding his job security to

2    Baskerville.  Baskerville did not reassure Plaintiff that his job was secure.

3    In or about November of 2017, given Plaintiff's skill level and expertise, he inherited a

4    number of new responsibilities, including operational support for two additional products,

5    including Scorecard Pro and Decision Tree Pro, two of FICO's legacy tools designed to enable

6    customers to evaluate, customize, deploy and scale state-of-the-art analytics and decision

7    management solutions.

8    On December 6, 2017, Plaintiff's father passed away.  Plaintiff took one week of

9    approved bereavement leave.

10    In or about March of 2018, Plaintiff was considered for a new position with Robert

11    Leider whom Plaintiff had known for about fifteen years.  Plaintiff and Leider agreed Plaintiff

12    was a great fit for the job which offered Plaintiff a much-needed change of pace and a hostility-

13    free environment.  Unfortunately, Plaintiff was ultimately denied the position because of the

14    September 2017 PIP.  Defendant's retaliatory actions had caused Plaintiff to lose out on

15    opportunities for professional advancement and potential financial gain.

16    At this same time, Plaintiff learned that FICO's service provider at its data center in San

17    Francisco was leaving.  This departure had the potential to seriously disrupt FICO operations for

18    Scorecard Pro and Decision Tree Pro.  Given Plaintiff's advanced skillset and work ethic,

19    Baskerville turned to Plaintiff to "find a way" to ensure there were no operational interruptions

20    through the departure.  This is a very difficult task.  Plaintiff took one day to find a workable

21    solution and an additional day to write a full report.  Plaintiff made the transition as seamless as

22    Baskerville had hoped.

23    On or about April 8, 2018, Plaintiff expressed increased concern over the offshore

24    maintenance for IFM.  At one point, Plaintiff commented to an offshore engineer that the

25    requested changes to a client's hosted IFM environment should not be performed by offshore

26    engineers because they are not allowed access to client data.  Plaintiff is informed and believes

27    that this remark was communicated back to Baskerville.

28    ///

Ex D
Page 91

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    On or about April 12, 2018, Plaintiff's worst fear came true: Baskerville terminated

2  Plaintiff, escorted him off the FICO property and forced him to leave behind his personal effects,

3  including his personal collection of technological books.

4    In between FICO giving Plaintiff a $25,000 retention bonus not to leave the company in

5  mid-2016 and Plaintiff's termination in April of 2018, two significant things happened:  Plaintiff

6  went on legally entitled Family Medical Leave, and Plaintiff objected to the illegal and unethical

7  offshore maintenance utilized by FICO.   Defendant wrongfully terminated Plaintiff in direct

8  retaliation for these two events.

9    Plaintiff invested over twenty years of his life and most of his career in Defendant FICO.

10  When FICO and Baskerville began demeaning, disparaging and belittling Plaintiff upon his

11  return from Family Medical Leave, as described above, Plaintiff was confused and extremely

12  distraught.  Plaintiff was haunted and tormented by the September 2017 unsubstantiated PIP

13  throughout his remaining days at FICO.

14  **Response to Special Interrogatory No. 11:**

15    Objection.  This Interrogatory calls for speculation and for information which is more

16  readily available to propounding party. This Interrogatory further seeks the legal reasoning and

17  theories of Plaintiff's contentions. Plaintiff is not required to prepare the respondent's case.

18  (Sav-On Drugs, Inc. v. Superior Court of Los Angeles County (1975) 15 Cal.3d 1.) Further, this

19  Interrogatory is unduly burdensome and oppressive insofar as it seems to require that the entire

20  case be litigated in writing, which is not the purpose of discovery; rather, discovery is intended to

21  eliminate surprise and promote resolution short of trial. *See generally* Greyhound Corp. v. Super.

22  Ct., 56 Cal. 2d 355 (1961).  This Interrogatory is additionally overbroad as to time. Subject to

23  and without waiving these or any other applicable objections, Plaintiff responds as follows:

24    In or about January of 1997, Plaintiff was hired by Hecht-Nielson Neural Computing

25  ("HNC") as an Application Engineer working to deploy software, develop and test code and

26  develop prototypes in cities across the United States and Canada. In or about April of 2002,

27  Defendant FICO acquired HNC, and Plaintiff became an employee of FICO.   Ex D
                                                                                Page 92

28  ///

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1   In 2010, Plaintiff started working with Insurance Fraud Manager, ("IFM").  In or about

2   January of 2013, Plaintiff was transferred to Product Operations for IFM.  The offshore

3   development of IFM had a number of logistical and technological hurdles to clear.  One of the

4   challenges was that offshore engineers did not have access to live HIPAA data.  All HIPAA data

5   had to be de-identified before being made available to offshore engineers.

6      In March of 2014, Plaintiff led a long-awaited IFM upgrade.

7      In 2015, Plaintiff was frequently "on call" as FICO moved its operations hub from

8   Minnesota to San Diego.  This move resulted in a major workload increase for Plaintiff who was

9   required to be near his laptop addressing emergencies and system failures on a near constant

10  basis. There were multiple "On call" weeks where Plaintiff slept for less than 18 hours over the

11  seven days. Consequently, there was a high level of attrition from the Product Operations group.

12  At one point, the "On call" rotation was just Plaintiff, Hannah Chan, and Greg Arseneau. In

13  December of 2015, Plaintiff took "On call" responsibilities for three out of the four weeks.

14     Also in 2016, Plaintiff learned that there was an increasing likelihood that FICO would

15  offshore IFM product operations despite the fact that the de-identification of HIPAA information

16  had not yet been accomplished.  When Plaintiff told Andrea Allmon, former product manager for

17  IFM, about this impending change, she responded, "That would literally take an act of Congress"

18  because HIPAA data cannot be handled by anyone outside of the United States.

19     In February of 2017, Plaintiff's father was diagnosed with pancreatic cancer.  Plaintiff's

20  father's prognosis was grim.  His physicians estimated he had three to six months to live.  In

21  addition to needing care and transportation, Plaintiff's father, who had lived with Plaintiff since

22  2008, presented a serious fall risk, and Plaintiff had to catch his father twice from falling during

23  a very short period. Because Plaintiff needed to care for his terminally ill father, in or about April

24  2017, Plaintiff went on Family Medical Leave.

25     In mid-July, Plaintiff's supervisor, Reef Baskerville, contacted Plaintiff to enquire when

26  Plaintiff would be returning to work. Plaintiff advised Baskerville he would be back at work on

27  July 20, 2017.  Baskerville immediately sent out a meeting request for Plaintiff to meet with him

28  at 10:00 a.m. on July 20, 2017.

Ex D
Page 93

1       The morning of July 20, 2017 did not go as planned for Plaintiff, and he was required to

2   administer to his gravely ill father.  Plaintiff advised Baskerville he would be fifteen minutes late

3   for their meeting.  Baskerville told Plaintiff not to bother, that he would be "too busy" to meet

4   with Plaintiff.  Immediately upon returning to work on July 20, 2017, Plaintiff felt that his work

5   place atmosphere had changed.  Baskerville was openly hostile, refusing to meet with Plaintiff

6   despite Plaintiff's numerous efforts to re-accomplish the return meeting.

7       As part of his pervasive discriminatory and retaliatory demeanor toward Plaintiff,

8   Baskerville did not agree to meet with Plaintiff again until July 24, 2017.  Baskerville began the

9   meeting with, "First of all, are you ready to come back to work because we've gone seventy-five

10  miles down the road since you left," implying that Plaintiff had been left behind as a result of his

11  taking FMLA.  Baskerville also advised Plaintiff that punctuality would now be monitored along

12  with productivity.  This was not the case for Plaintiff prior to his taking Family Medical Leave.

13  Baskerville further told Plaintiff he would need to become a subject matter expert ("SME") on

14  all hosted products.

15      Also during the July 24, 2017 meeting, Baskerville advised Plaintiff of another change

16  occurring at FICO.  He informed Plaintiff that maintenance work for IFM was now being

17  performed by offshore engineers in Bangalore and the United Kingdom.  Plaintiff felt that

18  preventing off-shore personnel from seeing United States health data was an obstacle that had

19  not been addressed by FICO during Plaintiff's leave.  Without this obstacle having been cleared,

20  the use of offshore personnel amounted to a potential HIPAA violation and a breach of client

21  contracts. Plaintiff responded by expressing his concern that the offshore arrangement presented

22  a potential HIPAA violation and further, violated client contracts, which specified that no

23  offshore personnel could be used. For example, Kaiser Permanente required background checks

24  for all persons touching Kaiser data.

25      Baskerville responded with hostility to Plaintiff's ongoing concerns telling him that the

26  issue had "already been decided" and that the offshore arrangement was "none of [Plaintiff's]

27  business."  Plaintiff had serious reservations about sending operation support offshore because it

28  ///

Ex D
Page 94

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1  was inconsistent with the information he had previously received on the topic of offshoring

2  HIPAA data.

3       Throughout the summer of 2017, the atmosphere at FICO became increasingly hostile

4  toward Plaintiff.  Baskerville was continually critical and antagonistic to Plaintiff.  For example,

5  if Plaintiff was required to attend an appointment with his father, Baskerville would tell Plaintiff,

6  "don't bother coming in."

7       In July of 2017, although Plaintiff was entitled to a new upgraded phone, his request for a

8  new phone was continually delayed.  Baskerville essentially sabotaged Plaintiff's ability to

9  perform his work tasks by denying him the equipment he needed.  In or about November of

10  2017, Plaintiff's request for a phone was declined when Neil Hartley said, "We don't know if

11  Johnny will be around to use the phone."  Only after Plaintiff documented his need, request and

12  subsequent delay did Plaintiff finally receive his new phone five (5) months later.

13       Starting in September of 2017, Baskerville instructed Plaintiff to no longer meet with

14  other team members and subject matter experts ("SME") to cross-train products.  Some of these

15  SME's were off-shore engineers.  Given that these meetings resulted in more employees having

16  familiarity and expertise with FICO's products, this measure was counter-productive and

17  designed to punish and alienate Plaintiff from fellow experts.  Baskerville came to Plaintiff's

18  cubicle, directed Plaintiff to clear his calendar of SME meetings and stood over him while he did

19  so.

20       In or about September 2017, Defendant further discriminated and retaliated against

21  Plaintiff because of his medical leave and his association with his father, as well as his

22  complaints about FICO's unlawful conduct.  On or about September 21, 2017, Baskerville

23  requested a meeting during which Lorraine Breithbart from HR was on the phone.  During this

24  meeting, Plaintiff was shocked to receive a Performance Improvement Plan ("PIP").  The PIP

25  gave Plaintiff a performance rating of "poor."  The PIP raised no concerns about Plaintiff's

26  skills. Rather, the PIP focused on a number of "tardies," or days Plaintiff was late for work, and

27  Plaintiff working three (3) days from home.

28  ///

Ex D
Page 95

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    Plaintiff objected to Baskerville and Breithbart regarding the tardies and absences and

2    expressed his feeling the numbers were inflated.  In response, Breithbart and Baskerville agreed

3    the number of absences may have been incorrect, corroborating that the PIP was unjustified and

4    therefore retaliatory.

5    In truth, there was no legitimate basis for the PIP.  The PIP was, in effect, retaliation for

6    Plaintiff taking Family Medical Leave to which he was legally entitled and an attempt to force

7    Plaintiff to comply with the offshore process of IFM, which he believed to be both illegal and

8    unethical.  Plaintiff was stunned and disappointed to receive the PIP.  About this time, Plaintiff

9    expressed his concerns to Breithbart that the PIP was a response to Plaintiff taking his legally

10   entitled Family Medical Leave.

11   On or about September 22, 2017, Plaintiff had a post-PIP follow-up meeting with

12   Breithbart during which Plaintiff expressed to Breithbart that his relationship with Baskerville

13   had deteriorated significantly since Plaintiff returned from FMLA.  Plaintiff expressed to

14   Breithbart his belief that Baskerville was unhappy with Plaintiff for taking FMLA and that

15   Baskerville was retaliating against him.  Breithbart dismissed Plaintiff's concerns and advised

16   Plaintiff that FMLA only guarantees an employee will have a job when he returns from leave.

17   During the September 22, 2017 meeting, Plaintiff additionally told Breithbart that he

18   objected to the allegation contained in the PIP that he failed "to follow processes and

19   procedures."  Ironically, Baskerville's instruction that Plaintiff cease training off-shore personnel

20   had become the subject of a Performance Improvement Plan targeted at Plaintiff.  This was also

21   a reference to Plaintiff's unwillingness to violate HIPAA requirements with the IFM product as

22   well as client contracts by pushing for offshore maintenance.  Accordingly, Defendant explicitly

23   instructed Plaintiff to violate the law, which Plaintiff refused to do. Again, Breithbart brushed

24   Plaintiff's concerns aside.

25   From about September 21, 2017 through April 12, 2018, although the issues raised in the

26   PIP were resolved within two-weeks, Plaintiff had weekly meetings with Baskerville during

27   which Baskerville was openly hostile, belittling and chastising Plaintiff at every opportunity.

28   Baskerville began falsely accusing Plaintiff of misrepresenting how Plaintiff spent time at

Ex D
Page 96

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1  work, and the more Plaintiff tried to correct Baskerville or defend himself, the more Baskerville

2  would accuse Plaintiff of lying.

3       In October of 2017, Plaintiff requested he be permitted to take Python training.

4  Baskerville told Plaintiff to worry about his PIP and denied Plaintiff the opportunity to receive

5  additional training in retaliation for Plaintiff taking FMLA and objecting to the utilization of

6  offshore maintenance. Later, Plaintiff is informed and believes that Baskerville communicated

7  with Suresh Reddy after Suresh had indicated that a number of the engineers who had been

8  signed up for AWS training were not using their access. Plaintiff asked Suresh if Plaintiff was

9  one of the engineers Suresh was trying to contact. Suresh said no, Plaintiff had not been signed

10  up for AWS training even though FICO was trying to get as many engineers "AWS Certified" as

11  possible.

12       In about October of 2017, Plaintiff felt increasingly uncomfortable with the PIP

13  requirements that he push IFM work offshore. Plaintiff felt compelled to call the FICO

14  whistleblower hotline. Plaintiff was very worried about his job. He asked the hotline where his

15  report would go once he completed it. The hotline advised Plaintiff that it would be sent to

16  Human Resources.

17       Realizing that a report to Human Resources would quickly escalate, Plaintiff decided to

18  speak with Allyn Pon, the IFM Product Manager first. After asking Plaintiff to wait a couple of

19  weeks before blowing the whistle, Pon eventually told Plaintiff he should go ahead and call back

20  the FICO whistleblower hotline.

21       Given the hostile environment Plaintiff had already been facing, he was seriously

22  concerned about his job security. Plaintiff was afraid he would be further retaliated against if he

23  blew the whistle on the offshore assignments. Instead of immediately calling the hotline,

24  Plaintiff sought advice from his friend and former IFM Product Manager. She advised Plaintiff

25  that the issue was really for Pon to address. Fearing he could lose his job, Plaintiff backed down

26  and didn't call the hotline back. Instead, Plaintiff resolved that he personally would not violate

27  HIPAA policy.

28  ///

Ex D
Page 97

1        Also in October of 2017, Plaintiff expressed his concerns regarding his job security to

2    Baskerville.  Baskerville did not reassure Plaintiff that his job was secure.

3        In or about November of 2017, given Plaintiff's skill level and expertise, he inherited a

4    number of new responsibilities, including operational support for two additional products,

5    including Scorecard Pro and Decision Tree Pro, two of FICO's legacy tools designed to enable

6    customers to evaluate, customize, deploy and scale state-of-the-art analytics and decision

7    management solutions.

8        On December 6, 2017, Plaintiff's father passed away.  Plaintiff took one week of

9    approved bereavement leave.

10       In or about March of 2018, Plaintiff was considered for a new position with Robert

11   Leider whom Plaintiff had known for about fifteen years.  Plaintiff and Leider agreed Plaintiff

12   was a great fit for the job which offered Plaintiff a much-needed change of pace and a hostility-

13   free environment.  Unfortunately, Plaintiff was ultimately denied the position because of the

14   September 2017 PIP.  Defendant's retaliatory actions had caused Plaintiff to lose out on

15   opportunities for professional advancement and potential financial gain.

16       At this same time, Plaintiff learned that FICO's service provider at its data center in San

17   Francisco was leaving.  This departure had the potential to seriously disrupt FICO operations for

18   Scorecard Pro and Decision Tree Pro.  Given Plaintiff's advanced skillset and work ethic,

19   Baskerville turned to Plaintiff to "find a way" to ensure there were no operational interruptions

20   through the departure.  This is a very difficult task.  Plaintiff took one day to find a workable

21   solution and an additional day to write a full report.  Plaintiff made the transition as seamless as

22   Baskerville had hoped.

23       On or about April 8, 2018, Plaintiff expressed increased concern over the offshore

24   maintenance for IFM.  At one point, Plaintiff commented to an offshore engineer that the

25   requested changes to a client's hosted IFM environment should not be performed by offshore

26   engineers because they are not allowed access to client data.  Plaintiff is informed and believes

27   that this remark was communicated back to Baskerville.

28   ///

Ex D
Page 98

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    On or about April 12, 2018, Plaintiff's worst fear came true: Baskerville terminated

2  Plaintiff, escorted him off the FICO property and forced him to leave behind his personal effects,

3  including his personal collection of technological books.

4    In between FICO giving Plaintiff a $25,000 retention bonus not to leave the company in

5  mid-2016 and Plaintiff's termination in April of 2018, two significant things happened:  Plaintiff

6  went on legally entitled Family Medical Leave, and Plaintiff objected to the illegal and unethical

7  offshore maintenance utilized by FICO.   Defendant wrongfully terminated Plaintiff in direct

8  retaliation for these two events.

9    Plaintiff invested over twenty years of his life and most of his career in Defendant FICO.

10  When FICO and Baskerville began demeaning, disparaging and belittling Plaintiff upon his

11  return from Family Medical Leave, as described above, Plaintiff was confused and extremely

12  distraught.  Plaintiff was haunted and tormented by the September 2017 unsubstantiated PIP

13  throughout his remaining days at FICO.

14  **Response to Special Interrogatory No. 12:**

15    Objection.  This Interrogatory calls for speculation and for information which is more

16  readily available to propounding party. This Interrogatory further seeks the legal reasoning and

17  theories of Plaintiff's contentions. Plaintiff is not required to prepare the respondent's case.

18  (Sav-On Drugs, Inc. v. Superior Court of Los Angeles County (1975) 15 Cal.3d 1.) Further, this

19  Interrogatory is unduly burdensome and oppressive insofar as it seems to require that the entire

20  case be litigated in writing, which is not the purpose of discovery; rather, discovery is intended to

21  eliminate surprise and promote resolution short of trial. *See generally* Greyhound Corp. v. Super.

22  Ct., 56 Cal. 2d 355 (1961).  This Interrogatory is additionally overbroad as to time. Subject to

23  and without waiving these or any other applicable objections, Plaintiff responds as follows:

24    In or about January of 1997, Plaintiff was hired by Hecht-Nielson Neural Computing

25  ("HNC") as an Application Engineer working to deploy software, develop and test code and

26  develop prototypes in cities across the United States and Canada. In or about April of 2002,

27  Defendant FICO acquired HNC, and Plaintiff became an employee of FICO.

28  ///

Ex D
Page 99

1    In 2010, Plaintiff started working with Insurance Fraud Manager, ("IFM").  In or about

2  January of 2013, Plaintiff was transferred to Product Operations for IFM.  The offshore

3  development of IFM had a number of logistical and technological hurdles to clear.  One of the

4  challenges was that offshore engineers did not have access to live HIPAA data.  All HIPAA data

5  had to be de-identified before being made available to offshore engineers.

6    In March of 2014, Plaintiff led a long-awaited IFM upgrade.

7    In 2015, Plaintiff was frequently "on call" as FICO moved its operations hub from

8  Minnesota to San Diego.  This move resulted in a major workload increase for Plaintiff who was

9  required to be near his laptop addressing emergencies and system failures on a near constant

10  basis. There were multiple "On call" weeks where Plaintiff slept for less than 18 hours over the

11  seven days. Consequently, there was a high level of attrition from the Product Operations group.

12  At one point, the "On call" rotation was just Plaintiff, Hannah Chan, and Greg Arseneau. In

13  December of 2015, Plaintiff took "On call" responsibilities for three out of the four weeks.

14    Also in 2016, Plaintiff learned that there was an increasing likelihood that FICO would

15  offshore IFM product operations despite the fact that the de-identification of HIPAA information

16  had not yet been accomplished.  When Plaintiff told Andrea Allmon, former product manager for

17  IFM, about this impending change, she responded, "That would literally take an act of Congress"

18  because HIPAA data cannot be handled by anyone outside of the United States.

19    In February of 2017, Plaintiff's father was diagnosed with pancreatic cancer.  Plaintiff's

20  father's prognosis was grim.  His physicians estimated he had three to six months to live.  In

21  addition to needing care and transportation, Plaintiff's father, who had lived with Plaintiff since

22  2008, presented a serious fall risk, and Plaintiff had to catch his father twice from falling during

23  a very short period. Because Plaintiff needed to care for his terminally ill father, in or about April

24  2017, Plaintiff went on Family Medical Leave.

25    In mid-July, Plaintiff's supervisor, Reef Baskerville, contacted Plaintiff to enquire when

26  Plaintiff would be returning to work. Plaintiff advised Baskerville he would be back at work on

27  July 20, 2017.  Baskerville immediately sent out a meeting request for Plaintiff to meet with him

28  at 10:00 a.m. on July 20, 2017.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

Ex D
Page 100

PLAINTIFF'S RESPONSES TO DEFENDANT'S SPECIAL INTERROGATORIES, SET ONE (1)

1    The morning of July 20, 2017 did not go as planned for Plaintiff, and he was required to

2  administer to his gravely ill father.  Plaintiff advised Baskerville he would be fifteen minutes late

3  for their meeting.  Baskerville told Plaintiff not to bother, that he would be "too busy" to meet

4  with Plaintiff.  Immediately upon returning to work on July 20, 2017, Plaintiff felt that his work

5  place atmosphere had changed.  Baskerville was openly hostile, refusing to meet with Plaintiff

6  despite Plaintiff's numerous efforts to re-accomplish the return meeting.

7    As part of his pervasive discriminatory and retaliatory demeanor toward Plaintiff,

8  Baskerville did not agree to meet with Plaintiff again until July 24, 2017.  Baskerville began the

9  meeting with, "First of all, are you ready to come back to work because we've gone seventy-five

10  miles down the road since you left," implying that Plaintiff had been left behind as a result of his

11  taking FMLA.  Baskerville also advised Plaintiff that punctuality would now be monitored along

12  with productivity.  This was not the case for Plaintiff prior to his taking Family Medical Leave.

13  Baskerville further told Plaintiff he would need to become a subject matter expert ("SME") on

14  all hosted products.

15    Also during the July 24, 2017 meeting, Baskerville advised Plaintiff of another change

16  occurring at FICO.  He informed Plaintiff that maintenance work for IFM was now being

17  performed by offshore engineers in Bangalore and the United Kingdom.  Plaintiff felt that

18  preventing off-shore personnel from seeing United States health data was an obstacle that had

19  not been addressed by FICO during Plaintiff's leave.  Without this obstacle having been cleared,

20  the use of offshore personnel amounted to a potential HIPAA violation and a breach of client

21  contracts. Plaintiff responded by expressing his concern that the offshore arrangement presented

22  a potential HIPAA violation and further, violated client contracts, which specified that no

23  offshore personnel could be used. For example, Kaiser Permanente required background checks

24  for all persons touching Kaiser data.

25    Baskerville responded with hostility to Plaintiff's ongoing concerns telling him that the

26  issue had "already been decided" and that the offshore arrangement was "none of [Plaintiff's]

27  business."  Plaintiff had serious reservations about sending operation support offshore because it

28  ///

Ex D
Page 101

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA  92101-2013

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1   was inconsistent with the information he had previously received on the topic of offshoring

2   HIPAA data.

3       Throughout the summer of 2017, the atmosphere at FICO became increasingly hostile

4   toward Plaintiff. Baskerville was continually critical and antagonistic to Plaintiff. For example,

5   if Plaintiff was required to attend an appointment with his father, Baskerville would tell Plaintiff,

6   "don't bother coming in."

7       In July of 2017, although Plaintiff was entitled to a new upgraded phone, his request for a

8   new phone was continually delayed. Baskerville essentially sabotaged Plaintiff's ability to

9   perform his work tasks by denying him the equipment he needed. In or about November of

10   2017, Plaintiff's request for a phone was declined when Neil Hartley said, "We don't know if

11   Johnny will be around to use the phone." Only after Plaintiff documented his need, request and

12   subsequent delay did Plaintiff finally receive his new phone five (5) months later.

13       Starting in September of 2017, Baskerville instructed Plaintiff to no longer meet with

14   other team members and subject matter experts ("SME") to cross-train products. Some of these

15   SME's were off-shore engineers. Given that these meetings resulted in more employees having

16   familiarity and expertise with FICO's products, this measure was counter-productive and

17   designed to punish and alienate Plaintiff from fellow experts. Baskerville came to Plaintiff's

18   cubicle, directed Plaintiff to clear his calendar of SME meetings and stood over him while he did

19   so.

20       In or about September 2017, Defendant further discriminated and retaliated against

21   Plaintiff because of his medical leave and his association with his father, as well as his

22   complaints about FICO's unlawful conduct. On or about September 21, 2017, Baskerville

23   requested a meeting during which Lorraine Breithbart from HR was on the phone. During this

24   meeting, Plaintiff was shocked to receive a Performance Improvement Plan ("PIP"). The PIP

25   gave Plaintiff a performance rating of "poor." The PIP raised no concerns about Plaintiff's

26   skills. Rather, the PIP focused on a number of "tardies," or days Plaintiff was late for work, and

27   Plaintiff working three (3) days from home.

    Ex D
    Page 102

28   ///

Plaintiff objected to Baskerville and Breithbart regarding the tardies and absences and expressed his feeling the numbers were inflated. In response, Breithbart and Baskerville agreed the number of absences may have been incorrect, corroborating that the PIP was unjustified and therefore retaliatory.

In truth, there was no legitimate basis for the PIP. The PIP was, in effect, retaliation for Plaintiff taking Family Medical Leave to which he was legally entitled and an attempt to force Plaintiff to comply with the offshore process of IFM, which he believed to be both illegal and unethical. Plaintiff was stunned and disappointed to receive the PIP. About this time, Plaintiff expressed his concerns to Breithbart that the PIP was a response to Plaintiff taking his legally entitled Family Medical Leave.

On or about September 22, 2017, Plaintiff had a post-PIP follow-up meeting with Breithbart during which Plaintiff expressed to Breithbart that his relationship with Baskerville had deteriorated significantly since Plaintiff returned from FMLA. Plaintiff expressed to Breithbart his belief that Baskerville was unhappy with Plaintiff for taking FMLA and that Baskerville was retaliating against him. Breithbart dismissed Plaintiff's concerns and advised Plaintiff that FMLA only guarantees an employee will have a job when he returns from leave.

During the September 22, 2017 meeting, Plaintiff additionally told Breithbart that he objected to the allegation contained in the PIP that he failed "to follow processes and procedures." Ironically, Baskerville's instruction that Plaintiff cease training off-shore personnel had become the subject of a Performance Improvement Plan targeted at Plaintiff. This was also a reference to Plaintiff's unwillingness to violate HIPAA requirements with the IFM product as well as client contracts by pushing for offshore maintenance. Accordingly, Defendant explicitly instructed Plaintiff to violate the law, which Plaintiff refused to do. Again, Breithbart brushed Plaintiff's concerns aside.

From about September 21, 2017 through April 12, 2018, although the issues raised in the PIP were resolved within two-weeks, Plaintiff had weekly meetings with Baskerville during which Baskerville was openly hostile, belittling and chastising Plaintiff at every opportunity. Baskerville began falsely accusing Plaintiff of misrepresenting how Plaintiff spends his time at

Ex D
Page 103

1   work, and the more Plaintiff tried to correct Baskerville or defend himself, the more Baskerville

2   would accuse Plaintiff of lying.

3           In October of 2017, Plaintiff requested he be permitted to take Python training.

4   Baskerville told Plaintiff to worry about his PIP and denied Plaintiff the opportunity to receive

5   additional training in retaliation for Plaintiff taking FMLA and objecting to the utilization of

6   offshore maintenance. Later, Plaintiff is informed and believes that Baskerville communicated

7   with Suresh Reddy after Suresh had indicated that a number of the engineers who had been

8   signed up for AWS training were not using their access. Plaintiff asked Suresh if Plaintiff was

9   one of the engineers Suresh was trying to contact. Suresh said no, Plaintiff had not been signed

10  up for AWS training even though FICO was trying to get as many engineers "AWS Certified" as

11  possible.

12          In about October of 2017, Plaintiff felt increasingly uncomfortable with the PIP

13  requirements that he push IFM work offshore.  Plaintiff felt compelled to call the FICO

14  whistleblower hotline.  Plaintiff was very worried about his job.  He asked the hotline where his

15  report would go once he completed it.  The hotline advised Plaintiff that it would be sent to

16  Human Resources.

17          Realizing that a report to Human Resources would quickly escalate, Plaintiff decided to

18  speak with Allyn Pon, the IFM Product Manager first.  After asking Plaintiff to wait a couple of

19  weeks before blowing the whistle, Pon eventually told Plaintiff he should go ahead and call back

20  the FICO whistleblower hotline.

21          Given the hostile environment Plaintiff had already been facing, he was seriously

22  concerned about his job security.  Plaintiff was afraid he would be further retaliated against if he

23  blew the whistle on the offshore assignments.  Instead of immediately calling the hotline,

24  Plaintiff sought advice from his friend and former IFM Product Manager.  She advised Plaintiff

25  that the issue was really for Pon to address.  Fearing he could lose his job, Plaintiff backed down

26  and didn't call the hotline back. Instead, Plaintiff resolved that he personally would not violate

27  HIPAA policy.                                                          Ex D

28  ///                                                                    Page 104

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    Also in October of 2017, Plaintiff expressed his concerns regarding his job security to

2   Baskerville. Baskerville did not reassure Plaintiff that his job was secure.

3    In or about November of 2017, given Plaintiff's skill level and expertise, he inherited a

4   number of new responsibilities, including operational support for two additional products,

5   including Scorecard Pro and Decision Tree Pro, two of FICO's legacy tools designed to enable

6   customers to evaluate, customize, deploy and scale state-of-the-art analytics and decision

7   management solutions.

8    On December 6, 2017, Plaintiff's father passed away. Plaintiff took one week of

9   approved bereavement leave.

10    In or about March of 2018, Plaintiff was considered for a new position with Robert

11   Leider whom Plaintiff had known for about fifteen years. Plaintiff and Leider agreed Plaintiff

12   was a great fit for the job which offered Plaintiff a much-needed change of pace and a hostility-

13   free environment. Unfortunately, Plaintiff was ultimately denied the position because of the

14   September 2017 PIP. Defendant's retaliatory actions had caused Plaintiff to lose out on

15   opportunities for professional advancement and potential financial gain.

16    At this same time, Plaintiff learned that FICO's service provider at its data center in San

17   Francisco was leaving. This departure had the potential to seriously disrupt FICO operations for

18   Scorecard Pro and Decision Tree Pro. Given Plaintiff's advanced skillset and work ethic,

19   Baskerville turned to Plaintiff to "find a way" to ensure there were no operational interruptions

20   through the departure. This is a very difficult task. Plaintiff took one day to find a workable

21   solution and an additional day to write a full report. Plaintiff made the transition as seamless as

22   Baskerville had hoped.

23    On or about April 8, 2018, Plaintiff expressed increased concern over the offshore

24   maintenance for IFM. At one point, Plaintiff commented to an offshore engineer that the

25   requested changes to a client's hosted IFM environment should not be performed by offshore

26   engineers because they are not allowed access to client data. Plaintiff is informed and believes

27   that this remark was communicated back to Baskerville.

28   ///

Ex D
Page 105

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    On or about April 12, 2018, Plaintiff's worst fear came true: Baskerville terminated

2    Plaintiff, escorted him off the FICO property and forced him to leave behind his personal effects,

3    including his personal collection of technological books.

4    In between FICO giving Plaintiff a $25,000 retention bonus not to leave the company in

5    mid-2016 and Plaintiff's termination in April of 2018, two significant things happened:  Plaintiff

6    went on legally entitled Family Medical Leave, and Plaintiff objected to the illegal and unethical

7    offshore maintenance utilized by FICO.   Defendant wrongfully terminated Plaintiff in direct

8    retaliation for these two events.

9    Plaintiff invested over twenty years of his life and most of his career in Defendant FICO.

10   When FICO and Baskerville began demeaning, disparaging and belittling Plaintiff upon his

11   return from Family Medical Leave, as described above, Plaintiff was confused and extremely

12   distraught.  Plaintiff was haunted and tormented by the September 2017 unsubstantiated PIP

13   throughout his remaining days at FICO.

14   **Response to Special Interrogatory No. 13:**

15   Objection.  This Interrogatory calls for speculation and for information which is more

16   readily available to propounding party. This Interrogatory further seeks the legal reasoning and

17   theories of Plaintiff's contentions. Plaintiff is not required to prepare the respondent's case.

18   (Sav-On Drugs, Inc. v. Superior Court of Los Angeles County (1975) 15 Cal.3d 1.) Further, this

19   Interrogatory is unduly burdensome and oppressive insofar as it seems to require that the entire

20   case be litigated in writing, which is not the purpose of discovery; rather, discovery is intended to

21   eliminate surprise and promote resolution short of trial. *See generally* Greyhound Corp. v. Super.

22   Ct., 56 Cal. 2d 355 (1961).  This Interrogatory is additionally overbroad as to time. Subject to

23   and without waiving these or any other applicable objections, Plaintiff responds as follows:

24   In or about January of 1997, Plaintiff was hired by Hecht-Nielson Neural Computing

25   ("HNC") as an Application Engineer working to deploy software, develop and test code and

26   develop prototypes in cities across the United States and Canada. In or about April of 2002,

27   Defendant FICO acquired HNC, and Plaintiff became an employee of FICO.

28   ///

Ex D
Page 106

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

In 2010, Plaintiff started working with Insurance Fraud Manager, ("IFM").  In or about January of 2013, Plaintiff was transferred to Product Operations for IFM.  The offshore development of IFM had a number of logistical and technological hurdles to clear.  One of the challenges was that offshore engineers did not have access to live HIPAA data.  All HIPAA data had to be de-identified before being made available to offshore engineers.

In March of 2014, Plaintiff led a long-awaited IFM upgrade.

In 2015, Plaintiff was frequently "on call" as FICO moved its operations hub from Minnesota to San Diego.  This move resulted in a major workload increase for Plaintiff who was required to be near his laptop addressing emergencies and system failures on a near constant basis. There were multiple "On call" weeks where Plaintiff slept for less than 18 hours over the seven days. Consequently, there was a high level of attrition from the Product Operations group. At one point, the "On call" rotation was just Plaintiff, Hannah Chan, and Greg Arseneau. In December of 2015, Plaintiff took "On call" responsibilities for three out of the four weeks.

Also in 2016, Plaintiff learned that there was an increasing likelihood that FICO would offshore IFM product operations despite the fact that the de-identification of HIPAA information had not yet been accomplished.  When Plaintiff told Andrea Allmon, former product manager for IFM, about this impending change, she responded, "That would literally take an act of Congress" because HIPAA data cannot be handled by anyone outside of the United States.

In February of 2017, Plaintiff's father was diagnosed with pancreatic cancer.  Plaintiff's father's prognosis was grim.  His physicians estimated he had three to six months to live.  In addition to needing care and transportation, Plaintiff's father, who had lived with Plaintiff since 2008, presented a serious fall risk, and Plaintiff had to catch his father twice from falling during a very short period. Because Plaintiff needed to care for his terminally ill father, in or about April 2017, Plaintiff went on Family Medical Leave.

In mid-July, Plaintiff's supervisor, Reef Baskerville, contacted Plaintiff to enquire when Plaintiff would be returning to work. Plaintiff advised Baskerville he would be back at work on July 20, 2017.  Baskerville immediately sent out a meeting request for Plaintiff to meet with him at 10:00 a.m. on July 20, 2017.

Ex D
Page 107

The morning of July 20, 2017 did not go as planned for Plaintiff, and he was required to administer to his gravely ill father. Plaintiff advised Baskerville he would be fifteen minutes late for their meeting. Baskerville told Plaintiff not to bother, that he would be "too busy" to meet with Plaintiff. Immediately upon returning to work on July 20, 2017, Plaintiff felt that his work place atmosphere had changed. Baskerville was openly hostile, refusing to meet with Plaintiff despite Plaintiff's numerous efforts to re-accomplish the return meeting.

As part of his pervasive discriminatory and retaliatory demeanor toward Plaintiff, Baskerville did not agree to meet with Plaintiff again until July 24, 2017. Baskerville began the meeting with, "First of all, are you ready to come back to work because we've gone seventy-five miles down the road since you left," implying that Plaintiff had been left behind as a result of his taking FMLA. Baskerville also advised Plaintiff that punctuality would now be monitored along with productivity. This was not the case for Plaintiff prior to his taking Family Medical Leave. Baskerville further told Plaintiff he would need to become a subject matter expert ("SME") on all hosted products.

Also during the July 24, 2017 meeting, Baskerville advised Plaintiff of another change occurring at FICO. He informed Plaintiff that maintenance work for IFM was now being performed by offshore engineers in Bangalore and the United Kingdom. Plaintiff felt that preventing off-shore personnel from seeing United States health data was an obstacle that had not been addressed by FICO during Plaintiff's leave. Without this obstacle having been cleared, the use of offshore personnel amounted to a potential HIPAA violation and a breach of client contracts. Plaintiff responded by expressing his concern that the offshore arrangement presented a potential HIPAA violation and further, violated client contracts, which specified that no offshore personnel could be used. For example, Kaiser Permanente required background checks for all persons touching Kaiser data.

Baskerville responded with hostility to Plaintiff's ongoing concerns telling him that the issue had "already been decided" and that the offshore arrangement was "none of [Plaintiff's] business." Plaintiff had serious reservations about sending operation support offshore because it

///

Ex D
Page 108

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA  92101-2013

1  was inconsistent with the information he had previously received on the topic of offshoring

2  HIPAA data.

3      Throughout the summer of 2017, the atmosphere at FICO became increasingly hostile

4  toward Plaintiff.  Baskerville was continually critical and antagonistic to Plaintiff.  For example,

5  if Plaintiff was required to attend an appointment with his father, Baskerville would tell Plaintiff,

6  "don't bother coming in."

7      In July of 2017, although Plaintiff was entitled to a new upgraded phone, his request for a

8  new phone was continually delayed.  Baskerville essentially sabotaged Plaintiff's ability to

9  perform his work tasks by denying him the equipment he needed.  In or about November of

10  2017, Plaintiff's request for a phone was declined when Neil Hartley said, "We don't know if

11  Johnny will be around to use the phone."  Only after Plaintiff documented his need, request and

12  subsequent delay did Plaintiff finally receive his new phone five (5) months later.

13      Starting in September of 2017, Baskerville instructed Plaintiff to no longer meet with

14  other team members and subject matter experts ("SME") to cross-train products.  Some of these

15  SME's were off-shore engineers.  Given that these meetings resulted in more employees having

16  familiarity and expertise with FICO's products, this measure was counter-productive and

17  designed to punish and alienate Plaintiff from fellow experts.  Baskerville came to Plaintiff's

18  cubicle, directed Plaintiff to clear his calendar of SME meetings and stood over him while he did

19  so.

20      In or about September 2017, Defendant further discriminated and retaliated against

21  Plaintiff because of his medical leave and his association with his father, as well as his

22  complaints about FICO's unlawful conduct.  On or about September 21, 2017, Baskerville

23  requested a meeting during which Lorraine Breithbart from HR was on the phone.  During this

24  meeting, Plaintiff was shocked to receive a Performance Improvement Plan ("PIP").  The PIP

25  gave Plaintiff a performance rating of "poor."  The PIP raised no concerns about Plaintiff's

26  skills. Rather, the PIP focused on a number of "tardies," or days Plaintiff was late for work, and

27  Plaintiff working three (3) days from home.

28  ///

Ex D
Page 109

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    Plaintiff objected to Baskerville and Breithbart regarding the tardies and absences and

2 expressed his feeling the numbers were inflated. In response, Breithbart and Baskerville agreed

3 the number of absences may have been incorrect, corroborating that the PIP was unjustified and

4 therefore retaliatory.

5    In truth, there was no legitimate basis for the PIP. The PIP was, in effect, retaliation for

6 Plaintiff taking Family Medical Leave to which he was legally entitled and an attempt to force

7 Plaintiff to comply with the offshore process of IFM, which he believed to be both illegal and

8 unethical. Plaintiff was stunned and disappointed to receive the PIP. About this time, Plaintiff

9 expressed his concerns to Breithbart that the PIP was a response to Plaintiff taking his legally

10 entitled Family Medical Leave.

11    On or about September 22, 2017, Plaintiff had a post-PIP follow-up meeting with

12 Breithbart during which Plaintiff expressed to Breithbart that his relationship with Baskerville

13 had deteriorated significantly since Plaintiff returned from FMLA. Plaintiff expressed to

14 Breithbart his belief that Baskerville was unhappy with Plaintiff for taking FMLA and that

15 Baskerville was retaliating against him. Breithbart dismissed Plaintiff's concerns and advised

16 Plaintiff that FMLA only guarantees an employee will have a job when he returns from leave.

17    During the September 22, 2017 meeting, Plaintiff additionally told Breithbart that he

18 objected to the allegation contained in the PIP that he failed "to follow processes and

19 procedures." Ironically, Baskerville's instruction that Plaintiff cease training off-shore personnel

20 had become the subject of a Performance Improvement Plan targeted at Plaintiff. This was also

21 a reference to Plaintiff's unwillingness to violate HIPAA requirements with the IFM product as

22 well as client contracts by pushing for offshore maintenance. Accordingly, Defendant explicitly

23 instructed Plaintiff to violate the law, which Plaintiff refused to do. Again, Breithbart brushed

24 Plaintiff's concerns aside.

25    From about September 21, 2017 through April 12, 2018, although the issues raised in the

26 PIP were resolved within two-weeks, Plaintiff had weekly meetings with Baskerville during

27 which Baskerville was openly hostile, belittling and chastising Plaintiff at every opportunity.

28 Baskerville began falsely accusing Plaintiff of misrepresenting how Plaintiff spends his time at

Ex D
Page 110

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    work, and the more Plaintiff tried to correct Baskerville or defend himself, the more Baskerville

2    would accuse Plaintiff of lying.

3          In October of 2017, Plaintiff requested he be permitted to take Python training.

4    Baskerville told Plaintiff to worry about his PIP and denied Plaintiff the opportunity to receive

5    additional training in retaliation for Plaintiff taking FMLA and objecting to the utilization of

6    offshore maintenance. Later, Plaintiff is informed and believes that Baskerville communicated

7    with Suresh Reddy after Suresh had indicated that a number of the engineers who had been

8    signed up for AWS training were not using their access. Plaintiff asked Suresh if Plaintiff was

9    one of the engineers Suresh was trying to contact. Suresh said no, Plaintiff had not been signed

10   up for AWS training even though FICO was trying to get as many engineers "AWS Certified" as

11   possible.

12         In about October of 2017, Plaintiff felt increasingly uncomfortable with the PIP

13   requirements that he push IFM work offshore.  Plaintiff felt compelled to call the FICO

14   whistleblower hotline.  Plaintiff was very worried about his job.  He asked the hotline where his

15   report would go once he completed it.  The hotline advised Plaintiff that it would be sent to

16   Human Resources.

17         Realizing that a report to Human Resources would quickly escalate, Plaintiff decided to

18   speak with Allyn Pon, the IFM Product Manager first.  After asking Plaintiff to wait a couple of

19   weeks before blowing the whistle, Pon eventually told Plaintiff he should go ahead and call back

20   the FICO whistleblower hotline.

21         Given the hostile environment Plaintiff had already been facing, he was seriously

22   concerned about his job security.  Plaintiff was afraid he would be further retaliated against if he

23   blew the whistle on the offshore assignments.  Instead of immediately calling the hotline,

24   Plaintiff sought advice from his friend and former IFM Product Manager.  She advised Plaintiff

25   that the issue was really for Pon to address.  Fearing he could lose his job, Plaintiff backed down

26   and didn't call the hotline back. Instead, Plaintiff resolved that he personally would not violate

27   HIPAA policy.

28   ///

Ex D
Page 111

1       Also in October of 2017, Plaintiff expressed his concerns regarding his job security to

2   Baskerville.  Baskerville did not reassure Plaintiff that his job was secure.

3       In or about November of 2017, given Plaintiff's skill level and expertise, he inherited a

4   number of new responsibilities, including operational support for two additional products,

5   including Scorecard Pro and Decision Tree Pro, two of FICO's legacy tools designed to enable

6   customers to evaluate, customize, deploy and scale state-of-the-art analytics and decision

7   management solutions.

8       On December 6, 2017, Plaintiff's father passed away.  Plaintiff took one week of

9   approved bereavement leave.

10       In or about March of 2018, Plaintiff was considered for a new position with Robert

11   Leider whom Plaintiff had known for about fifteen years.  Plaintiff and Leider agreed Plaintiff

12   was a great fit for the job which offered Plaintiff a much-needed change of pace and a hostility-

13   free environment.  Unfortunately, Plaintiff was ultimately denied the position because of the

14   September 2017 PIP.  Defendant's retaliatory actions had caused Plaintiff to lose out on

15   opportunities for professional advancement and potential financial gain.

16       At this same time, Plaintiff learned that FICO's service provider at its data center in San

17   Francisco was leaving.  This departure had the potential to seriously disrupt FICO operations for

18   Scorecard Pro and Decision Tree Pro.  Given Plaintiff's advanced skillset and work ethic,

19   Baskerville turned to Plaintiff to "find a way" to ensure there were no operational interruptions

20   through the departure.  This is a very difficult task.  Plaintiff took one day to find a workable

21   solution and an additional day to write a full report.  Plaintiff made the transition as seamless as

22   Baskerville had hoped.

23       On or about April 8, 2018, Plaintiff expressed increased concern over the offshore

24   maintenance for IFM.  At one point, Plaintiff commented to an offshore engineer that the

25   requested changes to a client's hosted IFM environment should not be performed by offshore

26   engineers because they are not allowed access to client data.  Plaintiff is informed and believes

27   that this remark was communicated back to Baskerville.

28   ///

Ex D
Page 112

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    On or about April 12, 2018, Plaintiff's worst fear came true: Baskerville terminated

2   Plaintiff, escorted him off the FICO property and forced him to leave behind his personal effects,

3   including his personal collection of technological books.

4    In between FICO giving Plaintiff a $25,000 retention bonus not to leave the company in

5   mid-2016 and Plaintiff's termination in April of 2018, two significant things happened:  Plaintiff

6   went on legally entitled Family Medical Leave, and Plaintiff objected to the illegal and unethical

7   offshore maintenance utilized by FICO.   Defendant wrongfully terminated Plaintiff in direct

8   retaliation for these two events.

9    Plaintiff invested over twenty years of his life and most of his career in Defendant FICO.

10   When FICO and Baskerville began demeaning, disparaging and belittling Plaintiff upon his

11   return from Family Medical Leave, as described above, Plaintiff was confused and extremely

12   distraught.  Plaintiff was haunted and tormented by the September 2017 unsubstantiated PIP

13   throughout his remaining days at FICO.

14   **Response to Special Interrogatory No. 14:**

15    Objection.  This Interrogatory calls for legal and/or expert opinion and analysis.  This

16   Interrogatory further calls for speculation and for information which is more readily available to

17   propounding party. This Interrogatory further seeks the legal reasoning and theories of Plaintiff's

18   contentions. Plaintiff is not required to prepare the respondent's case.  (Sav-On Drugs, Inc. v.

19   Superior Court of Los Angeles County (1975) 15 Cal.3d 1.) Further, this Interrogatory is unduly

20   burdensome and oppressive insofar as it seems to require that the entire case be litigated in

21   writing, which is not the purpose of discovery; rather, discovery is intended to eliminate surprise

22   and promote resolution short of trial. *See generally* Greyhound Corp. v. Super. Ct., 56 Cal. 2d

23   355 (1961).  This Interrogatory is additionally overbroad as to time. Subject to and without

24   waiving these or any other applicable objections, Plaintiff responds as follows:

25    In 2016, Plaintiff learned that there was an increasing likelihood that FICO would

26   offshore IFM product operations despite the fact that the de-identification of HIPAA information

27   had not yet been accomplished.  When Plaintiff told Andrea Allmon, former product manager for

28   ///

Ex D
Page 113

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1   IFM, about this impending change, she responded, "That would literally take an act of Congress"

2   because HIPAA data cannot be handled by anyone outside of the United States.

3          Also during the July 24, 2017 meeting, Baskerville advised Plaintiff of another change

4   occurring at FICO.  He informed Plaintiff that maintenance work for IFM was now being

5   performed by offshore engineers in Bangalore and the United Kingdom.  Plaintiff felt that

6   preventing off-shore personnel from seeing United States health data was an obstacle that had

7   not been addressed by FICO during Plaintiff's leave.  Without this obstacle having been cleared,

8   the use of offshore personnel amounted to a potential HIPAA violation and a breach of client

9   contracts. Plaintiff responded by expressing his concern that the offshore arrangement presented

10   a potential HIPAA violation and further, violated client contracts, which specified that no

11   offshore personnel could be used. For example, Kaiser Permanente required background checks

12   for all persons touching Kaiser data.

13          Baskerville responded with hostility to Plaintiff's ongoing concerns telling him that the

14   issue had "already been decided" and that the offshore arrangement was "none of [Plaintiff's]

15   business."  Plaintiff had serious reservations about sending operation support offshore because it

16   was inconsistent with the information he had previously received on the topic of offshoring

17   HIPAA data.

18   **Response to Special Interrogatory No. 15:**

19          Objection.  This Interrogatory calls for speculation and for information which is more

20   readily available to propounding party. This Interrogatory further seeks the legal reasoning and

21   theories of Plaintiff's contentions. Plaintiff is not required to prepare the respondent's case.

22   (Sav-On Drugs, Inc. v. Superior Court of Los Angeles County (1975) 15 Cal.3d 1.) Further, this

23   Interrogatory is unduly burdensome and oppressive insofar as it seems to require that the entire

24   case be litigated in writing, which is not the purpose of discovery; rather, discovery is intended to

25   eliminate surprise and promote resolution short of trial. *See generally* Greyhound Corp. v. Super.

26   Ct., 56 Cal. 2d 355 (1961).  This Interrogatory is additionally overbroad as to time. Subject to

27   and without waiving these or any other applicable objections, Plaintiff responds as follows:

28   ///

Ex D
Page 114

1    In or about January of 1997, Plaintiff was hired by Hecht-Nielson Neural Computing

2    ("HNC") as an Application Engineer working to deploy software, develop and test code and

3    develop prototypes in cities across the United States and Canada. In or about April of 2002,

4    Defendant FICO acquired HNC, and Plaintiff became an employee of FICO.

5    In 2010, Plaintiff started working with Insurance Fraud Manager, ("IFM").  In or about

6    January of 2013, Plaintiff was transferred to Product Operations for IFM.  The offshore

7    development of IFM had a number of logistical and technological hurdles to clear.  One of the

8    challenges was that offshore engineers did not have access to live HIPAA data.  All HIPAA data

9    had to be de-identified before being made available to offshore engineers.

10    In March of 2014, Plaintiff led a long-awaited IFM upgrade.

11    In 2015, Plaintiff was frequently "on call" as FICO moved its operations hub from

12    Minnesota to San Diego.  This move resulted in a major workload increase for Plaintiff who was

13    required to be near his laptop addressing emergencies and system failures on a near constant

14    basis. There were multiple "On call" weeks where Plaintiff slept for less than 18 hours over the

15    seven days. Consequently, there was a high level of attrition from the Product Operations group.

16    At one point, the "On call" rotation was just Plaintiff, Hannah Chan, and Greg Arseneau. In

17    December of 2015, Plaintiff took "On call" responsibilities for three out of the four weeks.

18    Also in 2016, Plaintiff learned that there was an increasing likelihood that FICO would

19    offshore IFM product operations despite the fact that the de-identification of HIPAA information

20    had not yet been accomplished.  When Plaintiff told Andrea Allmon, former product manager for

21    IFM, about this impending change, she responded, "That would literally take an act of Congress"

22    because HIPAA data cannot be handled by anyone outside of the United States.

23    In February of 2017, Plaintiff's father was diagnosed with pancreatic cancer.  Plaintiff's

24    father's prognosis was grim.  His physicians estimated he had three to six months to live.  In

25    addition to needing care and transportation, Plaintiff's father, who had lived with Plaintiff since

26    2008, presented a serious fall risk, and Plaintiff had to catch his father twice from falling during

27    a very short period. Because Plaintiff needed to care for his terminally ill father, in or about April

28    2017, Plaintiff went on Family Medical Leave.

Ex D
Page 115

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA  92101-2013

1   In mid-July, Plaintiff's supervisor, Reef Baskerville, contacted Plaintiff to enquire when
2   Plaintiff would be returning to work. Plaintiff advised Baskerville he would be back at work on
3   July 20, 2017.  Baskerville immediately sent out a meeting request for Plaintiff to meet with him
4   at 10:00 a.m. on July 20, 2017.

5   The morning of July 20, 2017 did not go as planned for Plaintiff, and he was required to
6   administer to his gravely ill father.  Plaintiff advised Baskerville he would be fifteen minutes late
7   for their meeting.  Baskerville told Plaintiff not to bother, that he would be "too busy" to meet
8   with Plaintiff.  Immediately upon returning to work on July 20, 2017, Plaintiff felt that his work
9   place atmosphere had changed.  Baskerville was openly hostile, refusing to meet with Plaintiff
10  despite Plaintiff's numerous efforts to re-accomplish the return meeting.

11  As part of his pervasive discriminatory and retaliatory demeanor toward Plaintiff,
12  Baskerville did not agree to meet with Plaintiff again until July 24, 2017.  Baskerville began the
13  meeting with, "First of all, are you ready to come back to work because we've gone seventy-five
14  miles down the road since you left," implying that Plaintiff had been left behind as a result of his
15  taking FMLA.  Baskerville also advised Plaintiff that punctuality would now be monitored along
16  with productivity.  This was not the case for Plaintiff prior to his taking Family Medical Leave.
17  Baskerville further told Plaintiff he would need to become a subject matter expert ("SME") on
18  all hosted products.

19  Also during the July 24, 2017 meeting, Baskerville advised Plaintiff of another change
20  occurring at FICO.  He informed Plaintiff that maintenance work for IFM was now being
21  performed by offshore engineers in Bangalore and the United Kingdom.  Plaintiff felt that
22  preventing off-shore personnel from seeing United States health data was an obstacle that had
23  not been addressed by FICO during Plaintiff's leave.  Without this obstacle having been cleared,
24  the use of offshore personnel amounted to a potential HIPAA violation and a breach of client
25  contracts. Plaintiff responded by expressing his concern that the offshore arrangement presented
26  a potential HIPAA violation and further, violated client contracts, which specified that no
27  offshore personnel could be used. For example, Kaiser Permanente required background checks
28  for all persons touching Kaiser data.

Ex D
Page 116

Baskerville responded with hostility to Plaintiff's ongoing concerns telling him that the issue had "already been decided" and that the offshore arrangement was "none of [Plaintiff's] business." Plaintiff had serious reservations about sending operation support offshore because it was inconsistent with the information he had previously received on the topic of offshoring HIPAA data.

Throughout the summer of 2017, the atmosphere at FICO became increasingly hostile toward Plaintiff. Baskerville was continually critical and antagonistic to Plaintiff. For example, if Plaintiff was required to attend an appointment with his father, Baskerville would tell Plaintiff, "don't bother coming in."

In July of 2017, although Plaintiff was entitled to a new upgraded phone, his request for a new phone was continually delayed. Baskerville essentially sabotaged Plaintiff's ability to perform his work tasks by denying him the equipment he needed. In or about November of 2017, Plaintiff's request for a phone was declined when Neil Hartley said, "We don't know if Johnny will be around to use the phone." Only after Plaintiff documented his need, request and subsequent delay did Plaintiff finally receive his new phone five (5) months later.

Starting in September of 2017, Baskerville instructed Plaintiff to no longer meet with other team members and subject matter experts ("SME") to cross-train products. Some of these SME's were off-shore engineers. Given that these meetings resulted in more employees having familiarity and expertise with FICO's products, this measure was counter-productive and designed to punish and alienate Plaintiff from fellow experts. Baskerville came to Plaintiff's cubicle, directed Plaintiff to clear his calendar of SME meetings and stood over him while he did so.

In or about September 2017, Defendant further discriminated and retaliated against Plaintiff because of his medical leave and his association with his father, as well as his complaints about FICO's unlawful conduct. On or about September 21, 2017, Baskerville requested a meeting during which Lorraine Breithbart from HR was on the phone. During this meeting, Plaintiff was shocked to receive a Performance Improvement Plan ("PIP"). The PIP gave Plaintiff a performance rating of "poor." The PIP raised no concerns about Plaintiff's

Ex D
Page 117

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1   skills. Rather, the PIP focused on a number of "tardies," or days Plaintiff was late for work, and

2   Plaintiff working three (3) days from home.

3          Plaintiff objected to Baskerville and Breithbart regarding the tardies and absences and

4   expressed his feeling the numbers were inflated.  In response, Breithbart and Baskerville agreed

5   the number of absences may have been incorrect, corroborating that the PIP was unjustified and

6   therefore retaliatory.

7          In truth, there was no legitimate basis for the PIP.  The PIP was, in effect, retaliation for

8   Plaintiff taking Family Medical Leave to which he was legally entitled and an attempt to force

9   Plaintiff to comply with the offshore process of IFM, which he believed to be both illegal and

10  unethical.  Plaintiff was stunned and disappointed to receive the PIP.  About this time, Plaintiff

11  expressed his concerns to Breithbart that the PIP was a response to Plaintiff taking his legally

12  entitled Family Medical Leave.

13         On or about September 22, 2017, Plaintiff had a post-PIP follow-up meeting with

14  Breithbart during which Plaintiff expressed to Breithbart that his relationship with Baskerville

15  had deteriorated significantly since Plaintiff returned from FMLA.  Plaintiff expressed to

16  Breithbart his belief that Baskerville was unhappy with Plaintiff for taking FMLA and that

17  Baskerville was retaliating against him.  Breithbart dismissed Plaintiff's concerns and advised

18  Plaintiff that FMLA only guarantees an employee will have a job when he returns from leave.

19         During the September 22, 2017 meeting, Plaintiff additionally told Breithbart that he

20  objected to the allegation contained in the PIP that he failed "to follow processes and

21  procedures."  Ironically, Baskerville's instruction that Plaintiff cease training off-shore personnel

22  had become the subject of a Performance Improvement Plan targeted at Plaintiff.  This was also

23  a reference to Plaintiff's unwillingness to violate HIPAA requirements with the IFM product as

24  well as client contracts by pushing for offshore maintenance.  Accordingly, Defendant explicitly

25  instructed Plaintiff to violate the law, which Plaintiff refused to do. Again, Breithbart brushed

26  Plaintiff's concerns aside.

27         From about September 21, 2017 through April 12, 2018, although the issues raised in the

28  PIP were resolved within two-weeks, Plaintiff had weekly meetings with Baskerville during

Ex D
Page 118

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1   which Baskerville was openly hostile, belittling and chastising Plaintiff at every opportunity.

2   Baskerville began falsely accusing Plaintiff of misrepresenting how Plaintiff spent his time at

3   work, and the more Plaintiff tried to correct Baskerville or defend himself, the more Baskerville

4   would accuse Plaintiff of lying.

5        In October of 2017, Plaintiff requested he be permitted to take Python training.

6   Baskerville told Plaintiff to worry about his PIP and denied Plaintiff the opportunity to receive

7   additional training in retaliation for Plaintiff taking FMLA and objecting to the utilization of

8   offshore maintenance. Later, Plaintiff is informed and believes that Baskerville communicated

9   with Suresh Reddy after Suresh had indicated that a number of the engineers who had been

10  signed up for AWS training were not using their access. Plaintiff asked Suresh if Plaintiff was

11  one of the engineers Suresh was trying to contact. Suresh said no, Plaintiff had not been signed

12  up for AWS training even though FICO was trying to get as many engineers "AWS Certified" as

13  possible.

14       In about October of 2017, Plaintiff felt increasingly uncomfortable with the PIP

15  requirements that he push IFM work offshore.  Plaintiff felt compelled to call the FICO

16  whistleblower hotline.  Plaintiff was very worried about his job.  He asked the hotline where his

17  report would go once he completed it.  The hotline advised Plaintiff that it would be sent to

18  Human Resources.

19       Realizing that a report to Human Resources would quickly escalate, Plaintiff decided to

20  speak with Allyn Pon, the IFM Product Manager first.  After asking Plaintiff to wait a couple of

21  weeks before blowing the whistle, Pon eventually told Plaintiff he should go ahead and call back

22  the FICO whistleblower hotline.

23       Given the hostile environment Plaintiff had already been facing, he was seriously

24  concerned about his job security.  Plaintiff was afraid he would be further retaliated against if he

25  blew the whistle on the offshore assignments.  Instead of immediately calling the hotline,

26  Plaintiff sought advice from his friend and former IFM Product Manager.  She advised Plaintiff

27  that the issue was really for Pon to address.  Fearing he could lose his job, Plaintiff backed down

28  ///

Ex D
Page 119

1   and didn't call the hotline back. Instead, Plaintiff resolved that he personally would not violate

2   HIPAA policy.

3          Also in October of 2017, Plaintiff expressed his concerns regarding his job security to

4   Baskerville.  Baskerville did not reassure Plaintiff that his job was secure.

5          In or about November of 2017, given Plaintiff's skill level and expertise, he inherited a

6   number of new responsibilities, including operational support for two additional products,

7   including Scorecard Pro and Decision Tree Pro, two of FICO's legacy tools designed to enable

8   customers to evaluate, customize, deploy and scale state-of-the-art analytics and decision

9   management solutions.

10         On December 6, 2017, Plaintiff's father passed away.  Plaintiff took one week of

11  approved bereavement leave.

12         In or about March of 2018, Plaintiff was considered for a new position with Robert

13  Leider whom Plaintiff had known for about fifteen years.  Plaintiff and Leider agreed Plaintiff

14  was a great fit for the job which offered Plaintiff a much-needed change of pace and a hostility-

15  free environment.  Unfortunately, Plaintiff was ultimately denied the position because of the

16  September 2017 PIP.  Defendant's retaliatory actions had caused Plaintiff to lose out on

17  opportunities for professional advancement and potential financial gain.

18         At this same time, Plaintiff learned that FICO's service provider at its data center in San

19  Francisco was leaving.  This departure had the potential to seriously disrupt FICO operations for

20  Scorecard Pro and Decision Tree Pro.  Given Plaintiff's advanced skillset and work ethic,

21  Baskerville turned to Plaintiff to "find a way" to ensure there were no operational interruptions

22  through the departure.  This is a very difficult task.  Plaintiff took one day to find a workable

23  solution and an additional day to write a full report.  Plaintiff made the transition as seamless as

24  Baskerville had hoped.

25         On or about April 8, 2018, Plaintiff expressed increased concern over the offshore

26  maintenance for IFM.  At one point, Plaintiff commented to an offshore engineer that the

27  requested changes to a client's hosted IFM environment should not be performed by offshore

28  ///

Ex D
Page 120

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1   engineers because they are not allowed access to client data.  Plaintiff is informed and believes

2   that this remark was communicated back to Baskerville.

3         On or about April 12, 2018, Plaintiff's worst fear came true: Baskerville terminated

4   Plaintiff, escorted him off the FICO property and forced him to leave behind his personal effects,

5   including his personal collection of technological books.

6         In between FICO giving Plaintiff a $25,000 retention bonus not to leave the company in

7   mid-2016 and Plaintiff's termination in April of 2018, two significant things happened:  Plaintiff

8   went on legally entitled Family Medical Leave, and Plaintiff objected to the illegal and unethical

9   offshore maintenance utilized by FICO.   Defendant wrongfully terminated Plaintiff in direct

10  retaliation for these two events.

11        Plaintiff invested over twenty years of his life and most of his career in Defendant FICO.

12  When FICO and Baskerville began demeaning, disparaging and belittling Plaintiff upon his

13  return from Family Medical Leave, as described above, Plaintiff was confused and extremely

14  distraught.  Plaintiff was haunted and tormented by the September 2017 unsubstantiated PIP

15  throughout his remaining days at FICO.

16  **Response to Special Interrogatory No. 16:**

17        Objection.  This Interrogatory calls for speculation and for information which is more

18  readily available to propounding party. This Interrogatory further seeks the legal reasoning and

19  theories of Plaintiff's contentions. Plaintiff is not required to prepare the respondent's case.

20  (Sav-On Drugs, Inc. v. Superior Court of Los Angeles County (1975) 15 Cal.3d 1.) Further, this

21  Interrogatory is unduly burdensome and oppressive insofar as it seems to require that the entire

22  case be litigated in writing, which is not the purpose of discovery; rather, discovery is intended to

23  eliminate surprise and promote resolution short of trial. *See generally* Greyhound Corp. v. Super.

24  Ct., 56 Cal. 2d 355 (1961).  This Interrogatory is additionally overbroad as to time. Subject to

25  and without waiving these or any other applicable objections, Plaintiff responds as follows:

26        In or about January of 1997, Plaintiff was hired by Hecht-Nielson Neural Computing

27  ("HNC") as an Application Engineer working to deploy software, develop and test code and

28  ///

Ex D
Page 121

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1  develop prototypes in cities across the United States and Canada. In or about April of 2002,

2  Defendant FICO acquired HNC, and Plaintiff became an employee of FICO.

3      In 2010, Plaintiff started working with Insurance Fraud Manager, ("IFM").  In or about

4  January of 2013, Plaintiff was transferred to Product Operations for IFM.  The offshore

5  development of IFM had a number of logistical and technological hurdles to clear.  One of the

6  challenges was that offshore engineers did not have access to live HIPAA data.  All HIPAA data

7  had to be de-identified before being made available to offshore engineers.

8      In March of 2014, Plaintiff led a long-awaited IFM upgrade.

9      In 2015, Plaintiff was frequently "on call" as FICO moved its operations hub from

10  Minnesota to San Diego.  This move resulted in a major workload increase for Plaintiff who was

11  required to be near his laptop addressing emergencies and system failures on a near constant

12  basis. There were multiple "On call" weeks where Plaintiff slept for less than 18 hours over the

13  seven days. Consequently, there was a high level of attrition from the Product Operations group.

14  At one point, the "On call" rotation was just Plaintiff, Hannah Chan, and Greg Arseneau. In

15  December of 2015, Plaintiff took "On call" responsibilities for three out of the four weeks.

16      Also in 2016, Plaintiff learned that there was an increasing likelihood that FICO would

17  offshore IFM product operations despite the fact that the de-identification of HIPAA information

18  had not yet been accomplished.  When Plaintiff told Andrea Allmon, former product manager for

19  IFM, about this impending change, she responded, "That would literally take an act of Congress"

20  because HIPAA data cannot be handled by anyone outside of the United States.

21      In February of 2017, Plaintiff's father was diagnosed with pancreatic cancer.  Plaintiff's

22  father's prognosis was grim.  His physicians estimated he had three to six months to live.  In

23  addition to needing care and transportation, Plaintiff's father, who had lived with Plaintiff since

24  2008, presented a serious fall risk, and Plaintiff had to catch his father twice from falling during

25  a very short period. Because Plaintiff needed to care for his terminally ill father, in or about April

26  2017, Plaintiff went on Family Medical Leave.

27      In mid-July, Plaintiff's supervisor, Reef Baskerville, contacted Plaintiff to enquire when

28  Plaintiff would be returning to work. Plaintiff advised Baskerville he would be able to work on

Ex D
Page 122

PLAINTIFF'S RESPONSES TO DEFENDANT'S SPECIAL INTERROGATORIES, SET ONE (1)

1    July 20, 2017.  Baskerville immediately sent out a meeting request for Plaintiff to meet with him

2    at 10:00 a.m. on July 20, 2017.

3         The morning of July 20, 2017 did not go as planned for Plaintiff, and he was required to

4    administer to his gravely ill father.  Plaintiff advised Baskerville he would be fifteen minutes late

5    for their meeting.  Baskerville told Plaintiff not to bother, that he would be "too busy" to meet

6    with Plaintiff.  Immediately upon returning to work on July 20, 2017, Plaintiff felt that his work

7    place atmosphere had changed.  Baskerville was openly hostile, refusing to meet with Plaintiff

8    despite Plaintiff's numerous efforts to re-accomplish the return meeting.

9         As part of his pervasive discriminatory and retaliatory demeanor toward Plaintiff,

10   Baskerville did not agree to meet with Plaintiff again until July 24, 2017.  Baskerville began the

11   meeting with, "First of all, are you ready to come back to work because we've gone seventy-five

12   miles down the road since you left," implying that Plaintiff had been left behind as a result of his

13   taking FMLA.  Baskerville also advised Plaintiff that punctuality would now be monitored along

14   with productivity.  This was not the case for Plaintiff prior to his taking Family Medical Leave.

15   Baskerville further told Plaintiff he would need to become a subject matter expert ("SME") on

16   all hosted products.

17        Also during the July 24, 2017 meeting, Baskerville advised Plaintiff of another change

18   occurring at FICO.  He informed Plaintiff that maintenance work for IFM was now being

19   performed by offshore engineers in Bangalore and the United Kingdom.  Plaintiff felt that

20   preventing off-shore personnel from seeing United States health data was an obstacle that had

21   not been addressed by FICO during Plaintiff's leave.  Without this obstacle having been cleared,

22   the use of offshore personnel amounted to a potential HIPAA violation and a breach of client

23   contracts. Plaintiff responded by expressing his concern that the offshore arrangement presented

24   a potential HIPAA violation and further, violated client contracts, which specified that no

25   offshore personnel could be used. For example, Kaiser Permanente required background checks

26   for all persons touching Kaiser data.

27        Baskerville responded with hostility to Plaintiff's ongoing concerns telling him that the

28   issue had "already been decided" and that the offshore arrangement was "none of [Plaintiff's]

Ex D
Page 128

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1  business." Plaintiff had serious reservations about sending operation support offshore because it

2  was inconsistent with the information he had previously received on the topic of offshoring

3  HIPAA data.

4  Throughout the summer of 2017, the atmosphere at FICO became increasingly hostile

5  toward Plaintiff. Baskerville was continually critical and antagonistic to Plaintiff. For example,

6  if Plaintiff was required to attend an appointment with his father, Baskerville would tell Plaintiff,

7  "don't bother coming in."

8  In July of 2017, although Plaintiff was entitled to a new upgraded phone, his request for a

9  new phone was continually delayed. Baskerville essentially sabotaged Plaintiff's ability to

10  perform his work tasks by denying him the equipment he needed. In or about November of

11  2017, Plaintiff's request for a phone was declined when Neil Hartley said, "We don't know if

12  Johnny will be around to use the phone." Only after Plaintiff documented his need, request and

13  subsequent delay did Plaintiff finally receive his new phone five (5) months later.

14  Starting in September of 2017, Baskerville instructed Plaintiff to no longer meet with

15  other team members and subject matter experts ("SME") to cross-train products. Some of these

16  SME's were off-shore engineers. Given that these meetings resulted in more employees having

17  familiarity and expertise with FICO's products, this measure was counter-productive and

18  designed to punish and alienate Plaintiff from fellow experts. Baskerville came to Plaintiff's

19  cubicle, directed Plaintiff to clear his calendar of SME meetings and stood over him while he did

20  so.

21  In or about September 2017, Defendant further discriminated and retaliated against

22  Plaintiff because of his medical leave and his association with his father, as well as his

23  complaints about FICO's unlawful conduct. On or about September 21, 2017, Baskerville

24  requested a meeting during which Lorraine Breithbart from HR was on the phone. During this

25  meeting, Plaintiff was shocked to receive a Performance Improvement Plan ("PIP"). The PIP

26  gave Plaintiff a performance rating of "poor." The PIP raised no concerns about Plaintiff's

27  skills. Rather, the PIP focused on a number of "tardies," or days Plaintiff was late for work, and

28  Plaintiff working three (3) days from home.

Ex D
Page 124

PLAINTIFF'S RESPONSES TO DEFENDANT'S SPECIAL INTERROGATORIES, SET ONE (1)

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1  Plaintiff objected to Baskerville and Breithbart regarding the tardies and absences and

2  expressed his feeling the numbers were inflated.  In response, Breithbart and Baskerville agreed

3  the number of absences may have been incorrect, corroborating that the PIP was unjustified and

4  therefore retaliatory.

5  In truth, there was no legitimate basis for the PIP.  The PIP was, in effect, retaliation for

6  Plaintiff taking Family Medical Leave to which he was legally entitled and an attempt to force

7  Plaintiff to comply with the offshore process of IFM, which he believed to be both illegal and

8  unethical.  Plaintiff was stunned and disappointed to receive the PIP.  About this time, Plaintiff

9  expressed his concerns to Breithbart that the PIP was a response to Plaintiff taking his legally

10  entitled Family Medical Leave.

11  On or about September 22, 2017, Plaintiff had a post-PIP follow-up meeting with

12  Breithbart during which Plaintiff expressed to Breithbart that his relationship with Baskerville

13  had deteriorated significantly since Plaintiff returned from FMLA.  Plaintiff expressed to

14  Breithbart his belief that Baskerville was unhappy with Plaintiff for taking FMLA and that

15  Baskerville was retaliating against him.  Breithbart dismissed Plaintiff's concerns and advised

16  Plaintiff that FMLA only guarantees an employee will have a job when he returns from leave.

17  During the September 22, 2017 meeting, Plaintiff additionally told Breithbart that he

18  objected to the allegation contained in the PIP that he failed "to follow processes and

19  procedures."  Ironically, Baskerville's instruction that Plaintiff cease training off-shore personnel

20  had become the subject of a Performance Improvement Plan targeted at Plaintiff.  This was also

21  a reference to Plaintiff's unwillingness to violate HIPAA requirements with the IFM product as

22  well as client contracts by pushing for offshore maintenance.  Accordingly, Defendant explicitly

23  instructed Plaintiff to violate the law, which Plaintiff refused to do. Again, Breithbart brushed

24  Plaintiff's concerns aside.

25  From about September 21, 2017 through April 12, 2018, although the issues raised in the

26  PIP were resolved within two-weeks, Plaintiff had weekly meetings with Baskerville during

27  which Baskerville was openly hostile, belittling and chastising Plaintiff at every opportunity.

28  Baskerville began falsely accusing Plaintiff of misrepresenting how Plaintiff spent his time at

Ex D Page 125

1    work, and the more Plaintiff tried to correct Baskerville or defend himself, the more Baskerville

2    would accuse Plaintiff of lying.

3         In October of 2017, Plaintiff requested he be permitted to take Python training.

4    Baskerville told Plaintiff to worry about his PIP and denied Plaintiff the opportunity to receive

5    additional training in retaliation for Plaintiff taking FMLA and objecting to the utilization of

6    offshore maintenance. Later, Plaintiff is informed and believes that Baskerville communicated

7    with Suresh Reddy after Suresh had indicated that a number of the engineers who had been

8    signed up for AWS training were not using their access. Plaintiff asked Suresh if Plaintiff was

9    one of the engineers Suresh was trying to contact. Suresh said no, Plaintiff had not been signed

10   up for AWS training even though FICO was trying to get as many engineers "AWS Certified" as

11   possible.

12        In about October of 2017, Plaintiff felt increasingly uncomfortable with the PIP

13   requirements that he push IFM work offshore.  Plaintiff felt compelled to call the FICO

14   whistleblower hotline.  Plaintiff was very worried about his job.  He asked the hotline where his

15   report would go once he completed it.  The hotline advised Plaintiff that it would be sent to

16   Human Resources.

17        Realizing that a report to Human Resources would quickly escalate, Plaintiff decided to

18   speak with Allyn Pon, the IFM Product Manager first.  After asking Plaintiff to wait a couple of

19   weeks before blowing the whistle, Pon eventually told Plaintiff he should go ahead and call back

20   the FICO whistleblower hotline.

21        Given the hostile environment Plaintiff had already been facing, he was seriously

22   concerned about his job security.  Plaintiff was afraid he would be further retaliated against if he

23   blew the whistle on the offshore assignments.  Instead of immediately calling the hotline,

24   Plaintiff sought advice from his friend and former IFM Product Manager.  She advised Plaintiff

25   that the issue was really for Pon to address.  Fearing he could lose his job, Plaintiff backed down

26   and didn't call the hotline back. Instead, Plaintiff resolved that he personally would not violate

27   HIPAA policy.

28   ///

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

Ex D
Page 126

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    Also in October of 2017, Plaintiff expressed his concerns regarding his job security to

2  Baskerville.  Baskerville did not reassure Plaintiff that his job was secure.

3    In or about November of 2017, given Plaintiff's skill level and expertise, he inherited a

4  number of new responsibilities, including operational support for two additional products,

5  including Scorecard Pro and Decision Tree Pro, two of FICO's legacy tools designed to enable

6  customers to evaluate, customize, deploy and scale state-of-the-art analytics and decision

7  management solutions.

8    On December 6, 2017, Plaintiff's father passed away.  Plaintiff took one week of

9  approved bereavement leave.

10    In or about March of 2018, Plaintiff was considered for a new position with Robert

11  Leider whom Plaintiff had known for about fifteen years.  Plaintiff and Leider agreed Plaintiff

12  was a great fit for the job which offered Plaintiff a much-needed change of pace and a hostility-

13  free environment.  Unfortunately, Plaintiff was ultimately denied the position because of the

14  September 2017 PIP.  Defendant's retaliatory actions had caused Plaintiff to lose out on

15  opportunities for professional advancement and potential financial gain.

16    At this same time, Plaintiff learned that FICO's service provider at its data center in San

17  Francisco was leaving.  This departure had the potential to seriously disrupt FICO operations for

18  Scorecard Pro and Decision Tree Pro.  Given Plaintiff's advanced skillset and work ethic,

19  Baskerville turned to Plaintiff to "find a way" to ensure there were no operational interruptions

20  through the departure.  This is a very difficult task.  Plaintiff took one day to find a workable

21  solution and an additional day to write a full report.  Plaintiff made the transition as seamless as

22  Baskerville had hoped.

23    On or about April 8, 2018, Plaintiff expressed increased concern over the offshore

24  maintenance for IFM.  At one point, Plaintiff commented to an offshore engineer that the

25  requested changes to a client's hosted IFM environment should not be performed by offshore

26  engineers because they are not allowed access to client data.  Plaintiff is informed and believes

27  that this remark was communicated back to Baskerville.

28  ///

Ex D
Page 127

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1       On or about April 12, 2018, Plaintiff's worst fear came true: Baskerville terminated

2   Plaintiff, escorted him off the FICO property and forced him to leave behind his personal effects,

3   including his personal collection of technological books.

4       In between FICO giving Plaintiff a $25,000 retention bonus not to leave the company in

5   mid-2016 and Plaintiff's termination in April of 2018, two significant things happened:  Plaintiff

6   went on legally entitled Family Medical Leave, and Plaintiff objected to the illegal and unethical

7   offshore maintenance utilized by FICO.   Defendant wrongfully terminated Plaintiff in direct

8   retaliation for these two events.

9       Plaintiff invested over twenty years of his life and most of his career in Defendant FICO.

10  When FICO and Baskerville began demeaning, disparaging and belittling Plaintiff upon his

11  return from Family Medical Leave, as described above, Plaintiff was confused and extremely

12  distraught.  Plaintiff was haunted and tormented by the September 2017 unsubstantiated PIP

13  throughout his remaining days at FICO.

14  **Response to Special Interrogatory No. 17**:

15      Objection.  This Interrogatory calls for speculation and for information which is more

16  readily available to propounding party. This Interrogatory further seeks the legal reasoning and

17  theories of Plaintiff's contentions. Plaintiff is not required to prepare the respondent's case.

18  (Sav-On Drugs, Inc. v. Superior Court of Los Angeles County (1975) 15 Cal.3d 1.) Further, this

19  Interrogatory is unduly burdensome and oppressive insofar as it seems to require that the entire

20  case be litigated in writing, which is not the purpose of discovery; rather, discovery is intended to

21  eliminate surprise and promote resolution short of trial. *See generally* Greyhound Corp. v. Super.

22  Ct., 56 Cal. 2d 355 (1961).  This Interrogatory is additionally overbroad as to time. Subject to

23  and without waiving these or any other applicable objections, Plaintiff responds as follows:

24      In September 2017, Plaintiff expressed his concerns to Breithbart that the PIP was a

25  response to Plaintiff taking his legally entitled Family Medical Leave.

26      Thereafter, on or about September 22, 2017, Plaintiff had a post-PIP follow-up meeting

27  with Breithbart during which Plaintiff expressed to Breithbart that his relationship with

28  Baskerville had deteriorated significantly since Plaintiff returned from FMLA

Ex D
Page 128

1   expressed to Breithbart his belief that Baskerville was unhappy with Plaintiff for taking FMLA

2   and that Baskerville was retaliating against him.  Breithbart dismissed Plaintiff's concerns and

3   advised Plaintiff that FMLA only guarantees an employee will have a job when he returns from

4   leave.

5           Also during the September 22, 2017 meeting, Plaintiff additionally told Breithbart that he

6   objected to the allegation contained in the PIP that he failed "to follow processes and

7   procedures."  Ironically, Baskerville's instruction that Plaintiff cease training off-shore personnel

8   had become the subject of a Performance Improvement Plan targeted at Plaintiff.  This was also

9   a reference to Plaintiff's unwillingness to violate HIPAA requirements with the IFM product as

10  well as client contracts by pushing for offshore maintenance.  Accordingly, Defendant explicitly

11  instructed Plaintiff to violate the law, which Plaintiff refused to do. Again, Breithbart brushed

12  Plaintiff's concerns aside.

13  **Response to Special Interrogatory No. 18:**

14          Objection.  This Interrogatory calls for speculation and for information which is more

15  readily available to propounding party. This Interrogatory further seeks the legal reasoning and

16  theories of Plaintiff's contentions. Plaintiff is not required to prepare the respondent's case.

17  (Sav-On Drugs, Inc. v. Superior Court of Los Angeles County (1975) 15 Cal.3d 1.) Further, this

18  Interrogatory is unduly burdensome and oppressive insofar as it seems to require that the entire

19  case be litigated in writing, which is not the purpose of discovery; rather, discovery is intended to

20  eliminate surprise and promote resolution short of trial. *See generally* Greyhound Corp. v. Super.

21  Ct., 56 Cal. 2d 355 (1961).  This Interrogatory is additionally overbroad as to time. Subject to

22  and without waiving these or any other applicable objections, Plaintiff responds as follows:

23          In or about January of 1997, Plaintiff was hired by Hecht-Nielson Neural Computing

24  ("HNC") as an Application Engineer working to deploy software, develop and test code and

25  develop prototypes in cities across the United States and Canada. In or about April of 2002,

26  Defendant FICO acquired HNC, and Plaintiff became an employee of FICO.

27          In 2010, Plaintiff started working with Insurance Fraud Manager, ("IFM").  In or about

28  January of 2013, Plaintiff was transferred to Product Operations for IFM. The offshore

Ex D
Page 129

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1   development of IFM had a number of logistical and technological hurdles to clear.  One of the

2   challenges was that offshore engineers did not have access to live HIPAA data.  All HIPAA data

3   had to be de-identified before being made available to offshore engineers.

4        In March of 2014, Plaintiff led a long-awaited IFM upgrade.

5        In 2015, Plaintiff was frequently "on call" as FICO moved its operations hub from

6   Minnesota to San Diego.  This move resulted in a major workload increase for Plaintiff who was

7   required to be near his laptop addressing emergencies and system failures on a near constant

8   basis. There were multiple "On call" weeks where Plaintiff slept for less than 18 hours over the

9   seven days. Consequently, there was a high level of attrition from the Product Operations group.

10  At one point, the "On call" rotation was just Plaintiff, Hannah Chan, and Greg Arseneau. In

11  December of 2015, Plaintiff took "On call" responsibilities for three out of the four weeks.

12       Also in 2016, Plaintiff learned that there was an increasing likelihood that FICO would

13  offshore IFM product operations despite the fact that the de-identification of HIPAA information

14  had not yet been accomplished.  When Plaintiff told Andrea Allmon, former product manager for

15  IFM, about this impending change, she responded, "That would literally take an act of Congress"

16  because HIPAA data cannot be handled by anyone outside of the United States.

17       In February of 2017, Plaintiff's father was diagnosed with pancreatic cancer.  Plaintiff's

18  father's prognosis was grim.  His physicians estimated he had three to six months to live.  In

19  addition to needing care and transportation, Plaintiff's father, who had lived with Plaintiff since

20  2008, presented a serious fall risk, and Plaintiff had to catch his father twice from falling during

21  a very short period. Because Plaintiff needed to care for his terminally ill father, in or about April

22  2017, Plaintiff went on Family Medical Leave.

23       In mid-July, Plaintiff's supervisor, Reef Baskerville, contacted Plaintiff to enquire when

24  Plaintiff would be returning to work. Plaintiff advised Baskerville he would be back at work on

25  July 20, 2017.  Baskerville immediately sent out a meeting request for Plaintiff to meet with him

26  at 10:00 a.m. on July 20, 2017.

27       The morning of July 20, 2017 did not go as planned for Plaintiff, and he was required to

28  administer to his gravely ill father.  Plaintiff advised Baskerville he would be fifteen minutes late

Ex D
Page 130

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1 | for their meeting.  Baskerville told Plaintiff not to bother, that he would be "too busy" to meet

2 | with Plaintiff.  Immediately upon returning to work on July 20, 2017, Plaintiff felt that his work

3 | place atmosphere had changed.  Baskerville was openly hostile, refusing to meet with Plaintiff

4 | despite Plaintiff's numerous efforts to re-accomplish the return meeting.

5 |       As part of his pervasive discriminatory and retaliatory demeanor toward Plaintiff,

6 | Baskerville did not agree to meet with Plaintiff again until July 24, 2017.  Baskerville began the

7 | meeting with, "First of all, are you ready to come back to work because we've gone seventy-five

8 | miles down the road since you left," implying that Plaintiff had been left behind as a result of his

9 | taking FMLA.  Baskerville also advised Plaintiff that punctuality would now be monitored along

10 | with productivity.  This was not the case for Plaintiff prior to his taking Family Medical Leave.

11 | Baskerville further told Plaintiff he would need to become a subject matter expert ("SME") on

12 | all hosted products.

13 |       Also during the July 24, 2017 meeting, Baskerville advised Plaintiff of another change

14 | occurring at FICO.  He informed Plaintiff that maintenance work for IFM was now being

15 | performed by offshore engineers in Bangalore and the United Kingdom.  Plaintiff felt that

16 | preventing off-shore personnel from seeing United States health data was an obstacle that had

17 | not been addressed by FICO during Plaintiff's leave.  Without this obstacle having been cleared,

18 | the use of offshore personnel amounted to a potential HIPAA violation and a breach of client

19 | contracts. Plaintiff responded by expressing his concern that the offshore arrangement presented

20 | a potential HIPAA violation and further, violated client contracts, which specified that no

21 | offshore personnel could be used. For example, Kaiser Permanente required background checks

22 | for all persons touching Kaiser data.

23 |       Baskerville responded with hostility to Plaintiff's ongoing concerns telling him that the

24 | issue had "already been decided" and that the offshore arrangement was "none of [Plaintiff's]

25 | business."  Plaintiff had serious reservations about sending operation support offshore because it

26 | was inconsistent with the information he had previously received on the topic of offshoring

27 | HIPAA data.

28 | ///

Ex D
Page 131

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    Throughout the summer of 2017, the atmosphere at FICO became increasingly hostile

2 toward Plaintiff. Baskerville was continually critical and antagonistic to Plaintiff. For example,

3 if Plaintiff was required to attend an appointment with his father, Baskerville would tell Plaintiff,

4 "don't bother coming in."

5    In July of 2017, although Plaintiff was entitled to a new upgraded phone, his request for a

6 new phone was continually delayed. Baskerville essentially sabotaged Plaintiff's ability to

7 perform his work tasks by denying him the equipment he needed. In or about November of

8 2017, Plaintiff's request for a phone was declined when Neil Hartley said, "We don't know if

9 Johnny will be around to use the phone." Only after Plaintiff documented his need, request and

10 subsequent delay did Plaintiff finally receive his new phone five (5) months later.

11    Starting in September of 2017, Baskerville instructed Plaintiff to no longer meet with

12 other team members and subject matter experts ("SME") to cross-train products. Some of these

13 SME's were off-shore engineers. Given that these meetings resulted in more employees having

14 familiarity and expertise with FICO's products, this measure was counter-productive and

15 designed to punish and alienate Plaintiff from fellow experts. Baskerville came to Plaintiff's

16 cubicle, directed Plaintiff to clear his calendar of SME meetings and stood over him while he did

17 so.

18    In or about September 2017, Defendant further discriminated and retaliated against

19 Plaintiff because of his medical leave and his association with his father, as well as his

20 complaints about FICO's unlawful conduct. On or about September 21, 2017, Baskerville

21 requested a meeting during which Lorraine Breithbart from HR was on the phone. During this

22 meeting, Plaintiff was shocked to receive a Performance Improvement Plan ("PIP"). The PIP

23 gave Plaintiff a performance rating of "poor." The PIP raised no concerns about Plaintiff's

24 skills. Rather, the PIP focused on a number of "tardies," or days Plaintiff was late for work, and

25 Plaintiff working three (3) days from home.

26    Plaintiff objected to Baskerville and Breithbart regarding the tardies and absences and

27 expressed his feeling the numbers were inflated. In response, Breithbart and Baskerville agreed

28 ///

Ex D
Page 132

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1   the number of absences may have been incorrect, corroborating that the PIP was unjustified and

2   therefore retaliatory.

3        In truth, there was no legitimate basis for the PIP.  The PIP was, in effect, retaliation for

4   Plaintiff taking Family Medical Leave to which he was legally entitled and an attempt to force

5   Plaintiff to comply with the offshore process of IFM, which he believed to be both illegal and

6   unethical.  Plaintiff was stunned and disappointed to receive the PIP.  About this time, Plaintiff

7   expressed his concerns to Breithbart that the PIP was a response to Plaintiff taking his legally

8   entitled Family Medical Leave.

9        On or about September 22, 2017, Plaintiff had a post-PIP follow-up meeting with

10   Breithbart during which Plaintiff expressed to Breithbart that his relationship with Baskerville

11   had deteriorated significantly since Plaintiff returned from FMLA.  Plaintiff expressed to

12   Breithbart his belief that Baskerville was unhappy with Plaintiff for taking FMLA and that

13   Baskerville was retaliating against him.  Breithbart dismissed Plaintiff's concerns and advised

14   Plaintiff that FMLA only guarantees an employee will have a job when he returns from leave.

15        During the September 22, 2017 meeting, Plaintiff additionally told Breithbart that he

16   objected to the allegation contained in the PIP that he failed "to follow processes and

17   procedures."  Ironically, Baskerville's instruction that Plaintiff cease training off-shore personnel

18   had become the subject of a Performance Improvement Plan targeted at Plaintiff.  This was also

19   a reference to Plaintiff's unwillingness to violate HIPAA requirements with the IFM product as

20   well as client contracts by pushing for offshore maintenance.  Accordingly, Defendant explicitly

21   instructed Plaintiff to violate the law, which Plaintiff refused to do. Again, Breithbart brushed

22   Plaintiff's concerns aside.

23        From about September 21, 2017 through April 12, 2018, although the issues raised in the

24   PIP were resolved within two-weeks, Plaintiff had weekly meetings with Baskerville during

25   which Baskerville was openly hostile, belittling and chastising Plaintiff at every opportunity.

26   Baskerville began falsely accusing Plaintiff of misrepresenting how Plaintiff spent his time at

27   work, and the more Plaintiff tried to correct Baskerville or defend himself, the more Baskerville

28   would accuse Plaintiff of lying.

Ex D
Page 133

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    In October of 2017, Plaintiff requested he be permitted to take Python training.

2    Baskerville told Plaintiff to worry about his PIP and denied Plaintiff the opportunity to receive

3    additional training in retaliation for Plaintiff taking FMLA and objecting to the utilization of

4    offshore maintenance. Later, Plaintiff is informed and believes that Baskerville communicated

5    with Suresh Reddy after Suresh had indicated that a number of the engineers who had been

6    signed up for AWS training were not using their access. Plaintiff asked Suresh if Plaintiff was

7    one of the engineers Suresh was trying to contact. Suresh said no, Plaintiff had not been signed

8    up for AWS training even though FICO was trying to get as many engineers "AWS Certified" as

9    possible.

10    In about October of 2017, Plaintiff felt increasingly uncomfortable with the PIP

11    requirements that he push IFM work offshore.  Plaintiff felt compelled to call the FICO

12    whistleblower hotline.  Plaintiff was very worried about his job.  He asked the hotline where his

13    report would go once he completed it.  The hotline advised Plaintiff that it would be sent to

14    Human Resources.

15    Realizing that a report to Human Resources would quickly escalate, Plaintiff decided to

16    speak with Allyn Pon, the IFM Product Manager first.  After asking Plaintiff to wait a couple of

17    weeks before blowing the whistle, Pon eventually told Plaintiff he should go ahead and call back

18    the FICO whistleblower hotline.

19    Given the hostile environment Plaintiff had already been facing, he was seriously

20    concerned about his job security.  Plaintiff was afraid he would be further retaliated against if he

21    blew the whistle on the offshore assignments.  Instead of immediately calling the hotline,

22    Plaintiff sought advice from his friend and former IFM Product Manager.  She advised Plaintiff

23    that the issue was really for Pon to address.  Fearing he could lose his job, Plaintiff backed down

24    and didn't call the hotline back. Instead, Plaintiff resolved that he personally would not violate

25    HIPAA policy.

26    Also in October of 2017, Plaintiff expressed his concerns regarding his job security to

27    Baskerville.  Baskerville did not reassure Plaintiff that his job was secure.        Ex D

28    ///                                                                              Page 134

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    In or about November of 2017, given Plaintiff's skill level and expertise, he inherited a

2    number of new responsibilities, including operational support for two additional products,

3    including Scorecard Pro and Decision Tree Pro, two of FICO's legacy tools designed to enable

4    customers to evaluate, customize, deploy and scale state-of-the-art analytics and decision

5    management solutions.

6    On December 6, 2017, Plaintiff's father passed away.  Plaintiff took one week of

7    approved bereavement leave.

8    In or about March of 2018, Plaintiff was considered for a new position with Robert

9    Leider whom Plaintiff had known for about fifteen years.  Plaintiff and Leider agreed Plaintiff

10   was a great fit for the job which offered Plaintiff a much-needed change of pace and a hostility-

11   free environment.  Unfortunately, Plaintiff was ultimately denied the position because of the

12   September 2017 PIP.  Defendant's retaliatory actions had caused Plaintiff to lose out on

13   opportunities for professional advancement and potential financial gain.

14   At this same time, Plaintiff learned that FICO's service provider at its data center in San

15   Francisco was leaving.  This departure had the potential to seriously disrupt FICO operations for

16   Scorecard Pro and Decision Tree Pro.  Given Plaintiff's advanced skillset and work ethic,

17   Baskerville turned to Plaintiff to "find a way" to ensure there were no operational interruptions

18   through the departure.  This is a very difficult task.  Plaintiff took one day to find a workable

19   solution and an additional day to write a full report.  Plaintiff made the transition as seamless as

20   Baskerville had hoped.

21   On or about April 8, 2018, Plaintiff expressed increased concern over the offshore

22   maintenance for IFM.  At one point, Plaintiff commented to an offshore engineer that the

23   requested changes to a client's hosted IFM environment should not be performed by offshore

24   engineers because they are not allowed access to client data.  Plaintiff is informed and believes

25   that this remark was communicated back to Baskerville.

26   On or about April 12, 2018, Plaintiff's worst fear came true: Baskerville terminated

27   Plaintiff, escorted him off the FICO property and forced him to leave behind his personal effects,

28   including his personal collection of technological books.

Exhibit
Page 135

1    In between FICO giving Plaintiff a $25,000 retention bonus not to leave the company in

2   mid-2016 and Plaintiff's termination in April of 2018, two significant things happened:  Plaintiff

3   went on legally entitled Family Medical Leave, and Plaintiff objected to the illegal and unethical

4   offshore maintenance utilized by FICO.   Defendant wrongfully terminated Plaintiff in direct

5   retaliation for these two events.

6    Plaintiff invested over twenty years of his life and most of his career in Defendant FICO.

7   When FICO and Baskerville began demeaning, disparaging and belittling Plaintiff upon his

8   return from Family Medical Leave, as described above, Plaintiff was confused and extremely

9   distraught.  Plaintiff was haunted and tormented by the September 2017 unsubstantiated PIP

10   throughout his remaining days at FICO.

11   **Response to Special Interrogatory No. 19:**

12    Objection.  This Interrogatory calls for speculation and for information which is more

13   readily available to propounding party. This Interrogatory further seeks the legal reasoning and

14   theories of Plaintiff's contentions. Plaintiff is not required to prepare the respondent's case.

15   (Sav-On Drugs, Inc. v. Superior Court of Los Angeles County (1975) 15 Cal.3d 1.) Further, this

16   Interrogatory is unduly burdensome and oppressive insofar as it seems to require that the entire

17   case be litigated in writing, which is not the purpose of discovery; rather, discovery is intended to

18   eliminate surprise and promote resolution short of trial. *See generally* Greyhound Corp. v. Super.

19   Ct., 56 Cal. 2d 355 (1961).  This Interrogatory is additionally overbroad as to time. Subject to

20   and without waiving these or any other applicable objections, Plaintiff responds as follows:

21    Among other times, in September 2017, Plaintiff expressed his concerns to Breithbart

22   that the PIP was a response to Plaintiff taking his legally entitled Family Medical Leave.

23    Thereafter, on or about September 22, 2017, Plaintiff had a post-PIP follow-up meeting

24   with Breithbart during which Plaintiff expressed to Breithbart that his relationship with

25   Baskerville had deteriorated significantly since Plaintiff returned from FMLA.  Plaintiff

26   expressed to Breithbart his belief that Baskerville was unhappy with Plaintiff for taking FMLA

27   and that Baskerville was retaliating against him.  Breithbart dismissed Plaintiff's concerns and

28   ///

Ex D
Page 136

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1  advised Plaintiff that FMLA only guarantees an employee will have a job when he returns from

2  leave.

3       Also during the September 22, 2017 meeting, Plaintiff additionally told Breithbart that he

4  objected to the allegation contained in the PIP that he failed "to follow processes and

5  procedures." Ironically, Baskerville's instruction that Plaintiff cease training off-shore personnel

6  had become the subject of a Performance Improvement Plan targeted at Plaintiff. This was also

7  a reference to Plaintiff's unwillingness to violate HIPAA requirements with the IFM product as

8  well as client contracts by pushing for offshore maintenance. Accordingly, Defendant explicitly

9  instructed Plaintiff to violate the law, which Plaintiff refused to do. Again, Breithbart brushed

10 Plaintiff's concerns aside.

11 **Response to Special Interrogatory No. 20:**

12       Objection. This Interrogatory calls for speculation and for information which is more

13 readily available to propounding party. This Interrogatory further seeks the legal reasoning and

14 theories of Plaintiff's contentions. Plaintiff is not required to prepare the respondent's case.

15 (Sav-On Drugs, Inc. v. Superior Court of Los Angeles County (1975) 15 Cal.3d 1.) Further, this

16 Interrogatory is unduly burdensome and oppressive insofar as it seems to require that the entire

17 case be litigated in writing, which is not the purpose of discovery; rather, discovery is intended to

18 eliminate surprise and promote resolution short of trial. *See generally* Greyhound Corp. v. Super.

19 Ct., 56 Cal. 2d 355 (1961). This Interrogatory is additionally overbroad as to time. Subject to

20 and without waiving these or any other applicable objections, Plaintiff responds as follows:

21       Among other times, in 2016, Plaintiff learned that there was an increasing likelihood that

22 FICO would offshore IFM product operations despite the fact that the de-identification of

23 HIPAA information had not yet been accomplished. When Plaintiff told Andrea Allmon, former

24 product manager for IFM, about this impending change, she responded, "That would literally

25 take an act of Congress" because HIPAA data cannot be handled by anyone outside of the United

26 States.

27       Also during a July 24, 2017 meeting, Baskerville advised Plaintiff of another change

28 occurring at FICO. He informed Plaintiff that maintenance work for IFM was~~Page 137~~

Ex D

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1  performed by offshore engineers in Bangalore and the United Kingdom.  Plaintiff felt that

2  preventing off-shore personnel from seeing United States health data was an obstacle that had

3  not been addressed by FICO during Plaintiff's leave.  Without this obstacle having been cleared,

4  the use of offshore personnel amounted to a potential HIPAA violation and a breach of client

5  contracts. Plaintiff responded by expressing his concern that the offshore arrangement presented

6  a potential HIPAA violation and further, violated client contracts, which specified that no

7  offshore personnel could be used. For example, Kaiser Permanente required background checks

8  for all persons touching Kaiser data.

9      In about October of 2017, Plaintiff felt increasingly uncomfortable with the PIP

10  requirements that he push IFM work offshore.  Plaintiff felt compelled to call the FICO

11  whistleblower hotline.  Plaintiff was very worried about his job.  He asked the hotline where his

12  report would go once he completed it.  The hotline advised Plaintiff that it would be sent to

13  Human Resources. Realizing that a report to Human Resources would quickly escalate, Plaintiff

14  decided to speak with Allyn Pon, the IFM Product Manager first.  After asking Plaintiff to wait a

15  couple of weeks before blowing the whistle, Pon eventually told Plaintiff he should go ahead and

16  call back the FICO whistleblower hotline.

17      Additionally, on or about April 8, 2018, Plaintiff expressed increased concern over the

18  offshore maintenance for IFM.  At one point, Plaintiff commented to an offshore engineer that

19  the requested changes to a client's hosted IFM environment should not be performed by offshore

20  engineers because they are not allowed access to client data.  Plaintiff is informed and believes

21  that this remark was communicated back to Baskerville.

22  **Response to Special Interrogatory No. 21:**

23      Objection.  This Interrogatory calls for speculation and for information which is more

24  readily available to propounding party. This Interrogatory further seeks the legal reasoning and

25  theories of Plaintiff's contentions. Plaintiff is not required to prepare the respondent's case.

26  (Sav-On Drugs, Inc. v. Superior Court of Los Angeles County (1975) 15 Cal.3d 1.) Further, this

27  Interrogatory is unduly burdensome and oppressive insofar as it seems to require that the entire

28  case be litigated in writing, which is not the purpose of discovery; rather, discovery is intended to

Ex D
Page 130

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1  eliminate surprise and promote resolution short of trial. *See generally* Greyhound Corp. v. Super.

2  Ct., 56 Cal. 2d 355 (1961).  This Interrogatory is additionally overbroad as to time. Subject to

3  and without waiving these or any other applicable objections, Plaintiff responds as follows:

4          In or about January of 1997, Plaintiff was hired by Hecht-Nielson Neural Computing

5  ("HNC") as an Application Engineer working to deploy software, develop and test code and

6  develop prototypes in cities across the United States and Canada. In or about April of 2002,

7  Defendant FICO acquired HNC, and Plaintiff became an employee of FICO.

8          In 2010, Plaintiff started working with Insurance Fraud Manager, ("IFM").  In or about

9  January of 2013, Plaintiff was transferred to Product Operations for IFM.  The offshore

10  development of IFM had a number of logistical and technological hurdles to clear.  One of the

11  challenges was that offshore engineers did not have access to live HIPAA data.  All HIPAA data

12  had to be de-identified before being made available to offshore engineers.

13          In March of 2014, Plaintiff led a long-awaited IFM upgrade.

14          In 2015, Plaintiff was frequently "on call" as FICO moved its operations hub from

15  Minnesota to San Diego.  This move resulted in a major workload increase for Plaintiff who was

16  required to be near his laptop addressing emergencies and system failures on a near constant

17  basis.

18          Also in 2016, Plaintiff learned that there was an increasing likelihood that FICO would

19  offshore IFM product operations despite the fact that the de-identification of HIPAA information

20  had not yet been accomplished.  When Plaintiff told Andrea Allmon, former product manager for

21  IFM, about this impending change, she responded, "That would literally take an act of Congress"

22  because HIPAA data cannot be handled by anyone outside of the United States.

23          In February of 2017, Plaintiff's father was diagnosed with pancreatic cancer.  Plaintiff's

24  father's prognosis was grim.  His physicians estimated he had three to six months to live.  In

25  addition to needing care and transportation, Plaintiff's father, who had lived with Plaintiff since

26  2008, presented a serious fall risk, and Plaintiff had to catch his father twice from falling during

27  a very short period. Because Plaintiff needed to care for his terminally ill father, in or about April

28  2017, Plaintiff went on Family Medical Leave.

Ex D
Page 139

1    In mid-July, Plaintiff's supervisor, Reef Baskerville, contacted Plaintiff to enquire when

2    Plaintiff would be returning to work. Plaintiff advised Baskerville he would be back at work on

3    July 20, 2017. Baskerville immediately sent out a meeting request for Plaintiff to meet with him

4    at 10:00 a.m. on July 20, 2017.

5    The morning of July 20, 2017 did not go as planned for Plaintiff, and he was required to

6    administer to his gravely ill father. Plaintiff advised Baskerville he would be fifteen minutes late

7    for their meeting. Baskerville told Plaintiff not to bother, that he would be "too busy" to meet

8    with Plaintiff. Immediately upon returning to work on July 20, 2017, Plaintiff felt that his work

9    place atmosphere had changed. Baskerville was openly hostile, refusing to meet with Plaintiff

10   despite Plaintiff's numerous efforts to re-accomplish the return meeting.

11   As part of his pervasive discriminatory and retaliatory demeanor toward Plaintiff,

12   Baskerville did not agree to meet with Plaintiff again until July 24, 2017. Baskerville began the

13   meeting with, "First of all, are you ready to come back to work because we've gone seventy-five

14   miles down the road since you left," implying that Plaintiff had been left behind as a result of his

15   taking FMLA. Baskerville also advised Plaintiff that punctuality would now be monitored along

16   with productivity. This was not the case for Plaintiff prior to his taking Family Medical Leave.

17   Baskerville further told Plaintiff he would need to become a subject matter expert ("SME") on

18   all hosted products.

19   Also during the July 24, 2017 meeting, Baskerville advised Plaintiff of another change

20   occurring at FICO. He informed Plaintiff that maintenance work for IFM was now being

21   performed by offshore engineers in Bangalore and the United Kingdom. Plaintiff felt that

22   preventing off-shore personnel from seeing United States health data was an obstacle that had

23   not been addressed by FICO during Plaintiff's leave. Without this obstacle having been cleared,

24   the use of offshore personnel amounted to a potential HIPAA violation and a breach of client

25   contracts. Plaintiff responded by expressing his concern that the offshore arrangement presented

26   a potential HIPAA violation and further, violated client contracts, which specified that no

27   offshore personnel could be used. For example, Kaiser Permanente required background checks

28   for all persons touching Kaiser data.

Ex D
Page 140

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    Baskerville responded with hostility to Plaintiff's ongoing concerns telling him that the

2    issue had "already been decided" and that the offshore arrangement was "none of [Plaintiff's]

3    business." Plaintiff had serious reservations about sending operation support offshore because it

4    was inconsistent with the information he had previously received on the topic of offshoring

5    HIPAA data.

6    Throughout the summer of 2017, the atmosphere at FICO became increasingly hostile

7    toward Plaintiff. Baskerville was continually critical and antagonistic to Plaintiff. For example,

8    if Plaintiff was required to attend an appointment with his father, Baskerville would tell Plaintiff,

9    "don't bother coming in."

10    In July of 2017, although Plaintiff was entitled to a new upgraded phone, his request for a

11    new phone was continually delayed. Baskerville essentially sabotaged Plaintiff's ability to

12    perform his work tasks by denying him the equipment he needed. In or about November of

13    2017, Plaintiff's request for a phone was declined when Neil Hartley said, "We don't know if

14    Johnny will be around to use the phone." Only after Plaintiff documented his need, request and

15    subsequent delay did Plaintiff finally received his new phone five (5) months later.

16    Starting in September of 2017, Baskerville instructed Plaintiff to no longer meet with

17    other team members and subject matter experts ("SME") to cross-train products. Some of these

18    SME's were off-shore engineers. Given that these meetings resulted in more employees having

19    familiarity and expertise with FICO's products, this measure was counter-productive and

20    designed to punish and alienate Plaintiff from fellow experts. Baskerville came to Plaintiff's

21    cubicle, directed Plaintiff to clear his calendar of SME meetings and stood over him while he did

22    so.

23    In or about September 2017, Defendant further discriminated and retaliated against

24    Plaintiff because of his medical leave and his association with his father, as well as his

25    complaints about FICO's unlawful conduct. On or about September 21, 2017, Baskerville

26    requested a meeting during which Lorraine Breithbart from HR was on the phone. During this

27    meeting, Plaintiff was shocked to receive a Performance Improvement Plan ("PIP"). The PIP

28    gave Plaintiff a performance rating of "poor." The PIP raised no concerns about Plaintiff's

PLAINTIFF'S RESPONSES TO DEFENDANT'S SPECIAL INTERROGATORIES, SET ONE (1)

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1   skills. Rather, the PIP focused on a number of "tardies," or days Plaintiff was late for work, and

2   Plaintiff working three (3) days from home.

3       Plaintiff objected to Baskerville and Breithbart regarding the tardies and absences and

4   expressed his feeling the numbers were inflated.  In response, Breithbart and Baskerville agreed

5   the number of absences may have been incorrect, corroborating that the PIP was unjustified and

6   therefore retaliatory.

7       Plaintiff contends there was no legitimate basis for the PIP.  The PIP was, in effect,

8   retaliation for Plaintiff taking Family Medical Leave to which he was legally entitled and an

9   attempt to force Plaintiff to comply with the offshore process of IFM, which he believed to be

10  both illegal and unethical.  Plaintiff was stunned and disappointed to receive the PIP.  About this

11  time, Plaintiff expressed his concerns to Breithbart that the PIP was a response to Plaintiff taking

12  his legally entitled Family Medical Leave.

13      On or about September 22, 2017, Plaintiff had a post-PIP follow-up meeting with

14  Breithbart during which Plaintiff expressed to Breithbart that his relationship with Baskerville

15  had deteriorated significantly since Plaintiff returned from FMLA.  Plaintiff expressed to

16  Breithbart his belief that Baskerville was unhappy with Plaintiff for taking FMLA and that

17  Baskerville was retaliating against him.  Breithbart dismissed Plaintiff's concerns and advised

18  Plaintiff that FMLA only guarantees an employee will have a job when he returns from leave.

19      During the September 22, 2017 meeting, Plaintiff additionally told Breithbart that he

20  objected to the allegation contained in the PIP that he failed "to follow processes and

21  procedures."  Baskerville's instruction that Plaintiff cease training off-shore personnel had

22  become the subject of a Performance Improvement Plan targeted at Plaintiff.  This was also a

23  reference to Plaintiff's unwillingness to violate HIPAA requirements with the IFM product as

24  well as client contracts by pushing for offshore maintenance.  Accordingly, Defendant explicitly

25  instructed Plaintiff to violate the law, which Plaintiff refused to do. Again, Baskerville brushed

26  Plaintiff's concerns aside.

27      From about September 21, 2017 through April 12, 2018, although the issues raised in the

28  PIP were resolved within two-weeks, Plaintiff had weekly meetings with Baskerville during

Ex D
Page 142

1   which Baskerville was openly hostile, belittling and chastising Plaintiff at every opportunity.

2   Baskerville began falsely accusing Plaintiff of misrepresenting how Plaintiff spent his time at

3   work, and the more Plaintiff tried to correct Baskerville or defend himself, the more Baskerville

4   would accuse Plaintiff of lying.

5         In October of 2017, Plaintiff requested he be permitted to complete training and become

6   AWS certified.  Baskerville told Plaintiff to worry about his PIP and denied Plaintiff the

7   opportunity to receive additional training in retaliation for Plaintiff taking FMLA and objecting

8   to the utilization of offshore maintenance.

9         In about October of 2017, Plaintiff felt increasingly uncomfortable with the PIP

10  requirements that he push IFM work offshore.  Plaintiff felt compelled to call the FICO

11  whistleblower hotline.  Plaintiff was very worried about his job.  He asked the hotline where his

12  report would go once he completed it.  The hotline advised Plaintiff that it would be sent to

13  Human Resources.

14        Realizing that a report to Human Resources would quickly escalate, Plaintiff decided to

15  speak with Allyn Pon, the IFM Product Manager first.  After asking Plaintiff to wait a couple of

16  weeks before blowing the whistle, Pon eventually told Plaintiff he should go ahead and call back

17  the FICO whistleblower hotline.

18        Given the hostile environment Plaintiff had already been facing, he was seriously

19  concerned about his job security.  Plaintiff was afraid he would be further retaliated against if he

20  blew the whistle on the offshore assignments.  Instead of immediately calling the hotline,

21  Plaintiff sought advice from his friend and former IFM Product Manager.  She advised Plaintiff

22  that the issue was really for Pon to address.  Fearing he could lose his job, Plaintiff backed down

23  and didn't call the hotline back.

24        Also in October of 2017, Plaintiff expressed his concerns regarding his job security to

25  Baskerville.  Baskerville did not reassure Plaintiff that his job was secure.

26        In or about November of 2017, given Plaintiff's skill level and expertise, he inherited a

27  number of new responsibilities, including operational support for two additional products,

28  including Scorecard Pro and Decision Tree Pro, two of FICO's legacy tools designed to enable

Ex D
Page 143

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA  92101-2013

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1  customers to evaluate, customize, deploy and scale state-of-the-art analytics and decision

2  management solutions.

3     On December 6, 2017, Plaintiff's father passed away.  Plaintiff took one week of

4  approved bereavement leave.

5     In or about March of 2018, Plaintiff was considered for a new position with Robert

6  Leider whom Plaintiff had known for about fifteen years.  Plaintiff and Leider agreed Plaintiff

7  was a great fit for the job which offered Plaintiff a much-needed change of pace and a hostility-

8  free environment.  Unfortunately, Plaintiff was ultimately denied the position because of the

9  September 2017 PIP.  Defendant's retaliatory actions had caused Plaintiff to lose out on

10  opportunities for professional advancement and potential financial gain.

11     At this same time, Plaintiff learned that FICO's service provider at its data center in San

12  Francisco was leaving.  This departure had the potential to seriously disrupt FICO operations for

13  Scorecard Pro and Decision Tree Pro.  Given Plaintiff's advanced skillset and work ethic,

14  Baskerville turned to Plaintiff to "find a way" to ensure there were no operational interruptions

15  through the departure.  This is a very difficult task.  Plaintiff took one day to find a workable

16  solution and an additional day to write a full report.  Plaintiff made the transition as seamless as

17  Baskerville had hoped.

18     On or about April 8, 2018, Plaintiff expressed increased concern over the offshore

19  maintenance for IFM.  At one point, Plaintiff commented to an offshore engineer that the

20  requested changes to a client's hosted IFM environment should not be performed by offshore

21  engineers because they are not allowed access to client data.  Plaintiff is informed and believes

22  that this remark was communicated back to Baskerville.

23     On or about April 12, 2018, Plaintiff's worst fear came true: Baskerville terminated

24  Plaintiff, escorted him off the FICO property and forced him to leave behind his personal effects,

25  including his personal collection of technological books.

26     In between FICO giving Plaintiff a $25,000 retention bonus not to leave the company in

27  mid-2016 and Plaintiff's termination in April of 2018, two significant things happened:  Plaintiff

28  went on legally entitled Family Medical Leave, and Plaintiff objected to the illegal and unethical

Ex D
Page 144

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1  offshore maintenance utilized by FICO.   Defendant wrongfully terminated Plaintiff in direct

2  retaliation for these two events.

3       Plaintiff invested over twenty years of his life and most of his career in Defendant FICO.

4  When FICO and Baskerville began demeaning, disparaging and belittling Plaintiff upon his

5  return from Family Medical Leave, as described above, Plaintiff was confused and extremely

6  distraught.  Plaintiff was haunted and tormented by the September 2017 unsubstantiated PIP

7  throughout his remaining days at FICO.

8  **Response to Special Interrogatory No. 22:**

9       Objection.  This Interrogatory calls for speculation and for information which is more

10  readily available to propounding party. This Interrogatory further seeks the legal reasoning and

11  theories of Plaintiff's contentions. Plaintiff is not required to prepare the respondent's case.

12  (Sav-On Drugs, Inc. v. Superior Court of Los Angeles County (1975) 15 Cal.3d 1.) Further, this

13  Interrogatory is unduly burdensome and oppressive insofar as it seems to require that the entire

14  case be litigated in writing, which is not the purpose of discovery; rather, discovery is intended to

15  eliminate surprise and promote resolution short of trial. *See generally* Greyhound Corp. v. Super.

16  Ct., 56 Cal. 2d 355 (1961).  This Interrogatory is additionally overbroad as to time. Subject to

17  and without waiving these or any other applicable objections, Plaintiff responds as follows:

18       In or about January of 1997, Plaintiff was hired by Hecht-Nielson Neural Computing

19  ("HNC") as an Application Engineer working to deploy software, develop and test code and

20  develop prototypes in cities across the United States and Canada. In or about April of 2002,

21  Defendant FICO acquired HNC, and Plaintiff became an employee of FICO.

22       In 2010, Plaintiff started working with Insurance Fraud Manager, ("IFM").  In or about

23  January of 2013, Plaintiff was transferred to Product Operations for IFM.  The offshore

24  development of IFM had a number of logistical and technological hurdles to clear.  One of the

25  challenges was that offshore engineers did not have access to live HIPAA data.  All HIPAA data

26  had to be de-identified before being made available to offshore engineers.

27       In March of 2014, Plaintiff led a long-awaited IFM upgrade.

Ex D
Page 145

28  ///

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    In 2015, Plaintiff was frequently "on call" as FICO moved its operations hub from

2 Minnesota to San Diego.  This move resulted in a major workload increase for Plaintiff who was

3 required to be near his laptop addressing emergencies and system failures on a near constant

4 basis.

5    Also in 2016, Plaintiff learned that there was an increasing likelihood that FICO would

6 offshore IFM product operations despite the fact that the de-identification of HIPAA information

7 had not yet been accomplished.  When Plaintiff told Andrea Allmon, former product manager for

8 IFM, about this impending change, she responded, "That would literally take an act of Congress"

9 because HIPAA data cannot be handled by anyone outside of the United States.

10    In February of 2017, Plaintiff's father was diagnosed with pancreatic cancer.  Plaintiff's

11 father's prognosis was grim.  His physicians estimated he had three to six months to live.  In

12 addition to needing care and transportation, Plaintiff's father, who had lived with Plaintiff since

13 2008, presented a serious fall risk, and Plaintiff had to catch his father twice from falling during

14 a very short period. Because Plaintiff needed to care for his terminally ill father, in or about April

15 2017, Plaintiff went on Family Medical Leave.

16    In mid-July, Plaintiff's supervisor, Reef Baskerville, contacted Plaintiff to enquire when

17 Plaintiff would be returning to work. Plaintiff advised Baskerville he would be back at work on

18 July 20, 2017.  Baskerville immediately sent out a meeting request for Plaintiff to meet with him

19 at 10:00 a.m. on July 20, 2017.

20    The morning of July 20, 2017 did not go as planned for Plaintiff, and he was required to

21 administer to his gravely ill father.  Plaintiff advised Baskerville he would be fifteen minutes late

22 for their meeting.  Baskerville told Plaintiff not to bother, that he would be "too busy" to meet

23 with Plaintiff.  Immediately upon returning to work on July 20, 2017, Plaintiff felt that his work

24 place atmosphere had changed.  Baskerville was openly hostile, refusing to meet with Plaintiff

25 despite Plaintiff's numerous efforts to re-accomplish the return meeting.

26    As part of his pervasive discriminatory and retaliatory demeanor toward Plaintiff,

27 Baskerville did not agree to meet with Plaintiff again until July 24, 2017.  Baskerville began the

28 meeting with, "First of all, are you ready to come back to work because we've got twenty-five

Ex D
Page 146

PLAINTIFF'S RESPONSES TO DEFENDANT'S SPECIAL INTERROGATORIES, SET ONE (1)

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    miles down the road since you left," implying that Plaintiff had been left behind as a result of his

2    taking FMLA. Baskerville also advised Plaintiff that punctuality would now be monitored along

3    with productivity. This was not the case for Plaintiff prior to his taking Family Medical Leave.

4    Baskerville further told Plaintiff he would need to become a subject matter expert ("SME") on

5    all hosted products.

6         Also during the July 24, 2017 meeting, Baskerville advised Plaintiff of another change

7    occurring at FICO. He informed Plaintiff that maintenance work for IFM was now being

8    performed by offshore engineers in Bangalore and the United Kingdom. Plaintiff felt that

9    preventing off-shore personnel from seeing United States health data was an obstacle that had

10   not been addressed by FICO during Plaintiff's leave. Without this obstacle having been cleared,

11   the use of offshore personnel amounted to a potential HIPAA violation and a breach of client

12   contracts. Plaintiff responded by expressing his concern that the offshore arrangement presented

13   a potential HIPAA violation and further, violated client contracts, which specified that no

14   offshore personnel could be used. For example, Kaiser Permanente required background checks

15   for all persons touching Kaiser data.

16        Baskerville responded with hostility to Plaintiff's ongoing concerns telling him that the

17   issue had "already been decided" and that the offshore arrangement was "none of [Plaintiff's]

18   business." Plaintiff had serious reservations about sending operation support offshore because it

19   was inconsistent with the information he had previously received on the topic of offshoring

20   HIPAA data.

21        Throughout the summer of 2017, the atmosphere at FICO became increasingly hostile

22   toward Plaintiff. Baskerville was continually critical and antagonistic to Plaintiff. For example,

23   if Plaintiff was required to attend an appointment with his father, Baskerville would tell Plaintiff,

24   "don't bother coming in."

25        In July of 2017, although Plaintiff was entitled to a new upgraded phone, his request for a

26   new phone was continually delayed. Baskerville essentially sabotaged Plaintiff's ability to

27   perform his work tasks by denying him the equipment he needed. In or about November of

28   2017, Plaintiff's request for a phone was declined when Neil Hartley said, "We don't know if

Ex D
Page 147

1   Johnny will be around to use the phone." Only after Plaintiff documented his need, request and

2   subsequent delay did Plaintiff finally received his new phone five (5) months later.

3        Starting in September of 2017, Baskerville instructed Plaintiff to no longer meet with

4   other team members and subject matter experts ("SME") to cross-train products. Some of these

5   SME's were off-shore engineers. Given that these meetings resulted in more employees having

6   familiarity and expertise with FICO's products, this measure was counter-productive and

7   designed to punish and alienate Plaintiff from fellow experts. Baskerville came to Plaintiff's

8   cubicle, directed Plaintiff to clear his calendar of SME meetings and stood over him while he did

9   so.

10        In or about September 2017, Defendant further discriminated and retaliated against

11   Plaintiff because of his medical leave and his association with his father, as well as his

12   complaints about FICO's unlawful conduct. On or about September 21, 2017, Baskerville

13   requested a meeting during which Lorraine Breithbart from HR was on the phone. During this

14   meeting, Plaintiff was shocked to receive a Performance Improvement Plan ("PIP"). The PIP

15   gave Plaintiff a performance rating of "poor." The PIP raised no concerns about Plaintiff's

16   skills. Rather, the PIP focused on a number of "tardies," or days Plaintiff was late for work, and

17   Plaintiff working three (3) days from home.

18        Plaintiff objected to Baskerville and Breithbart regarding the tardies and absences and

19   expressed his feeling the numbers were inflated. In response, Breithbart and Baskerville agreed

20   the number of absences may have been incorrect, corroborating that the PIP was unjustified and

21   therefore retaliatory.

22        Plaintiff contends there was no legitimate basis for the PIP. The PIP was, in effect,

23   retaliation for Plaintiff taking Family Medical Leave to which he was legally entitled and an

24   attempt to force Plaintiff to comply with the offshore process of IFM, which he believed to be

25   both illegal and unethical. Plaintiff was stunned and disappointed to receive the PIP. About this

26   time, Plaintiff expressed his concerns to Breithbart that the PIP was a response to Plaintiff taking

27   his legally entitled Family Medical Leave.

28   ///

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

Ex D
Page 148

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    On or about September 22, 2017, Plaintiff had a post-PIP follow-up meeting with

2  Breithbart during which Plaintiff expressed to Breithbart that his relationship with Baskerville

3  had deteriorated significantly since Plaintiff returned from FMLA.  Plaintiff expressed to

4  Breithbart his belief that Baskerville was unhappy with Plaintiff for taking FMLA and that

5  Baskerville was retaliating against him.  Breithbart dismissed Plaintiff's concerns and advised

6  Plaintiff that FMLA only guarantees an employee will have a job when he returns from leave.

7    During the September 22, 2017 meeting, Plaintiff additionally told Breithbart that he

8  objected to the allegation contained in the PIP that he failed "to follow processes and

9  procedures."  Baskerville's instruction that Plaintiff cease training off-shore personnel had

10  become the subject of a Performance Improvement Plan targeted at Plaintiff.  This was also a

11  reference to Plaintiff's unwillingness to violate HIPAA requirements with the IFM product as

12  well as client contracts by pushing for offshore maintenance.  Accordingly, Defendant explicitly

13  instructed Plaintiff to violate the law, which Plaintiff refused to do. Again, Baskerville brushed

14  Plaintiff's concerns aside.

15    From about September 21, 2017 through April 12, 2018, although the issues raised in the

16  PIP were resolved within two-weeks, Plaintiff had weekly meetings with Baskerville during

17  which Baskerville was openly hostile, belittling and chastising Plaintiff at every opportunity.

18  Baskerville began falsely accusing Plaintiff of misrepresenting how Plaintiff spent his time at

19  work, and the more Plaintiff tried to correct Baskerville or defend himself, the more Baskerville

20  would accuse Plaintiff of lying.

21    In October of 2017, Plaintiff requested he be permitted to complete training and become

22  AWS certified.  Baskerville told Plaintiff to worry about his PIP and denied Plaintiff the

23  opportunity to receive additional training in retaliation for Plaintiff taking FMLA and objecting

24  to the utilization of offshore maintenance.

25    In about October of 2017, Plaintiff felt increasingly uncomfortable with the PIP

26  requirements that he push IFM work offshore.  Plaintiff felt compelled to call the FICO

27  whistleblower hotline.  Plaintiff was very worried about his job.  He asked the hotline where his

28  ///

Ex D
Page 149

PLAINTIFF'S RESPONSES TO DEFENDANT'S SPECIAL INTERROGATORIES, SET ONE (1)

1   report would go once he completed it.  The hotline advised Plaintiff that it would be sent to

2   Human Resources.

3            Realizing that a report to Human Resources would quickly escalate, Plaintiff decided to

4   speak with Allyn Pon, the IFM Product Manager first.  After asking Plaintiff to wait a couple of

5   weeks before blowing the whistle, Pon eventually told Plaintiff he should go ahead and call back

6   the FICO whistleblower hotline.

7            Given the hostile environment Plaintiff had already been facing, he was seriously

8   concerned about his job security.  Plaintiff was afraid he would be further retaliated against if he

9   blew the whistle on the offshore assignments.  Instead of immediately calling the hotline,

10  Plaintiff sought advice from his friend and former IFM Product Manager.  She advised Plaintiff

11  that the issue was really for Pon to address.  Fearing he could lose his job, Plaintiff backed down

12  and didn't call the hotline back.

13           Also in October of 2017, Plaintiff expressed his concerns regarding his job security to

14  Baskerville.  Baskerville did not reassure Plaintiff that his job was secure.

15           In or about November of 2017, given Plaintiff's skill level and expertise, he inherited a

16  number of new responsibilities, including operational support for two additional products,

17  including Scorecard Pro and Decision Tree Pro, two of FICO's legacy tools designed to enable

18  customers to evaluate, customize, deploy and scale state-of-the-art analytics and decision

19  management solutions.

20           On December 6, 2017, Plaintiff's father passed away.  Plaintiff took one week of

21  approved bereavement leave.

22           In or about March of 2018, Plaintiff was considered for a new position with Robert

23  Leider whom Plaintiff had known for about fifteen years.  Plaintiff and Leider agreed Plaintiff

24  was a great fit for the job which offered Plaintiff a much-needed change of pace and a hostility-

25  free environment.  Unfortunately, Plaintiff was ultimately denied the position because of the

26  September 2017 PIP.  Defendant's retaliatory actions had caused Plaintiff to lose out on

27  opportunities for professional advancement and potential financial gain.

Ex D

Page 150

28  ///

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA  92101-2013

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    At this same time, Plaintiff learned that FICO's service provider at its data center in San

2  Francisco was leaving.  This departure had the potential to seriously disrupt FICO operations for

3  Scorecard Pro and Decision Tree Pro.  Given Plaintiff's advanced skillset and work ethic,

4  Baskerville turned to Plaintiff to "find a way" to ensure there were no operational interruptions

5  through the departure.  This is a very difficult task.  Plaintiff took one day to find a workable

6  solution and an additional day to write a full report.  Plaintiff made the transition as seamless as

7  Baskerville had hoped.

8    On or about April 8, 2018, Plaintiff expressed increased concern over the offshore

9  maintenance for IFM.  At one point, Plaintiff commented to an offshore engineer that the

10  requested changes to a client's hosted IFM environment should not be performed by offshore

11  engineers because they are not allowed access to client data.  Plaintiff is informed and believes

12  that this remark was communicated back to Baskerville.

13    On or about April 12, 2018, Plaintiff's worst fear came true: Baskerville terminated

14  Plaintiff, escorted him off the FICO property and forced him to leave behind his personal effects,

15  including his personal collection of technological books.

16    In between FICO giving Plaintiff a $25,000 retention bonus not to leave the company in

17  mid-2016 and Plaintiff's termination in April of 2018, two significant things happened:  Plaintiff

18  went on legally entitled Family Medical Leave, and Plaintiff objected to the illegal and unethical

19  offshore maintenance utilized by FICO.   Defendant wrongfully terminated Plaintiff in direct

20  retaliation for these two events.

21    Plaintiff invested over twenty years of his life and most of his career in Defendant FICO.

22  When FICO and Baskerville began demeaning, disparaging and belittling Plaintiff upon his

23  return from Family Medical Leave, as described above, Plaintiff was confused and extremely

24  distraught.  Plaintiff was haunted and tormented by the September 2017 unsubstantiated PIP

25  throughout his remaining days at FICO.

26  **Response to Special Interrogatory No. 23**:

27    Objection.  This Interrogatory calls for speculation and for information which is

28  more readily available to propounding party. This Interrogatory further seeks the legal reasoning

Ex. D

1   and theories of Plaintiff's contentions. Plaintiff is not required to prepare the respondent's case.

2   (Sav-On Drugs, Inc. v. Superior Court of Los Angeles County (1975) 15 Cal.3d 1.) Further, this

3   Interrogatory is unduly burdensome and oppressive insofar as it seems to require that the entire

4   case be litigated in writing, which is not the purpose of discovery; rather, discovery is intended to

5   eliminate surprise and promote resolution short of trial. *See generally* Greyhound Corp. v. Super.

6   Ct., 56 Cal. 2d 355 (1961).  This Interrogatory is additionally overbroad as to time. Subject to

7   and without waiving these or any other applicable objections, Plaintiff responds as follows:

8          In or about January of 1997, Plaintiff was hired by Hecht-Nielson Neural Computing

9   ("HNC") as an Application Engineer working to deploy software, develop and test code and

10   develop prototypes in cities across the United States and Canada. In or about April of 2002,

11   Defendant FICO acquired HNC, and Plaintiff became an employee of FICO.

12          In 2010, Plaintiff started working with Insurance Fraud Manager, ("IFM").  In or about

13   January of 2013, Plaintiff was transferred to Product Operations for IFM.  The offshore

14   development of IFM had a number of logistical and technological hurdles to clear.  One of the

15   challenges was that offshore engineers did not have access to live HIPAA data.  All HIPAA data

16   had to be de-identified before being made available to offshore engineers.

17          In March of 2014, Plaintiff led a long-awaited IFM upgrade.

18          In 2015, Plaintiff was frequently "on call" as FICO moved its operations hub from

19   Minnesota to San Diego.  This move resulted in a major workload increase for Plaintiff who was

20   required to be near his laptop addressing emergencies and system failures on a near constant

21   basis.

22          Also in 2016, Plaintiff learned that there was an increasing likelihood that FICO would

23   offshore IFM product operations despite the fact that the de-identification of HIPAA information

24   had not yet been accomplished.  When Plaintiff told Andrea Allmon, former product manager for

25   IFM, about this impending change, she responded, "That would literally take an act of Congress"

26   because HIPAA data cannot be handled by anyone outside of the United States.

27          In February of 2017, Plaintiff's father was diagnosed with pancreatic cancer.  Plaintiff's

28   father's prognosis was grim.  His physicians estimated he had three to six months to live.  In

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

Ex D
Page 152

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA  92101-2013

1   addition to needing care and transportation, Plaintiff's father, who had lived with Plaintiff since

2   2008, presented a serious fall risk, and Plaintiff had to catch his father twice from falling during

3   a very short period. Because Plaintiff needed to care for his terminally ill father, in or about April

4   2017, Plaintiff went on Family Medical Leave.

5          In mid-July, Plaintiff's supervisor, Reef Baskerville, contacted Plaintiff to enquire when

6   Plaintiff would be returning to work. Plaintiff advised Baskerville he would be back at work on

7   July 20, 2017.  Baskerville immediately sent out a meeting request for Plaintiff to meet with him

8   at 10:00 a.m. on July 20, 2017.

9          The morning of July 20, 2017 did not go as planned for Plaintiff, and he was required to

10  administer to his gravely ill father.  Plaintiff advised Baskerville he would be fifteen minutes late

11  for their meeting.  Baskerville told Plaintiff not to bother, that he would be "too busy" to meet

12  with Plaintiff.  Immediately upon returning to work on July 20, 2017, Plaintiff felt that his work

13  place atmosphere had changed.  Baskerville was openly hostile, refusing to meet with Plaintiff

14  despite Plaintiff's numerous efforts to re-accomplish the return meeting.

15         As part of his pervasive discriminatory and retaliatory demeanor toward Plaintiff,

16  Baskerville did not agree to meet with Plaintiff again until July 24, 2017.  Baskerville began the

17  meeting with, "First of all, are you ready to come back to work because we've gone seventy-five

18  miles down the road since you left," implying that Plaintiff had been left behind as a result of his

19  taking FMLA.  Baskerville also advised Plaintiff that punctuality would now be monitored along

20  with productivity.  This was not the case for Plaintiff prior to his taking Family Medical Leave.

21  Baskerville further told Plaintiff he would need to become a subject matter expert ("SME") on

22  all hosted products.

23         Also during the July 24, 2017 meeting, Baskerville advised Plaintiff of another change

24  occurring at FICO.  He informed Plaintiff that maintenance work for IFM was now being

25  performed by offshore engineers in Bangalore and the United Kingdom.  Plaintiff felt that

26  preventing off-shore personnel from seeing United States health data was an obstacle that had

27  not been addressed by FICO during Plaintiff's leave.  Without this obstacle having been cleared,

28  the use of offshore personnel amounted to a potential HIPAA violation and a breach of client

EX'D
Page 153

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1  contracts. Plaintiff responded by expressing his concern that the offshore arrangement presented

2  a potential HIPAA violation and further, violated client contracts, which specified that no

3  offshore personnel could be used. For example, Kaiser Permanente required background checks

4  for all persons touching Kaiser data.

5        Baskerville responded with hostility to Plaintiff's ongoing concerns telling him that the

6  issue had "already been decided" and that the offshore arrangement was "none of [Plaintiff's]

7  business." Plaintiff had serious reservations about sending operation support offshore because it

8  was inconsistent with the information he had previously received on the topic of offshoring

9  HIPAA data.

10        Throughout the summer of 2017, the atmosphere at FICO became increasingly hostile

11  toward Plaintiff. Baskerville was continually critical and antagonistic to Plaintiff. For example,

12  if Plaintiff was required to attend an appointment with his father, Baskerville would tell Plaintiff,

13  "don't bother coming in."

14        In July of 2017, although Plaintiff was entitled to a new upgraded phone, his request for a

15  new phone was continually delayed. Baskerville essentially sabotaged Plaintiff's ability to

16  perform his work tasks by denying him the equipment he needed. In or about November of

17  2017, Plaintiff's request for a phone was declined when Neil Hartley said, "We don't know if

18  Johnny will be around to use the phone." Only after Plaintiff documented his need, request and

19  subsequent delay did Plaintiff finally received his new phone five (5) months later.

20        Starting in September of 2017, Baskerville instructed Plaintiff to no longer meet with

21  other team members and subject matter experts ("SME") to cross-train products. Some of these

22  SME's were off-shore engineers. Given that these meetings resulted in more employees having

23  familiarity and expertise with FICO's products, this measure was counter-productive and

24  designed to punish and alienate Plaintiff from fellow experts. Baskerville came to Plaintiff's

25  cubicle, directed Plaintiff to clear his calendar of SME meetings and stood over him while he did

26  so.

27        In or about September 2017, Defendant further discriminated and retaliated against

28  Plaintiff because of his medical leave and his association with his father, as well as his

EX D
Page 154

1   complaints about FICO's unlawful conduct.  On or about September 21, 2017, Baskerville

2   requested a meeting during which Lorraine Breithbart from HR was on the phone.  During this

3   meeting, Plaintiff was shocked to receive a Performance Improvement Plan ("PIP").  The PIP

4   gave Plaintiff a performance rating of "poor."  The PIP raised no concerns about Plaintiff's

5   skills. Rather, the PIP focused on a number of "tardies," or days Plaintiff was late for work, and

6   Plaintiff working three (3) days from home.

7   Plaintiff objected to Baskerville and Breithbart regarding the tardies and absences and

8   expressed his feeling the numbers were inflated.  In response, Breithbart and Baskerville agreed

9   the number of absences may have been incorrect, corroborating that the PIP was unjustified and

10  therefore retaliatory.

11  Plaintiff contends there was no legitimate basis for the PIP.  The PIP was, in effect,

12  retaliation for Plaintiff taking Family Medical Leave to which he was legally entitled and an

13  attempt to force Plaintiff to comply with the offshore process of IFM, which he believed to be

14  both illegal and unethical.  Plaintiff was stunned and disappointed to receive the PIP.  About this

15  time, Plaintiff expressed his concerns to Breithbart that the PIP was a response to Plaintiff taking

16  his legally entitled Family Medical Leave.

17  On or about September 22, 2017, Plaintiff had a post-PIP follow-up meeting with

18  Breithbart during which Plaintiff expressed to Breithbart that his relationship with Baskerville

19  had deteriorated significantly since Plaintiff returned from FMLA.  Plaintiff expressed to

20  Breithbart his belief that Baskerville was unhappy with Plaintiff for taking FMLA and that

21  Baskerville was retaliating against him.  Breithbart dismissed Plaintiff's concerns and advised

22  Plaintiff that FMLA only guarantees an employee will have a job when he returns from leave.

23  During the September 22, 2017 meeting, Plaintiff additionally told Breithbart that he

24  objected to the allegation contained in the PIP that he failed "to follow processes and

25  procedures."  Baskerville's instruction that Plaintiff cease training off-shore personnel had

26  become the subject of a Performance Improvement Plan targeted at Plaintiff.  This was also a

27  reference to Plaintiff's unwillingness to violate HIPAA requirements with the IFM product as

28  well as client contracts by pushing for offshore maintenance.  Accordingly, Defendant explicitly

Ex 5

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

instructed Plaintiff to violate the law, which Plaintiff refused to do. Again, Baskerville brushed Plaintiff's concerns aside.

From about September 21, 2017 through April 12, 2018, although the issues raised in the PIP were resolved within two-weeks, Plaintiff had weekly meetings with Baskerville during which Baskerville was openly hostile, belittling and chastising Plaintiff at every opportunity. Baskerville began falsely accusing Plaintiff of misrepresenting how Plaintiff spent his time at work, and the more Plaintiff tried to correct Baskerville or defend himself, the more Baskerville would accuse Plaintiff of lying.

In October of 2017, Plaintiff requested he be permitted to complete training and become AWS certified. Baskerville told Plaintiff to worry about his PIP and denied Plaintiff the opportunity to receive additional training in retaliation for Plaintiff taking FMLA and objecting to the utilization of offshore maintenance.

In about October of 2017, Plaintiff felt increasingly uncomfortable with the PIP requirements that he push IFM work offshore. Plaintiff felt compelled to call the FICO whistleblower hotline. Plaintiff was very worried about his job. He asked the hotline where his report would go once he completed it. The hotline advised Plaintiff that it would be sent to Human Resources.

Realizing that a report to Human Resources would quickly escalate, Plaintiff decided to speak with Allyn Pon, the IFM Product Manager first. After asking Plaintiff to wait a couple of weeks before blowing the whistle, Pon eventually told Plaintiff he should go ahead and call back the FICO whistleblower hotline.

Given the hostile environment Plaintiff had already been facing, he was seriously concerned about his job security. Plaintiff was afraid he would be further retaliated against if he blew the whistle on the offshore assignments. Instead of immediately calling the hotline, Plaintiff sought advice from his friend and former IFM Product Manager. She advised Plaintiff that the issue was really for Pon to address. Fearing he could lose his job, Plaintiff backed down and didn't call the hotline back.

///

Ex D
Page 156

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1  Also in October of 2017, Plaintiff expressed his concerns regarding his job security to

2  Baskerville. Baskerville did not reassure Plaintiff that his job was secure.

3  In or about November of 2017, given Plaintiff's skill level and expertise, he inherited a

4  number of new responsibilities, including operational support for two additional products,

5  including Scorecard Pro and Decision Tree Pro, two of FICO's legacy tools designed to enable

6  customers to evaluate, customize, deploy and scale state-of-the-art analytics and decision

7  management solutions.

8  On December 6, 2017, Plaintiff's father passed away. Plaintiff took one week of

9  approved bereavement leave.

10  In or about March of 2018, Plaintiff was considered for a new position with Robert

11  Leider whom Plaintiff had known for about fifteen years. Plaintiff and Leider agreed Plaintiff

12  was a great fit for the job which offered Plaintiff a much-needed change of pace and a hostility-

13  free environment. Unfortunately, Plaintiff was ultimately denied the position because of the

14  September 2017 PIP. Defendant's retaliatory actions had caused Plaintiff to lose out on

15  opportunities for professional advancement and potential financial gain.

16  At this same time, Plaintiff learned that FICO's service provider at its data center in San

17  Francisco was leaving. This departure had the potential to seriously disrupt FICO operations for

18  Scorecard Pro and Decision Tree Pro. Given Plaintiff's advanced skillset and work ethic,

19  Baskerville turned to Plaintiff to "find a way" to ensure there were no operational interruptions

20  through the departure. This is a very difficult task. Plaintiff took one day to find a workable

21  solution and an additional day to write a full report. Plaintiff made the transition as seamless as

22  Baskerville had hoped.

23  On or about April 8, 2018, Plaintiff expressed increased concern over the offshore

24  maintenance for IFM. At one point, Plaintiff commented to an offshore engineer that the

25  requested changes to a client's hosted IFM environment should not be performed by offshore

26  engineers because they are not allowed access to client data. Plaintiff is informed and believes

27  that this remark was communicated back to Baskerville.

Ex D
Page 157

28  ///

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    On or about April 12, 2018, Plaintiff's worst fear came true: Baskerville terminated

2 Plaintiff, escorted him off the FICO property and forced him to leave behind his personal effects,

3 including his personal collection of technological books.

4    In between FICO giving Plaintiff a $25,000 retention bonus not to leave the company in

5 mid-2016 and Plaintiff's termination in April of 2018, two significant things happened:  Plaintiff

6 went on legally entitled Family Medical Leave, and Plaintiff objected to the illegal and unethical

7 offshore maintenance utilized by FICO.   Defendant wrongfully terminated Plaintiff in direct

8 retaliation for these two events.

9    Plaintiff invested over twenty years of his life and most of his career in Defendant FICO.

10 When FICO and Baskerville began demeaning, disparaging and belittling Plaintiff upon his

11 return from Family Medical Leave, as described above, Plaintiff was confused and extremely

12 distraught.  Plaintiff was haunted and tormented by the September 2017 unsubstantiated PIP

13 throughout his remaining days at FICO.

14 **Response to Special Interrogatory No. 24:**

15    Objection.  This Interrogatory calls for speculation and for information which is

16 more readily available to propounding party. This Interrogatory further seeks the legal reasoning

17 and theories of Plaintiff's contentions. Plaintiff is not required to prepare the respondent's case.

18 (Sav-On Drugs, Inc. v. Superior Court of Los Angeles County (1975) 15 Cal.3d 1.) Further, this

19 Interrogatory is unduly burdensome and oppressive insofar as it seems to require that the entire

20 case be litigated in writing, which is not the purpose of discovery; rather, discovery is intended to

21 eliminate surprise and promote resolution short of trial. *See generally* Greyhound Corp. v. Super.

22 Ct., 56 Cal. 2d 355 (1961).  This Interrogatory is additionally overbroad as to time. Subject to

23 and without waiving these or any other applicable objections, Plaintiff responds as follows:

24    In or about January of 1997, Plaintiff was hired by Hecht-Nielson Neural Computing

25 ("HNC") as an Application Engineer working to deploy software, develop and test code and

26 develop prototypes in cities across the United States and Canada. In or about April of 2002,

27 Defendant FICO acquired HNC, and Plaintiff became an employee of FICO.

Ex D
Page 158

28 ///

1   In 2010, Plaintiff started working with Insurance Fraud Manager, ("IFM").  In or about

2   January of 2013, Plaintiff was transferred to Product Operations for IFM.  The offshore

3   development of IFM had a number of logistical and technological hurdles to clear.  One of the

4   challenges was that offshore engineers did not have access to live HIPAA data.  All HIPAA data

5   had to be de-identified before being made available to offshore engineers.

6   In March of 2014, Plaintiff led a long-awaited IFM upgrade.

7   In 2015, Plaintiff was frequently "on call" as FICO moved its operations hub from

8   Minnesota to San Diego.  This move resulted in a major workload increase for Plaintiff who was

9   required to be near his laptop addressing emergencies and system failures on a near constant

10   basis.

11   Also in 2016, Plaintiff learned that there was an increasing likelihood that FICO would

12   offshore IFM product operations despite the fact that the de-identification of HIPAA information

13   had not yet been accomplished.  When Plaintiff told Andrea Allmon, former product manager for

14   IFM, about this impending change, she responded, "That would literally take an act of Congress"

15   because HIPAA data cannot be handled by anyone outside of the United States.

16   In February of 2017, Plaintiff's father was diagnosed with pancreatic cancer.  Plaintiff's

17   father's prognosis was grim.  His physicians estimated he had three to six months to live.  In

18   addition to needing care and transportation, Plaintiff's father, who had lived with Plaintiff since

19   2008, presented a serious fall risk, and Plaintiff had to catch his father twice from falling during

20   a very short period. Because Plaintiff needed to care for his terminally ill father, in or about April

21   2017, Plaintiff went on Family Medical Leave.

22   In mid-July, Plaintiff's supervisor, Reef Baskerville, contacted Plaintiff to enquire when

23   Plaintiff would be returning to work. Plaintiff advised Baskerville he would be back at work on

24   July 20, 2017.  Baskerville immediately sent out a meeting request for Plaintiff to meet with him

25   at 10:00 a.m. on July 20, 2017.

26   The morning of July 20, 2017 did not go as planned for Plaintiff, and he was required to

27   administer to his gravely ill father.  Plaintiff advised Baskerville he would be fifteen minutes late

28   for their meeting.  Baskerville told Plaintiff not to bother, that he would be "too busy" to meet

Ex B
Page 159

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA  92101-2013

with Plaintiff. Immediately upon returning to work on July 20, 2017, Plaintiff felt that his work place atmosphere had changed. Baskerville was openly hostile, refusing to meet with Plaintiff despite Plaintiff's numerous efforts to re-accomplish the return meeting.

As part of his pervasive discriminatory and retaliatory demeanor toward Plaintiff, Baskerville did not agree to meet with Plaintiff again until July 24, 2017. Baskerville began the meeting with, "First of all, are you ready to come back to work because we've gone seventy-five miles down the road since you left," implying that Plaintiff had been left behind as a result of his taking FMLA. Baskerville also advised Plaintiff that punctuality would now be monitored along with productivity. This was not the case for Plaintiff prior to his taking Family Medical Leave. Baskerville further told Plaintiff he would need to become a subject matter expert ("SME") on all hosted products.

Also during the July 24, 2017 meeting, Baskerville advised Plaintiff of another change occurring at FICO. He informed Plaintiff that maintenance work for IFM was now being performed by offshore engineers in Bangalore and the United Kingdom. Plaintiff felt that preventing off-shore personnel from seeing United States health data was an obstacle that had not been addressed by FICO during Plaintiff's leave. Without this obstacle having been cleared, the use of offshore personnel amounted to a potential HIPAA violation and a breach of client contracts. Plaintiff responded by expressing his concern that the offshore arrangement presented a potential HIPAA violation and further, violated client contracts, which specified that no offshore personnel could be used. For example, Kaiser Permanente required background checks for all persons touching Kaiser data.

Baskerville responded with hostility to Plaintiff's ongoing concerns telling him that the issue had "already been decided" and that the offshore arrangement was "none of [Plaintiff's] business." Plaintiff had serious reservations about sending operation support offshore because it was inconsistent with the information he had previously received on the topic of offshoring HIPAA data.

Throughout the summer of 2017, the atmosphere at FICO became increasingly hostile toward Plaintiff. Baskerville was continually critical and antagonistic to Plaintiff. For example,

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

Ex D
Page 160

1   if Plaintiff was required to attend an appointment with his father, Baskerville would tell Plaintiff,

2   "don't bother coming in."

3       In July of 2017, although Plaintiff was entitled to a new upgraded phone, his request for a

4   new phone was continually delayed.  Baskerville essentially sabotaged Plaintiff's ability to

5   perform his work tasks by denying him the equipment he needed.  In or about November of

6   2017, Plaintiff's request for a phone was declined when Neil Hartley said, "We don't know if

7   Johnny will be around to use the phone."  Only after Plaintiff documented his need, request and

8   subsequent delay did Plaintiff finally received his new phone five (5) months later.

9       Starting in September of 2017, Baskerville instructed Plaintiff to no longer meet with

10   other team members and subject matter experts ("SME") to cross-train products.  Some of these

11   SME's were off-shore engineers.  Given that these meetings resulted in more employees having

12   familiarity and expertise with FICO's products, this measure was counter-productive and

13   designed to punish and alienate Plaintiff from fellow experts.  Baskerville came to Plaintiff's

14   cubicle, directed Plaintiff to clear his calendar of SME meetings and stood over him while he did

15   so.

16       In or about September 2017, Defendant further discriminated and retaliated against

17   Plaintiff because of his medical leave and his association with his father, as well as his

18   complaints about FICO's unlawful conduct.  On or about September 21, 2017, Baskerville

19   requested a meeting during which Lorraine Breithbart from HR was on the phone.  During this

20   meeting, Plaintiff was shocked to receive a Performance Improvement Plan ("PIP").  The PIP

21   gave Plaintiff a performance rating of "poor."  The PIP raised no concerns about Plaintiff's

22   skills. Rather, the PIP focused on a number of "tardies," or days Plaintiff was late for work, and

23   Plaintiff working three (3) days from home.

24       Plaintiff objected to Baskerville and Breithbart regarding the tardies and absences and

25   expressed his feeling the numbers were inflated.  In response, Breithbart and Baskerville agreed

26   the number of absences may have been incorrect, corroborating that the PIP was unjustified and

27   therefore retaliatory.

28   ///

Ex D
Page 161

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA  92101-2013

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    Plaintiff contends there was no legitimate basis for the PIP. The PIP was, in effect,

2    retaliation for Plaintiff taking Family Medical Leave to which he was legally entitled and an

3    attempt to force Plaintiff to comply with the offshore process of IFM, which he believed to be

4    both illegal and unethical. Plaintiff was stunned and disappointed to receive the PIP. About this

5    time, Plaintiff expressed his concerns to Breithbart that the PIP was a response to Plaintiff taking

6    his legally entitled Family Medical Leave.

7        On or about September 22, 2017, Plaintiff had a post-PIP follow-up meeting with

8    Breithbart during which Plaintiff expressed to Breithbart that his relationship with Baskerville

9    had deteriorated significantly since Plaintiff returned from FMLA. Plaintiff expressed to

10   Breithbart his belief that Baskerville was unhappy with Plaintiff for taking FMLA and that

11   Baskerville was retaliating against him. Breithbart dismissed Plaintiff's concerns and advised

12   Plaintiff that FMLA only guarantees an employee will have a job when he returns from leave.

13       During the September 22, 2017 meeting, Plaintiff additionally told Breithbart that he

14   objected to the allegation contained in the PIP that he failed "to follow processes and

15   procedures." Baskerville's instruction that Plaintiff cease training off-shore personnel had

16   become the subject of a Performance Improvement Plan targeted at Plaintiff. This was also a

17   reference to Plaintiff's unwillingness to violate HIPAA requirements with the IFM product as

18   well as client contracts by pushing for offshore maintenance. Accordingly, Defendant explicitly

19   instructed Plaintiff to violate the law, which Plaintiff refused to do. Again, Baskerville brushed

20   Plaintiff's concerns aside.

21       From about September 21, 2017 through April 12, 2018, although the issues raised in the

22   PIP were resolved within two-weeks, Plaintiff had weekly meetings with Baskerville during

23   which Baskerville was openly hostile, belittling and chastising Plaintiff at every opportunity.

24   Baskerville began falsely accusing Plaintiff of misrepresenting how Plaintiff spent his time at

25   work, and the more Plaintiff tried to correct Baskerville or defend himself, the more Baskerville

26   would accuse Plaintiff of lying.

27       In October of 2017, Plaintiff requested he be permitted to complete training and become

28   AWS certified. Baskerville told Plaintiff to worry about his PIP and denied Plaintiff the

EX D
Page 162

PLAINTIFF'S RESPONSES TO DEFENDANT'S SPECIAL INTERROGATORIES, SET ONE (1)

1  opportunity to receive additional training in retaliation for Plaintiff taking FMLA and objecting
2  to the utilization of offshore maintenance.

3  In about October of 2017, Plaintiff felt increasingly uncomfortable with the PIP
4  requirements that he push IFM work offshore. Plaintiff felt compelled to call the FICO
5  whistleblower hotline. Plaintiff was very worried about his job. He asked the hotline where his
6  report would go once he completed it. The hotline advised Plaintiff that it would be sent to
7  Human Resources.

8  Realizing that a report to Human Resources would quickly escalate, Plaintiff decided to
9  speak with Allyn Pon, the IFM Product Manager first. After asking Plaintiff to wait a couple of
10  weeks before blowing the whistle, Pon eventually told Plaintiff he should go ahead and call back
11  the FICO whistleblower hotline.

12  Given the hostile environment Plaintiff had already been facing, he was seriously
13  concerned about his job security. Plaintiff was afraid he would be further retaliated against if he
14  blew the whistle on the offshore assignments. Instead of immediately calling the hotline,
15  Plaintiff sought advice from his friend and former IFM Product Manager. She advised Plaintiff
16  that the issue was really for Pon to address. Fearing he could lose his job, Plaintiff backed down
17  and didn't call the hotline back.

18  Also in October of 2017, Plaintiff expressed his concerns regarding his job security to
19  Baskerville. Baskerville did not reassure Plaintiff that his job was secure.

20  In or about November of 2017, given Plaintiff's skill level and expertise, he inherited a
21  number of new responsibilities, including operational support for two additional products,
22  including Scorecard Pro and Decision Tree Pro, two of FICO's legacy tools designed to enable
23  customers to evaluate, customize, deploy and scale state-of-the-art analytics and decision
24  management solutions.

25  On December 6, 2017, Plaintiff's father passed away. Plaintiff took one week of
26  approved bereavement leave.

27  In or about March of 2018, Plaintiff was considered for a new position with Robert
28  Leider whom Plaintiff had known for about fifteen years. Plaintiff and Leider agreed Plaintiff

Ex. B
Page 163

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    was a great fit for the job which offered Plaintiff a much-needed change of pace and a hostility-

2    free environment.  Unfortunately, Plaintiff was ultimately denied the position because of the

3    September 2017 PIP.  Defendant's retaliatory actions had caused Plaintiff to lose out on

4    opportunities for professional advancement and potential financial gain.

5         At this same time, Plaintiff learned that FICO's service provider at its data center in San

6    Francisco was leaving.  This departure had the potential to seriously disrupt FICO operations for

7    Scorecard Pro and Decision Tree Pro.  Given Plaintiff's advanced skillset and work ethic,

8    Baskerville turned to Plaintiff to "find a way" to ensure there were no operational interruptions

9    through the departure.  This is a very difficult task.  Plaintiff took one day to find a workable

10   solution and an additional day to write a full report.  Plaintiff made the transition as seamless as

11   Baskerville had hoped.

12        On or about April 8, 2018, Plaintiff expressed increased concern over the offshore

13   maintenance for IFM.  At one point, Plaintiff commented to an offshore engineer that the

14   requested changes to a client's hosted IFM environment should not be performed by offshore

15   engineers because they are not allowed access to client data.  Plaintiff is informed and believes

16   that this remark was communicated back to Baskerville.

17        On or about April 12, 2018, Plaintiff's worst fear came true: Baskerville terminated

18   Plaintiff, escorted him off the FICO property and forced him to leave behind his personal effects,

19   including his personal collection of technological books.

20        In between FICO giving Plaintiff a $25,000 retention bonus not to leave the company in

21   mid-2016 and Plaintiff's termination in April of 2018, two significant things happened:  Plaintiff

22   went on legally entitled Family Medical Leave, and Plaintiff objected to the illegal and unethical

23   offshore maintenance utilized by FICO.   Defendant wrongfully terminated Plaintiff in direct

24   retaliation for these two events.

25        Plaintiff invested over twenty years of his life and most of his career in Defendant FICO.

26   When FICO and Baskerville began demeaning, disparaging and belittling Plaintiff upon his

27   return from Family Medical Leave, as described above, Plaintiff was confused and extremely

28   ///

EX-D
Page 164

1   distraught. Plaintiff was haunted and tormented by the September 2017 unsubstantiated PIP

2   throughout his remaining days at FICO.

3   **Response to Special Interrogatory No. 25:**

4          Objection. This Interrogatory calls for speculation and for information which is more

5   readily available to propounding party. This Interrogatory further seeks the legal reasoning and

6   theories of Plaintiff's contentions. Plaintiff is not required to prepare the respondent's case.

7   (Sav-On Drugs, Inc. v. Superior Court of Los Angeles County (1975) 15 Cal.3d 1.) Further, this

8   Interrogatory is unduly burdensome and oppressive insofar as it seems to require that the entire

9   case be litigated in writing, which is not the purpose of discovery; rather, discovery is intended to

10  eliminate surprise and promote resolution short of trial. *See generally* Greyhound Corp. v. Super.

11  Ct., 56 Cal. 2d 355 (1961). This Interrogatory is additionally overbroad as to time. Subject to

12  and without waiving these or any other applicable objections, Plaintiff responds as follows:

13         In or about January of 1997, Plaintiff was hired by Hecht-Nielson Neural Computing

14  ("HNC") as an Application Engineer working to deploy software, develop and test code and

15  develop prototypes in cities across the United States and Canada. In or about April of 2002,

16  Defendant FICO acquired HNC, and Plaintiff became an employee of FICO.

17         In 2010, Plaintiff started working with Insurance Fraud Manager, ("IFM"). In or about

18  January of 2013, Plaintiff was transferred to Product Operations for IFM. The offshore

19  development of IFM had a number of logistical and technological hurdles to clear. One of the

20  challenges was that offshore engineers did not have access to live HIPAA data. All HIPAA data

21  had to be de-identified before being made available to offshore engineers.

22         In March of 2014, Plaintiff led a long-awaited IFM upgrade.

23         In 2015, Plaintiff was frequently "on call" as FICO moved its operations hub from

24  Minnesota to San Diego. This move resulted in a major workload increase for Plaintiff who was

25  required to be near his laptop addressing emergencies and system failures on a near constant

26  basis.

27         Also in 2016, Plaintiff learned that there was an increasing likelihood that FICO would

28  offshore IFM product operations despite the fact that the de-identification of HIPAA information

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

EX D

1  had not yet been accomplished. When Plaintiff told Andrea Allmon, former product manager for

2  IFM, about this impending change, she responded, "That would literally take an act of Congress"

3  because HIPAA data cannot be handled by anyone outside of the United States.

4      In February of 2017, Plaintiff's father was diagnosed with pancreatic cancer. Plaintiff's

5  father's prognosis was grim. His physicians estimated he had three to six months to live. In

6  addition to needing care and transportation, Plaintiff's father, who had lived with Plaintiff since

7  2008, presented a serious fall risk, and Plaintiff had to catch his father twice from falling during

8  a very short period. Because Plaintiff needed to care for his terminally ill father, in or about April

9  2017, Plaintiff went on Family Medical Leave.

10      In mid-July, Plaintiff's supervisor, Reef Baskerville, contacted Plaintiff to enquire when

11  Plaintiff would be returning to work. Plaintiff advised Baskerville he would be back at work on

12  July 20, 2017. Baskerville immediately sent out a meeting request for Plaintiff to meet with him

13  at 10:00 a.m. on July 20, 2017.

14      The morning of July 20, 2017 did not go as planned for Plaintiff, and he was required to

15  administer to his gravely ill father. Plaintiff advised Baskerville he would be fifteen minutes late

16  for their meeting. Baskerville told Plaintiff not to bother, that he would be "too busy" to meet

17  with Plaintiff. Immediately upon returning to work on July 20, 2017, Plaintiff felt that his work

18  place atmosphere had changed. Baskerville was openly hostile, refusing to meet with Plaintiff

19  despite Plaintiff's numerous efforts to re-accomplish the return meeting.

20      As part of his pervasive discriminatory and retaliatory demeanor toward Plaintiff,

21  Baskerville did not agree to meet with Plaintiff again until July 24, 2017. Baskerville began the

22  meeting with, "First of all, are you ready to come back to work because we've gone seventy-five

23  miles down the road since you left," implying that Plaintiff had been left behind as a result of his

24  taking FMLA. Baskerville also advised Plaintiff that punctuality would now be monitored along

25  with productivity. This was not the case for Plaintiff prior to his taking Family Medical Leave.

26  Baskerville further told Plaintiff he would need to become a subject matter expert ("SME") on

27  all hosted products.                                              Ex D
                                                                      Page 166
28  ///

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

PLAINTIFF'S RESPONSES TO DEFENDANT'S SPECIAL INTERROGATORIES, SET ONE (1)

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    Also during the July 24, 2017 meeting, Baskerville advised Plaintiff of another change

2    occurring at FICO.  He informed Plaintiff that maintenance work for IFM was now being

3    performed by offshore engineers in Bangalore and the United Kingdom.  Plaintiff felt that

4    preventing off-shore personnel from seeing United States health data was an obstacle that had

5    not been addressed by FICO during Plaintiff's leave.  Without this obstacle having been cleared,

6    the use of offshore personnel amounted to a potential HIPAA violation and a breach of client

7    contracts. Plaintiff responded by expressing his concern that the offshore arrangement presented

8    a potential HIPAA violation and further, violated client contracts, which specified that no

9    offshore personnel could be used. For example, Kaiser Permanente required background checks

10   for all persons touching Kaiser data.

11        Baskerville responded with hostility to Plaintiff's ongoing concerns telling him that the

12   issue had "already been decided" and that the offshore arrangement was "none of [Plaintiff's]

13   business."  Plaintiff had serious reservations about sending operation support offshore because it

14   was inconsistent with the information he had previously received on the topic of offshoring

15   HIPAA data.

16        Throughout the summer of 2017, the atmosphere at FICO became increasingly hostile

17   toward Plaintiff.  Baskerville was continually critical and antagonistic to Plaintiff.  For example,

18   if Plaintiff was required to attend an appointment with his father, Baskerville would tell Plaintiff,

19   "don't bother coming in."

20        In July of 2017, although Plaintiff was entitled to a new upgraded phone, his request for a

21   new phone was continually delayed.  Baskerville essentially sabotaged Plaintiff's ability to

22   perform his work tasks by denying him the equipment he needed.  In or about November of

23   2017, Plaintiff's request for a phone was declined when Neil Hartley said, "We don't know if

24   Johnny will be around to use the phone."  Only after Plaintiff documented his need, request and

25   subsequent delay did Plaintiff finally received his new phone five (5) months later.

26        Starting in September of 2017, Baskerville instructed Plaintiff to no longer meet with

27   other team members and subject matter experts ("SME") to cross-train products.  Some of these

28   SME's were off-shore engineers.  Given that these meetings resulted in more employees having

Ex D

PLAINTIFF'S RESPONSES TO DEFENDANT'S SPECIAL INTERROGATORIES, SET ONE (1)

familiarity and expertise with FICO's products, this measure was counter-productive and designed to punish and alienate Plaintiff from fellow experts. Baskerville came to Plaintiff's cubicle, directed Plaintiff to clear his calendar of SME meetings and stood over him while he did so.

In or about September 2017, Defendant further discriminated and retaliated against Plaintiff because of his medical leave and his association with his father, as well as his complaints about FICO's unlawful conduct. On or about September 21, 2017, Baskerville requested a meeting during which Lorraine Breithbart from HR was on the phone. During this meeting, Plaintiff was shocked to receive a Performance Improvement Plan ("PIP"). The PIP gave Plaintiff a performance rating of "poor." The PIP raised no concerns about Plaintiff's skills. Rather, the PIP focused on a number of "tardies," or days Plaintiff was late for work, and Plaintiff working three (3) days from home.

Plaintiff objected to Baskerville and Breithbart regarding the tardies and absences and expressed his feeling the numbers were inflated. In response, Breithbart and Baskerville agreed the number of absences may have been incorrect, corroborating that the PIP was unjustified and therefore retaliatory.

Plaintiff contends there was no legitimate basis for the PIP. The PIP was, in effect, retaliation for Plaintiff taking Family Medical Leave to which he was legally entitled and an attempt to force Plaintiff to comply with the offshore process of IFM, which he believed to be both illegal and unethical. Plaintiff was stunned and disappointed to receive the PIP. About this time, Plaintiff expressed his concerns to Breithbart that the PIP was a response to Plaintiff taking his legally entitled Family Medical Leave.

On or about September 22, 2017, Plaintiff had a post-PIP follow-up meeting with Breithbart during which Plaintiff expressed to Breithbart that his relationship with Baskerville had deteriorated significantly since Plaintiff returned from FMLA. Plaintiff expressed to Breithbart his belief that Baskerville was unhappy with Plaintiff for taking FMLA and that Baskerville was retaliating against him. Breithbart dismissed Plaintiff's concerns and advised Plaintiff that FMLA only guarantees an employee will have a job when he returns from leave.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

Ex D
Page 168

PLAINTIFF'S RESPONSES TO DEFENDANT'S SPECIAL INTERROGATORIES, SET ONE (1)

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    During the September 22, 2017 meeting, Plaintiff additionally told Breithbart that he

2    objected to the allegation contained in the PIP that he failed "to follow processes and

3    procedures." Baskerville's instruction that Plaintiff cease training off-shore personnel had

4    become the subject of a Performance Improvement Plan targeted at Plaintiff. This was also a

5    reference to Plaintiff's unwillingness to violate HIPAA requirements with the IFM product as

6    well as client contracts by pushing for offshore maintenance. Accordingly, Defendant explicitly

7    instructed Plaintiff to violate the law, which Plaintiff refused to do. Again, Baskerville brushed

8    Plaintiff's concerns aside.

9    From about September 21, 2017 through April 12, 2018, although the issues raised in the

10   PIP were resolved within two-weeks, Plaintiff had weekly meetings with Baskerville during

11   which Baskerville was openly hostile, belittling and chastising Plaintiff at every opportunity.

12   Baskerville began falsely accusing Plaintiff of misrepresenting how Plaintiff spent his time at

13   work, and the more Plaintiff tried to correct Baskerville or defend himself, the more Baskerville

14   would accuse Plaintiff of lying.

15   In October of 2017, Plaintiff requested he be permitted to complete training and become

16   AWS certified. Baskerville told Plaintiff to worry about his PIP and denied Plaintiff the

17   opportunity to receive additional training in retaliation for Plaintiff taking FMLA and objecting

18   to the utilization of offshore maintenance.

19   In about October of 2017, Plaintiff felt increasingly uncomfortable with the PIP

20   requirements that he push IFM work offshore. Plaintiff felt compelled to call the FICO

21   whistleblower hotline. Plaintiff was very worried about his job. He asked the hotline where his

22   report would go once he completed it. The hotline advised Plaintiff that it would be sent to

23   Human Resources.

24   Realizing that a report to Human Resources would quickly escalate, Plaintiff decided to

25   speak with Allyn Pon, the IFM Product Manager first. After asking Plaintiff to wait a couple of

26   weeks before blowing the whistle, Pon eventually told Plaintiff he should go ahead and call back

27   the FICO whistleblower hotline.                          Ex D
                                                              Page 169

28   ///

1    Given the hostile environment Plaintiff had already been facing, he was seriously

2    concerned about his job security.  Plaintiff was afraid he would be further retaliated against if he

3    blew the whistle on the offshore assignments.  Instead of immediately calling the hotline,

4    Plaintiff sought advice from his friend and former IFM Product Manager.  She advised Plaintiff

5    that the issue was really for Pon to address.  Fearing he could lose his job, Plaintiff backed down

6    and didn't call the hotline back.

7        Also in October of 2017, Plaintiff expressed his concerns regarding his job security to

8    Baskerville.  Baskerville did not reassure Plaintiff that his job was secure.

9        In or about November of 2017, given Plaintiff's skill level and expertise, he inherited a

10   number of new responsibilities, including operational support for two additional products,

11   including Scorecard Pro and Decision Tree Pro, two of FICO's legacy tools designed to enable

12   customers to evaluate, customize, deploy and scale state-of-the-art analytics and decision

13   management solutions.

14       On December 6, 2017, Plaintiff's father passed away.  Plaintiff took one week of

15   approved bereavement leave.

16       In or about March of 2018, Plaintiff was considered for a new position with Robert

17   Leider whom Plaintiff had known for about fifteen years.  Plaintiff and Leider agreed Plaintiff

18   was a great fit for the job which offered Plaintiff a much-needed change of pace and a hostility-

19   free environment.  Unfortunately, Plaintiff was ultimately denied the position because of the

20   September 2017 PIP.  Defendant's retaliatory actions had caused Plaintiff to lose out on

21   opportunities for professional advancement and potential financial gain.

22       At this same time, Plaintiff learned that FICO's service provider at its data center in San

23   Francisco was leaving.  This departure had the potential to seriously disrupt FICO operations for

24   Scorecard Pro and Decision Tree Pro.  Given Plaintiff's advanced skillset and work ethic,

25   Baskerville turned to Plaintiff to "find a way" to ensure there were no operational interruptions

26   through the departure.  This is a very difficult task.  Plaintiff took one day to find a workable

27   solution and an additional day to write a full report.  Plaintiff made the transition as seamless as

28   Baskerville had hoped.

Page 170

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

On or about April 8, 2018, Plaintiff expressed increased concern over the offshore maintenance for IFM. At one point, Plaintiff commented to an offshore engineer that the requested changes to a client's hosted IFM environment should not be performed by offshore engineers because they are not allowed access to client data. Plaintiff is informed and believes that this remark was communicated back to Baskerville.

On or about April 12, 2018, Plaintiff's worst fear came true: Baskerville terminated Plaintiff, escorted him off the FICO property and forced him to leave behind his personal effects, including his personal collection of technological books.

In between FICO giving Plaintiff a $25,000 retention bonus not to leave the company in mid-2016 and Plaintiff's termination in April of 2018, two significant things happened: Plaintiff went on legally entitled Family Medical Leave, and Plaintiff objected to the illegal and unethical offshore maintenance utilized by FICO. Defendant wrongfully terminated Plaintiff in direct retaliation for these two events.

Plaintiff invested over twenty years of his life and most of his career in Defendant FICO. When FICO and Baskerville began demeaning, disparaging and belittling Plaintiff upon his return from Family Medical Leave, as described above, Plaintiff was confused and extremely distraught. Plaintiff was haunted and tormented by the September 2017 unsubstantiated PIP throughout his remaining days at FICO.

**Response to Special Interrogatory No. 26:**

Objection. This Interrogatory is burdensome and oppressive in that it calls for a compilation. Subject to and without waiving this or any other appropriate objection, Plaintiff responds as follows: On a near daily basis, Plaintiff searches the internet and various job sites for appropriate jobs. Plaintiff is also in touch with headhunters and recruiters. Plaintiff is producing a spreadsheet of his job search, contacts and results which will provide the information called for in response to this Interrogatory.

**Response to Special Interrogatory No. 27:**

Objection. This Interrogatory is burdensome and oppressive in that it calls for a Ex D

compilation. Subject to and without waiving this or any other appropriate objection, Plaintiff

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1   responds as follows:  Plaintiff is producing a spreadsheet of his job search, contacts and results

2   which will provide the information called for in response to this Interrogatory.

3   **Response to Special Interrogatory No. 28**:

4       Objection.  This Interrogatory is burdensome and oppressive in that it calls for a

5   compilation.  Subject to and without waiving this or any other appropriate objection, Plaintiff

6   responds as follows:  Plaintiff is producing a spreadsheet of his job search, contacts and results

7   which will provide the information called for in response to this Interrogatory.  Plaintiff

8   additionally identifies his resume, also produced.

9   **Response to Special Interrogatory No. 29**:

10       Objection.  This Interrogatory is burdensome and oppressive in that it calls for a

11   compilation.  Subject to and without waiving this or any other appropriate objection, Plaintiff

12   responds as follows:  Plaintiff is producing a spreadsheet of his job search, contacts and results

13   which will provide the information called for in response to this Interrogatory.

14   **Response to Special Interrogatory No. 30**:

15       Plaintiff is currently unemployed.

16   **Response to Special Interrogatory No. 31**:

17       Objection.  This Interrogatory violates Plaintiff's rights of privacy.  Subject to and

18   without waiving this or any other appropriate objection, Plaintiff responds as follows:  Plaintiff is

19   currently unemployed.

20   **Response to Special Interrogatory No. 32**:

21       Objection.  This Interrogatory is burdensome and oppressive in that it calls for a

22   compilation.  Subject to and without waiving this or any other appropriate objection, Plaintiff

23   responds as follows:  From January 1, 2016 until April 12, 2018 performed work only for FICO.

24   Since that time, Plaintiff has been unemployed.

25   **Response to Special Interrogatory No. 33**:

26       Objection.  This Interrogatory is compound and invasive of Plaintiff's rights of privacy.

27   Subject to and without waiving these or any other appropriate objections, Plaintiff responds as

Page 172

28   ///

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA  92101-2013

1   follows:  From January 1, 2016 until April 12, 2018, Plaintiff earned $8916.67 monthly working

2   for FICO.  Since that time, Plaintiff has been unemployed.

3

4   DATED: January 29, 2019                          **GRUENBERG LAW**

5

6

7                                                    JOSH D. GRUENBERG
                                                     DAPHNE DELVAUX
8                                                    AISLING S. GILLILAND
                                                     Attorneys for Plaintiff
9                                                    **JOHN MARTIN GARON**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                                   Ex D
                                                     Page 173
28

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA  92101-2013

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | | | | | | *for court use only* |
|---|---|---|---|---|---|---|
| Attorney(s) Name and Address<br>JOSHUA D. GRUENBERG, ESQ., SB #163281<br>DAPHNE A.M. DELVAUX ESQ., SB #292345<br>AISLING S. GILLILAND., ESQ SB #163321<br>GRUENBERG LAW<br>2155 First Ave, San Diego, CA 92101 | | | | | | |
| Name of Case (abbreviated)<br>**Garon v. Fair Isaac, Corp. dba FICO** | | | | | | |
| Attorney(s) For | Telephone | Hearing Date | | Time | Dept | Case Number |
| Plaintiff | (619) 230-1234 | | | | | 37-2018-000047800-CU-DE-CTL |

<u>PROOF OF SERVICE</u>

I, the undersigned, declare that I am over the age of 18 years and not a party to this action; I am employed in the County of San Diego, State of California, within which County the subject mailing occurred; my business address is 2155 First Avenue, San Diego, CA 92101.

On January 29, 2019, I served the following

1.      **PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES, SET ONE.**

[X]      **Service By Mail:**  I am familiar with attorney JOSHUA D. GRUENBERG'S practice for collection and processing correspondence for mailing with the United States Postal Service the same day in the ordinary course of business. By placing a true copy of each document in a separate envelope addressed to each addressee. By placing each for deposit in the United States Postal Service, this same day, following ordinary business practices.

[X ]      **By Electronic Transmission**:  Parties have agreed to accept service by email transmission.


Phillip L. Kossy, Esq.
phillip.kossy@procopio.com
Annie Ellis, Esq.
Annie.ellis@procopio.com
PROCOPIO, CORY, HARGREAVES &
SAVITCH, LLP
525 B Street, Suit 2200
San Diego, CA 92101


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on January 29, 2019, at San Diego, California.

_____
                               Bianca Villegas

Ex D
Page 174

1

**VERIFICATION**

2

I, John Garon, am a Plaintiff in the action entitled Garon v. FICO, I have read the

3

foregoing:

4

- Plaintiff's Responses to Special Interrogatories, set one.

5

6

7

and declare under the penalty of perjury under the laws of the State of California that the

8

foregoing responses are true and correct.

9

10

Executed this 28th day of January, 2019, at San Diego, California.

11

12

JOHN GARON

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

Ex D
Page 175

PLAINTIFF'S VERIFICATION

1